UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

JOE'S LOBSTER MART, INC. and **05  1 1 2 5 6 GAO**
JOSEPH A. VAUDO,
    Plaintiffs,               CIVIL ACTION    RECEIPT # 65098
                         NO. 05-   -    AMOUNT $___
                                        SUMMONS ISSUED Yes

v.                                     LOCAL RULE 4.1___
                                        WAIVER FORM___

FRANCIS DONOVAN, DISTRICT ENGINEER,        MCF ISSUED___
U.S. ARMY CORPS OF ENGINEERS, MAGISTRATE JUDGE    BY DPTY. CLK.___
ENGLAND DISTRICT, COL. THOMAS L. KONING,    DATE___
U.S. ARMY CORPS OF ENGINEERS,
NEW ENGLAND DISTRICT, LTG. CARL A. STROCK,
CHIEF OF ENGINEERS & COMMANDER,
U.S. ARMY CORPS OF ENGINEERS,
HON. FRANCIS J. HARVEY, SECRETARY OF THE ARMY,
and the UNITED STATES OF AMERICA,
    Defendants.

### PLAINTIFFS' COMPLAINT, REQUEST FOR DECLARATORY JUDGMENT AND INJUNCTIVE RELIEF

I.    INTRODUCTION

    Plaintiff brings this action, seeking declaratory judgment and injunctive

relief, to declare the "Invitation to Bid, No. DACW33-9-05-02," purporting to put

out for competitive bid the lease for Lot 2 [hereinafter "the Lot"], with bids due

by June 21, 2005, at 2:00 p.m., located at the Sandwich Bulkhead of the Cape

Cod Canal, which is owned and controlled by the U.S. Army Corps of Engineers

[hereinafter "U.S.A.C.E."], as unlawful, and further seeks to enjoin the

defendants from proceeding with the competitive bid, because to do so is

impracticable, pursuant to 33 C.F.R 211.8(a), and instead affirmatively order the

defendants to award the lease to the plaintiffs on a non-competitive basis, at the

fair market rental value, as determined by an appraisal.

1

As grounds, plaintiffs state that, in the first instance, due to the Town of Sandwich zoning by-laws, _no_ business other than Joe's Lobster Mart, Inc. [hereinafter "JLM"] could conduct a business on the site, in accordance with the sample lease terms and the Invitation to Bid, unless such person also purchased JML's building and equipment (and no such person(s) have approached the plaintiffs to do so; See Affidavit of Joseph A. Vaudo). Accordingly, pursuant to 33 C.F.R. 211.18(a), placing the lease for this parcel out for competitive bid, as the defendants seek to do is not practicable. Moreover, the Notice of Availability and Invitation to Bid contains unlawful requirements, purporting to state that the Lot will not be leased out by the U.S.A.C.E. after July 14, 2010, in violation of federal appropriations law and the federal Rivers and Harbors Act, which approved the rehabilitation of the Sandwich Bulkhead in the 1986 Fiscal Year, pursuant to P.L. 99-103 and P.L. 99-141, in order, *inter alia*, that retail fish processing plants could continue to business in the Town of Sandwich, which has no other commercial ports other than the Sandwich Bulkhead.

Moreover, in statements made to plaintiffs' counsel, Mr. Francis Donovan, District Engineer, indicated that he had decided that after July 15, 2010, he intended to offer the property to the Town of Sandwich for lease and use in connection with the Sandwich Marina expansion plan, a plan which has not yet been approved by the U.S.A.C.E., or U.S. Congress, as is required. So, effectively, the defendants evidently have already made plans to lease the Lot on a non-competitive basis, to the Town of Sandwich.

In support of plaintiffs' claims, and by way of precedent, the U.S.A.C.E. awarded the lease for the Lot on a non-competitive basis to the plaintiffs in 2000,

2

for a five year period, set to expire on July 14, 2005, because it was not

practicable to put it out for a competitive bid, given the zoning considerations. As

set forth in the October 1980 Reconnaissance Report prepared by the U.S. Army

Corps of Engineers, in justifying the rehabilitation of the Sandwich Bulkhead, the

U.S.A.C.E. stated that, if the Sandwich bulkhead were not rehabilitated as

recommended, the loss to the local and regional economy would be staggering:

> The major long range adverse impact involved in either of the
> alternatives is the socioeconomic impact on the local and regional
> economy which would occur if the least action alternative [the rip-
> rap, Scheme 1] was implemented. As part of this alternative the
> leases involving the three commercial fish plants will be terminated
> and they will be required to relocate. Since their operations are
> dependent upon direct access to fishing vessels and *since the*
> *bulkhead is the only port in the town of Sandwich, it is likely that*
> *the plants will have to relocate outside the town of Sandwich. In*
> *addition, due to the present situation with regard to access to*
> *commercial offloading facilities within the region, it is likely they*
> *will be compelled to relocate off the Cape.* The loss of the plants on
> leased properties would mean the loss of over 90 percent of the ex-
> vessel value of fish landed at the port of Sandwich. Based on 1977
> and 1978 landings, *this loss would amount to $6.8 to $9.2 million.*
> *Taking into consideration the secondary impacts, or the economic*
> *activity related to these fish landings, the total loss would be $20.4*
> *to $27.6 million per year.* In addition, the fish plants directly
> employ approximately 30 people who may lose their jobs if the
> plants relocate.
>
> All the other rehabilitation alternatives will not have this
> adverse impact on the local and regional economy and will in fact
> allow expanded utilization by the industry.
>
> See Exhibit 1, Reconnaissance Report, pp. 19-20 (emphasis added).

II.    Facts

1.    Joe's Lobster Mart, Inc., is a Massachusetts corporation duly
      authorized to do business in the Commonwealth as a fish processing
      plant, and retail and wholesale fish sales, with a registered office at 298
      Route 6A, Sandwich MA 02653, and a mailing address of P.O. Box 248,
      Sandwich MA 02563.

2.    Joseph A. Vaudo is an individual, competent and of legal age, and the president, treasurer, clerk, and director of Joe's Lobster Mart, Inc., with a with a registered office at 298 Route 6A, Sandwich MA 02653, and a mailing address of P.O. Box 248, Sandwich MA 02563.

3.    The Secretary of the Army, the Hon. Francis J. Harvey, is charged with control of all Army operations, including those of the U.S. Army Corps of Engineer, and maintains a principal place of business at 1500 Army Pentagon, Washington, DC 20310-1500.

4.    Control of U.S Army Corps of Engineers' property is delegated by the Secretary of the Army to the LTG. Carl A. Strock, Chief of Engineers & Commander, U.S. Army Corps of Engineers, U.S. Army Corps of Engineers, Headquarters, 441 G. Street, NW , Washington, DC 20314, who in turn delegates authority regarding the same, in this instance, to Col. Thomas L. Koning, U.S. Army Corps of Engineers, New England District, located at 696 Virginia Road Concord, Massachusetts 01742-2751.

5.    Defendant, Mr. Francis Donovan, is the District Engineer for the Sandwich Bulkhead, and maintains a principal place of business at , U.S. Army Corps of Engineers, New England District, located at 696 Virginia Road Concord, Massachusetts 01742-2751.

6.    Plaintiffs have maintained a place of business, engaged in fish processing and retail sales of fish and shellfish product at the Sandwich Bulkhead for some 32 years. See Exhibit 2, Affidavit of Joseph A. Vaudo.

7.    Lot 2, the lot leased to plaintiffs, consists of just over 16,000 square feet in lot area.

8.    JLM has leased Lot 2 from 1985 through the present, in accordance with the two (2) leases attached as Exhibit 3 and 4.

9.    The lease from 1990 through 2000, Exhibit 3, was for a ten (10) year period.

10.    The lease from 2000 through 2005, Exhibit 4, was awarded on a non-competitive basis to JLM, and is for a five year period, because it was deemed impracticable, pursuant to 33 C.F.R. 211.8(a) that placing the Lot out for competitive bid.

11.    Upon information and belief, the current lease was awarded on a non-competitive basis because the current Town of Sandwich zoning by-laws prohibit building on any of the three (3) lots, including Lot 2, because the lots contain only some 16,000 square feet, and zoning now

4

requires a minimum lot area of 20,000 square feet in order to have a buildable lot.

12. Despite the fact that the fair market rental value of Lot 2 in 2000 was only some $17,000, J.L.M. agreed and contracted to pay annual rent in the amount of just under $29,000, a substantial benefit to the U.S.A.C.E.

13. J.L.M. owns the building and all structures located on the Lot, as set forth in the leases, and is required to remove the same in the event of termination of his lease.

14. If he is not awarded the lease for the Lot, and removes all structures he owns thereon, as required by the current lease, no other person would be able to obtain building permits to construct the structures required under the Invitation to Bid and the Sample Lease, because of the zoning restrictions in the Town of Sandwich zoning by-laws, which require a minimum lot area of 20,000 square feet, which the Lot does not contain, effectively rendering it un-buildable. See Exhibit 5, Town of Sandwich Protective Zoning By-Laws, Section 2600.

15. No lessee other the J.L.M. could operate a business in conformance with the requirements of the Invitation to Bid or the Sample Lease, because the Lot is unbuildable.

16. J.L.M. has attempted to negotiate a lease with the U.S.A.C.E. since January 2005, contacting Mr. Donovan on numerous occasions, to no avail, and on May 21, 2005, received notice of the Invitation to Bid on a competitive basis, at which point he cancelled a meeting with Mr. Donovan scheduled for May 23, 2005, which meeting purportedly was to negotiate a lease for the Lot, because it appeared, by issuance of the invitation to bid, that the U.S.A.C.E. had no intention of negotiating in good faith. See Exhibit 2.

17. Unless a prospective bidder also buys J.L.M.'s facilities, equipment, and permits, to the extent that the same are assignable, such bidder would be unable to meet the requirements of the Invitation to Bid and Sample Lease.

18. To date, just seven (7) days before the bids are due, no such person has approached J.L.M. about purchasing his building, equipment and licenses.

19. In the absence of any such agreement, any prospective lessee would be prohibited from erecting any structures on Lot 2, and would be limited to off-loading fish into commercially registered and permitted trucks for transportation of the same to licensed fish processing facilities

outside of the Town of Sandwich, because J.L.M. is the only licensed fish processing plant within the Town of Sandwich.

20.  By failing to erect a structure of at least 600 square feet, and no greater than 50 feet by 100 feet, any other prospective lessee would be in violation of the terms of the Invitation to Bid and the Sample Lease, as issued by the U.S.A.C.E.

21.  If the U.S.A.C.E. wishes to lease property for the purposes set forth above, with no structures, and strictly for the off-loading of fish into commercial trucks for transport to fish processing plants outside of Sandwich, two other lots, Lots 1 and 3, on either side of the Lot leased by J.L.M. are available for such lease.

22.  Further, the Invitation to Bid and Sample Lease are defective in that they purport to remove Lot 2 from availability for lease beyond July 15, 2010, violate the federal appropriations laws, which authorized reconstruction of the Sandwich Bulkhead in 1986, in large part base upon the adverse socio-economic impact of failing to do so would have on the local and regional economy, as set forth above, in quoting the October 1980 Reconnaissance Report prepared by the U.S.A.C.E. in support of its request for FY 1986 appropriations for said project.

23.  J.L.M. will be irreparably harmed if it is not awarded the lease for Lot 2 for the next five years and after July 15, 2010, in that there are no other commercial ports within the Town of Sandwich, and, given the limited availability of other commercial ports on Cape Cod, in all likelihood, it would be required to re-locate off Cape, with no guaranty of any commercial success, especially in light of the fact that it is the only retail fish processing plant within the Town of Sandwich. See Exhibit 2.

24.  The Town of Sandwich would be irreparably harmed if J.L.M. is not awarded the lease through 2010 and thereafter, as it would lose the only local retail fish processing located within the Town of Sandwich, leading to adverse economic repercussions ranging from "$6.8 to $9.2 million. Taking into consideration the secondary impacts, or the economic activity related to these fish landings, the total loss would be $20.4 to $27.6 million per year," as set forth in the October 1980 Reconnaissance Report, Exhibit 1. See Exhibit 2.

25.  On or about June 6, 2005, J.L.M. sent the U.S.A.C.E. a proposed lease, a copy of which is attached as Exhibit 6, setting forth the terms of the lease as has been previously awarded to J.L.M. on a non-competitive basis, with the rent established at fair market rental value. This proposed lease was sent together with the letter outlining the problems

6

with the Invitation to Bid, which is attached as Exhibit 7, to which, to date, no response has been received.

26. To date, no response has been received from the U.S.A.C.E. to this proposed lease or letter.

27. On June 16, 2005, J.L.M. submitted a signed lease, in accordance with G.L. c. 186, s. 15D, containing all essential terms, and again offering to lease the property (Lot 2) at fair market rental value.

28. In order for any lessee of the property, Lot 2, to conduct business as called for under the Invitation to Bid and Sample Lease, they would have to have some 7 permits and/or licenses from various federal and state agencies, none of which is set forth in the Invitation to Bid as a pre-requisite to the Lease, and all of which permits J.L.M. has obtained. See Exhibit 8, Letter dated June 6, 2005, to U.S.A.C.E.

29. As a direct and proximate cause of the defendants' negligent acts or omissions, the plaintiffs have been and will be irreparably harmed unless they are awarded a non-competitive lease for Lot 2, at fair market rental value, and essentially will be put out of business.

III. Counts

## COUNT I

### *Request for Declaratory Judgment*

30. Plaintiffs repeat and reassert the facts set forth in paragraphs 1 through 29, set forth above, and incorporate the same herein by reference as if fully set forth herein, and further state as follows:

31. Under the circumstances, advertising Lot 2 for competitive bid is not practicable, as defined in 33 C.F.R 211.8(a), because no one other than J.L.M. could conduct business as required under the Invitation to Bid and the Sample Lease, unless such other person purchased J.L.M.'S building, equipment, licenses and permits, if assignable.

32. To date, just seven (7) days before the deadline for submission of bids, due on June 21, 2005, at 2:00 p.m., no one has approached J.L.M. about purchasing his building, equipment, licenses, permits, etc.

33. Unless the defendants award J.M.L. a non-competitive lease for Lot 2, at fair market rental value, it will be irreparably harmed, and essentially will be put out of business.

WHEREFORE, plaintiffs request that this Court declare that the Invitation to Bid and the Sample Lease are inherently flawed in light of current zoning requirements, which would prevent any lessee, other than J.L.M., from operating a fish processing plant in compliance with the requirements of the Invitation to Bid and the Sample Lease, in addition to the fact that neither the Invitation to Bid nor the Sample Lease require the successful bidder to have the necessary licenses and permits in hand to operate a retail fish processing plant.

## COUNT II

### *Request for Injunctive Relief*

34.    Plaintiffs repeat and reassert the facts set forth in paragraphs 1 through 33, set forth above, and incorporate the same herein by reference as if fully set forth herein, and further state as follows:

35.    33 C.F.R. 211.8(a) states that "It is the policy of to grant lease to the highest responsible bidders after advertising, *where competition is practicable. ..."*(emphasis added).

36.    Under the circumstances relating to Lot 2 and the Town of Sandwich zoning by-laws, it is not practicable to offer the lease of the premises at issue, Lot 2, Sandwich Bulkhead, on a competitive basis, since no person other than J.L.M. is able to meet the requirements of building a structure 0 at least 600 square feet, and no larger than 50 feet  by 100 feet, because the Lot contains less than the 20,000 square feet required under the zoning by-laws for the Town of Sandwich, and thus, unless J.L.M. remains on the site, no other lessee would be able to construct any buildings on the site, and could only operate in compliance with the sample lease requirements of said lessee purchased J.L.M.'s building, equipment, licenses and permits (assuming the same are assignable).

37.    As previously noted, to date, less than seven (7) days before the due date for the bids to be submitted, no one has approached J.L.M. regarding purchasing J.L.M.'s building, equipment, licenses and permits to operate a retail fish processing plant.

38.    Unless the defendants award J.M.L. a non-competitive lease for Lot 2, at fair market rental value, it will be irreparably harmed, and essentially will be put out of business.

WHEREFORE, plaintiffs request that this Court issue a temporary and preliminary injunction, prohibiting the defendants from proceeding with the Invitation to Bid and the Sample Lease, and to affirmatively order the defendants to award the Lease for Lot 2 to J.L.M. on non-competitive basis, at fair market

8

rental value of the property, and redacting from the Sample Lease the statement that Lot 2 will not be available for leasing after July 15, 2010.

## COUNT III

### *Damages*

39.   Plaintiffs repeat and reassert the facts set forth in paragraphs 1 through 38, set forth above, and incorporate the same herein by reference as if fully set forth herein, and further state as follows:

40.   If plaintiffs are not awarded the lease for Lot 2, plaintiffs will effectively be put out of business within the Town of Sandwich, as the only commercial port within the Town is located at the Sandwich Bulkhead, and likely will be out of business anywhere on Cape Cod, given the limited commercial facilities available, as noted in the October 1980 Reconnaissance Report, p.19-20 (Exhibit 1), and would be required to locate off-Cape, which would decimate J.L.M.'s business, which grosses some $3 million per year.

41.   This would have residual effects upon local fisherman who sell their fish to J.L.M., and the local socio-economic industry, deemed in 1980 to have potential adverse impacts ranging from "$6.8 to $9.2 million. Taking into consideration the secondary impacts, or the economic activity related to these fish landings, the total loss would be $20.4 to $27.6 million per year," per Exhibit 1, October 1980, Reconnaissance Report.

WHEREFORE, plaintiffs request judgment in their favor and against the defendants. Together with an award of damages to be determined at trial, together with interest, costs, and attorneys' fees, and such other amounts as this Court deems just and reasonable.

## COUNT IV

### *Violation of G.L. c. 186, s. 15D*

42.   Plaintiffs repeat and reassert the facts set forth in paragraphs 1 through 41, set forth above, and incorporate the same herein by reference as if fully set forth herein, and further state as follows:

43.   On or about June 6, 2005, and again on June 16, 2005, plaintiffs sent to defendants, a proposed lease containing all essential terms, and signed by J.L.M., in accordance with G.L. c. 186, s. 15D, which requires a landlord to accept such lease within thirty (30) days thereafter.

44.   To date, no such executed lease by the landlord has been received.

WHEREFORE, plaintiffs request judgment in their favor and against the defendants. Together with an award of damages to be determined at trial, together with interest, costs, and attorneys' fees, and such other amounts as this Court deems just and reasonable.

## COUNT V

### *Unfair & Deceptive Business Practices*

45. Plaintiffs repeat and reassert the facts set forth in paragraphs 1 through 44, set forth above, and incorporate the same herein by reference as if fully set forth herein, and further state as follows:

46. Defendants are engaged in the business of managing and leasing real property.

47. Defendants, in seeking to remove Lot 2 from the inventory of leaseable property after July 15, 2010, and in putting the lease for this Lot 2 out for competitive bid, when the same is impracticable because of Town zoning requirements, are and have engaged in unfair and deceptive business practices.

48. Plaintiffs have been harmed due to the uncertainty created with respect to their 32-year-old business, which will be irreparably harmed if they are not allowed to continue to lease Lot 2, at fair market rental value, for the next ten (10) to fifteen (15) years.

WHEREFORE, plaintiffs request judgment in their favor and against the defendants, together with an award of multiple damages to be determined at trial, together with interest, costs, and attorneys' fees, and such other amounts as this Court deems just and reasonable.

Plaintiffs,

JOE'S LOBSTER MART, INC. and
JOSEPH A. VAUDO,

By their attorney,

Julie C. Molloy    BBO #555176
379 Route 6A
East Sandwich MA 02537
(508) 833-3707

Dated:    June 16, 2005

MAJOR REHABILITATION PROJECT

SANDWICH BULKHEAD

CAPE COD CANAL

SANDWICH, MASSACHUSETTS

# RECONNAISSANCE REPORT



DEPARTMENT OF THE ARMY
NEW ENGLAND DIVISION, CORPS OF ENGINEERS
WALTHAM, MASS.

OCTOBER 1980



DEPARTMENT OF THE ARMY
NEW ENGLAND DIVISION, CORPS OF ENGINEERS
424 TRAPELO ROAD
WALTHAM, MASSACHUSETTS 02154

REPLY TO
ATTENTION OF

NEDED-E                                                   31 October 1980

SUBJECT: Reconnaissance Report
         Major Rehabilitation Project
         Sandwich Bulkhead, Cape Cod Canal,
         Sandwich, Massachusetts


HQDA (DAEN-CWO-M)
WASH DC  20314


1. In accordance with ER-1130-2-417, there is forwarded for review
and approval a Reconnaissance Report, Major Rehabilitation Project,
Sandwich Bulkhead, Cape Cod Canal, Sandwich, Massachusetts.

2. New England Division is prepared to complete a detailed design
memorandum for the project. A project schedule contained in the
report outlines the time and funds required to complete the design
memorandum and environmental assessment.

3. It is requested that approval be granted to prepare a design
memorandum and environmental assessment for the subject project.


FOR THE DIVISION ENGINEER;



                              JOE B. FRYAR
                              Chief, Engineering Division

Incl (10 cys)
as

MAJOR REHABILITATION PROJECT

SANDWICH BULKHEAD

CAPE COD CANAL

SANDWICH, MASSACHUSETTS

RECONNAISSANCE REPORT

DEPARTMENT OF THE ARMY
NEW ENGLAND DIVISION, CORPS OF ENGINEERS
WALTHAM, MASSACHUSETTS 02254
OCTOBER 1980

TABLE OF CONTENTS

Section
Number                    Description                              Page

1. Purpose                                                          1

2. Scope of Report                                                 1

3. Project Authorization                                           1

4. Project Description                                             2

5. Current Condition                                              3

    a. Steel Sheeting                                          3
    b. Tie Back System                                         3
    c. Fender Pile System                                      3
    d. Controlling Depth                                       3
    e. Conclusions                                             4

6. History of Maintenance and Rehabilitation               · 4

7. Project Use                                                     5

    a. History                                                 5
    b. Current Uses                                            5
        1. Legal Agreements                                    5
        2. Commercial Fishing                                  6
        3. Recreational Usage                                  6
        4. Other Uses                                          8
    c. Future Use                                              8
        1. General                                             8
        2. Proposed East Boat Basin Expansion                  8
        3. Projected Future Usage                              8

8. Alternatives Investigated                                      10

    a. General                                                10
    b. Other Alternatives Considered                          10
    c. Design Considerations                                  10
    d. Alternatives                                           11

9. Evaluation of Alternatives                                     13

    a. Economic Analysis                                      13
        1. Annual Costs                                        13
        2. Annual Benefits                                     14
        3. Benefit-Cost Ratios                                 18
    b. Environmental Considerations                           19
    c. Comparison of Alternatives                             20

TABLE OF CONTENTS (Cont.)

| Section Number | Description | Page |
|---|---|---|
| 10. | Recommended Plan | 20 |
| 11. | Consequences of Nonimplementation of Recommended Repairs | 22 |

## APPENDICES

A       Current Legal Agreements, Sandwich Bulkhead and Adjacent Property

B       Cost Data

## LIST OF FIGURES

| No. | Title |
|---|---|
| 1 | Locus Map and Vicinity Map |
| 2 | Contract Drawing – Cape Cod Canal, Massachusetts Bulkhead, Sta 18+00-36+00, Sheet No. 1 of 2 |
| 3 | Contract Drawing – Cape Cod Canal, Massachusetts, Bulkhead, Sta 18+00-36+00, Sheet No. 2 of 2 |
| 4 | Present Use of Bulkhead Area |
| 5 | Plan A – Open Basin Proposed Expansion of Cape Cod Canal, East Boat Basin |
| 6 | Plan B – Split Basin Proposed Expansion of Cape Cod Canal, East Boat Basin |
| 7 | Plan View – Scheme 1, Least Action Alternative |
| 8 | Typical Cross Section, Scheme 1, Riprap Slope |
| 9 | Plan View, Scheme 2, Steel Sheet Bulkhead |
| 10 | Typical Cross Section, Scheme 2, Steel Sheet Bulkhead |
| 11 | Plan View, Scheme 3, Prestressed Concrete Wharf |
| 12 | Typical Cross Section, Scheme 3, Prestressed Concrete Wharf |

TABLE OF CONTENTS (Cont.)

LIST OF TABLES

| No. | Title | Page |
|-----|-------|------|
| 1 | Comparison of Sandwich Fish Catch With Other Massachusetts Ports | 7 |
| 2 | Attendance Figures 1978 and 1979 Corps Recreational Areas, East Boat Basin, Sandwich, Massachusetts | 7 |
| 3 | Summary of Annual Costs | 14 |
| 4 | Fish Landings Reported by Fish Packing Plants 1977 and 1978, Port of Sandwich | 16 |
| 5 | Total Economic Cost of Least Action Plan, Riprap Slope | 18 |
| 6 | Comparison of Benefits and Costs | 18 |
| 7 | Project Schedule | 21 |

1. <u>Purpose</u>. The purpose of this report is to present the findings of a reconnaissance investigation of the need for the rehabilitation of the Sandwich Bulkhead, Cape Cod Canal. An economic and environmental evaluation of all the alternatives developed is also presented to establish justification for the recommended repairs.

2. <u>Scope of Report</u>. The report has been prepared in accordance with the guidelines set forth in ER 1130-2-417. It evaluates whether conditions necessary for funding under the Construction General, Major Rehabilitation Program are present. Based upon current usage and projected future usage, the report develops three alternative methods of rehabilitation and compares them with regard to costs, benefits, environmental and socioeconomic impacts, and effects on local and regional economies. The report recommends the alternative which optimizes public benefits and minimizes adverse impacts, in addition to optimizing authorized project use. Funding, design and design review requirements are also outlined for the recommended plan.

3. <u>Project Authorization</u>. The Cape Cod Canal was originally constructed by private interests chartered by the Massachusetts Legislature. The original Canal was completed to a bottom width of 100 feet and a depth of 25 feet in 1916. The U.S. Government purchased the Canal in 1928 at a cost of $11.5 million and placed it under the supervision of the U.S. Army, Corps of Engineers.

The construction of the Sandwich bulkhead was part of a major improvement project to widen and deepen the Cape Cod Canal, as authorized by Section 1 of the River and Harbor Act (40 Stat. 1028, 1029) approved August 30, 1935. The authorized project is described in House Document No. 15, 74th Congress, 1st Session, as follows:

> "The Board recommends that the existing project for Cape Cod Canal be modified so as to provide for an open canal 32 feet deep, for a width of 540 feet in the land cut, 500 feet in a straight channel in Buzzards Bay to Wings Neck, and 700 feet beyond Wings Neck, for a harbor of refuge for small vessels, mooring basins, an improved lighting system, and other accessory and minor features which may be deemed necessary and shall be in accordance with plans approved by the Chief of Engineers at an estimated cost of $26 million for the construction with $400,000 annually for operation, care and maintenance of the entire project, including the maintenance of the new bridges now under construction."

The project was constructed during the period from 1935 to 1940.

The Sandwich Bulkhead was constructed as an integral part of the East Boat Basin which was completed in the late 1930's under the authority of the "other accessory and minor features" provision of the Cape Cod Canal authorizing legislation. The original purpose of the bulkhead in conjunction with the East Boat Basin was to replace facilities, which existed prior to the widening of the canal, used for the maintenance, fueling and operation of canal equipment. The East Boat Basin was subsequently enlarged to serve as a Harbor of Refuge.

1

4. Project Description. The bulkhead is located in Sandwich, Massachusetts, on Cape Cod, at the extreme eastern end of the Cape Cod Canal (see Figure 1). It extends on either side of the entrance to the East Boat Basin from Canal Stations 18+00 to 36+00. On the west side of the entrance, the bulkhead extends 490 feet along the canal and on the east, 1140 feet. The Basin, a manmade harbor of about 8 acres water surface, is the only usable port in the town of Sandwich and is a developed commercial and recreational port.

Facilities along the bulkhead on the east side include three fish packing plants which lease their land from the Corps of Engineers, a deteriorated marine railway, a boathouse and a small vessel refueling station on property formerly leased to the Coast Guard and a pipeline and barge terminal under permanent easement to Northeast Petroleum Corporation. On the west there is a fish packing and freezing plant which is located on a privately owned site except for a small parcel leased from the Corps adjacent to the bulkhead.

The Corps owns a total of 19 acres of land at the East Boat Basin including 5-1/2 acres developed as recreation areas of which a portion abuts the east and west bulkhead.

Facilities inside the East Boat Basin consist of a Coast Guard dock, a Corps' dock, a commercial fishing dock and a recreational boat marina with land leased by the town of Sandwich from the Corps. A portion of the basin is designated as a harbor of refuge by the Corps of Engineers.

The bulkhead is constructed of steel sheet piling, 43 feet in length, driven to elevation 65.5* with a top elevation of 108.5* and a controlling depth at the face of 10 feet below MLW. The sheet piling totals over 1940 feet in length including 46.5 ft. returns on each side at the entrance to the basin, 25 ft. returns at the ends of the sections and two 97 ft. returns for the marine railway (see Figures 2 and 3).

The sheet piling is anchored by a tie back system which connects to the bulkhead 2.0 feet above MLW. The tie back system consists of tie rods 6' 8" on center attached to a 2-foot thick and 4-foot wide continuous concrete deadman installed 45 feet back from the face of the steel sheet piling. A series of 25' long timber piles spaced 6' 8" on center are driven in front of the deadman. The tie rod system utilizes 2" diameter tie rods upset to 2-1/2" diameter at a turnbuckle located approximately 15 feet from the back of the sheet piling. The rods, the steel sheeting and the concrete deadman are all coal tar treated while the deadman timber piles are treated with creosote. The wale, which connects the tie rods to the sheet piling, is untreated. The bulkhead is protected by creosote treated 12 inch diameter timber fender piles.

*Cape Cod Canal Datum  El. 100.0 = El. 0.0 MSL
                        El.  95.5 = MLW
                        El. 104.5 = MHW

2

## 5. Current Condition

a. Steel Sheeting. A visual inspection of the face of the bulkhead was conducted during periods of extreme low water to evaluate the condition of the bulkhead. Damages caused by corrosion were observed in the steel sheeting. The area east of the entrance to the East Boat Basin has experienced severe corrosion. Holes ranging in size from 1 inch to 12 inches in diameter were observed. In the area of the larger holes, the subsoil from behind the bulkhead was being washed out by wave action. The Corps field office has been continually filling the voids at the top of the bulkhead created by the erosion. An accident has occurred involving a fisherman who was injured when he fell into one of the holes. The useful life of the coating on the sheeting has expired and the sheeting in its entirety appears to be severely laminated due to corrosion.

In the area west of the entrance there are fewer holes visible in the sheeting, however, severe erosion of fill from behind the bulkhead is still taking place. It must be concluded that this subsoil loss is due to holes in the steel sheeting in the splash zone beneath the wale not visible at the time of inspection. Lamination of the sheeting due to corrosion is also occurring.

b. Tie Back System. To ascertain the condition of the tie back system three tie rods and the concrete deadman and timber piles were exposed by excavation and inspected. The tie rods exposed were located in the vicinity of the west recreation area, the east recreation area, and the Coast Guard area. The coal tar coating on the tie rods has become very brittle and pervious indicating that the life of the coating has expired. The average loss in the diameter of the tie rods measured in the range of .05 inch to .15 inch which equals a 5 to 15 percent loss in the cross sectional area of the rod. The concrete deadman and timber piles exposed appeared to be in good condition.

In spite of the relatively good condition of the tie rods exposed several other factors tend to indicate a greater problem with the tie back system. In 1978, a bulge occurred in the sheeting due to a tie rod failure. In the process of repairing the damages, nine additional tie rods were exposed and replaced due to their poor condition. In addition, it was noted during the visual inspection of the sheeting that in the area east of the marine railway several tie rods were not visible at the wale.

c. Fender Pile System. Due to the incease in the size of the craft utilizing the bulkhead since its construction, the fender pile system is totally inadequate. The Canal Office is constantly replacing fender piles as they are being snapped by the larger vessels using the bulkhead. The present practice of replacing the fender piles is to drive a new pile beside the broken one.

d. Controlling Depth. Apart from its deteriorated condition the structural configuration of the existing bulkhead has caused operational constraints. The controlling depth of 10 feet below MLW at the face of the bulkhead has become a problem due to an increase in the size of the vessels using the bulkhead. The drafts on these vessels range from 12-13 feet. To date these larger vessels have been timing their arrivals to coincide with tidal

conditions necessary to provide and maintain sufficient depth. However, with the trend toward the use of larger and more economical craft, traffic, tidal delays and early departures are expected to occur increasingly in the future. In the structural design of rehabilitation measures it is prudent to allow for the potential of future deepening at the bulkhead to 16 feet below MLW.

e.  Conclusions.  The steel sheet piling is in an advanced state of deterioration.  The presence of the holes, the lamination, and the loss of subsoil behind the bulkhead indicate that it has reached the end of its useful life.  In its present condition it represents a hazard to life, property and navigation and should be removed or replaced as soon as possible.

Due to the conflicting information relative to the condition of the rods in the tie back system and as the life of the protective coating on the rods has expired, a further, more in-depth inspection of the tie rods will be conducted during the Design Memorandum phase to determine the remaining life and strength.

As noted previously, the fender pile system as originally designed is inadequate for present usage and a replacement system will be considered later in the report.

6.  History of Maintenance and Rehabilitation.  The bulkhead experienced major damage in 1962 when the ship Korendyk collided with it and caused a breach in the sheet piling 40 feet long.  The tie back system was also damaged.  Repairs were satisfactorily completed in July 1962 by Holland American Lines for the amount of $289,975.

An engineering study completed in 1968 determined that the steel sheeting needed repair and the steel wale at 2 feet above MLW needed to be replaced. Work was initiated in June 1969 and completed in October at a cost of $267,633.

Damage to the bulkhead by an unknown vessel at the location of Canal Marine, Inc. was reported on 7 September 1976.  The cost of repair was $1,500.

In 1977 an investigation was conducted of a void in the middle section of the bulkhead in the vicinity of Northeast Petroleum's offloading area.  Divers found four 18" x 3" holes and one 18" x 4" hole just below the wale in the vicinity of the void.  A hole at a tie back in the vicinity of the void was also found.

In 1978, an investigation of a bulge in the sheeting revealed that the wale had crumpled due to a tie rod failure.  The area was located just east of the Atlantic Coast Fillet Building.  Repairs were effected immediately including replacement of the wale and 10 tie rods.

Fender piles have been repeatedly replaced during the life of the bulkhead. And more recently, fill has been continually placed in the voids along the top of the bulkhead.

7. Project Use

a. <u>History</u>. Since its construction, the bulkhead has served the purpose of providing an area where properly equipped small craft can moor for a variety of users.

Following construction, the first commercial usage was fish off-loading at Canal Fish & Freezing Company (now Canal Marine, Inc.) which was given a lease from the Corps for a small piece of land adjacent to the bulkhead in exchange for a lease to a parcel of land adjacent to the East Boat Basin. Commercial usage expanded in 1937 when Frederick F. Scudder was given an easement (now held by Northeast Petroleum Corporation) by the Corps to lay pipelines from the bulkhead and install underground tanks for the purpose of off-loading oil products. In 1939, Sandwich Marine Corporation was given a lease to property adjacent to the property leased by Scudder, for the purpose of the retail vending of marine fuels and supplies. This lease has since been discontinued.

During World War II, the Coast Guard, who had utilized the bulkhead since its construction, assumed control of the Sandwich Bulkhead and it became customary for west-bound ships to pick up their orders at the Sandwich Control Station, located at the bulkhead. For several years following the war, the Air Force continued to maintain two crash boats at the East Boat Basin.

The first commercial fishing activity on the east bulkhead may have been in 1948 when a trapping company began using the site now occupied by R&D Corporation, Inc. (No record of a lease was found.) Cape Cod Shellfish Company leased the site in 1953. In 1955 and 1956, Clearwater Fish Company (now Atlantic Coast Fillet Company, Inc.) and Victory Fish Company (at the present site of Joe's Lobster Mart, Inc.) began using the bulkhead for commercial fish enterprises. Usage by fish packers has been continuous at these three sites since that time.

Recreational fishermen began using the bulkhead immediately after its construction in the late 1930's. Responding to the recreational usage of the site, the Corps provided picnic tables around 1940. The restrooms in the east recreation area were built in 1962, and the parking lot was enlarged and paved in 1973. In 1976, a restroom and parking were built and a few picnic tables were provided at the west recreation area which was opened for public use in 1977.

In 1963 the East Boat Basin was expanded to its present size.

b. <u>Current Uses</u>

(1) <u>Legal Agreements</u>

The Corps has granted several leases and easements (see Appendix A) which allow various uses of the bulkhead and adjacent areas. Northeast Petroleum has two easements which were transferred to them from Frederick F. Scudder. The easements allow them to convey oil from 250-foot barges at

the bulkhead to oil storage tanks located on privately owned land east of the East Boat Basin. The remainder of the leases along the bulkhead involve the commercial fishing industry. On the east side of the entrance, three fish packing plants, (R&D Corporation, Inc., Atlantic Coast Fillet Company, Inc., and Joe's Lobster Mart, Inc.) have just recently been awarded five year leases effective 15 July 1980. On the west side of the entrance, Canal Marine, Inc., a fish freezer, owns the site where the plant is located but leases a small parcel of land adjacent to the bulkhead. Their 25-year lease expires on 21 July 1986. In total, the four fish processing plants lease property adjacent to 498 feet of the bulkhead and utilize upwards of an additional 300 feet during their day-to-day operations.

The Coast Guard (Department of Transportation) does lease property behind the bulkhead from the Corps in connection with its Pier in the East Boat Basin. However, the lease for the parcel, including the boathouse and marine railway, has recently been terminated and the Coast Guard no longer uses the bulkhead for any purpose at this time.

### (2) Commercial Fishing

As previously noted, four fish processing plants lease property along the bulkhead. The leases allow the utilization of the bulkhead for the offloading of fish. Virtually all of the fish landed at the port of Sandwich are offloaded at the bulkhead. Sandwich is the second largest fishing port, in terms of pounds and dollar value, on Cape Cod, second only to Provincetown. In addition, it ranks fifth in Massachusetts behind Gloucester, New Bedford, Boston, and Provincetown, in that order (see Table 1). The fishing vessels which offload at Sandwich vary from small inshore lobster boats to draggers of 100 feet in length. Most of the catch is landed by the larger vessels whose homeports are New Bedford, Mass., Pt. Judith, R.I., and the various other Cape and Island ports. The generally smaller vessels of the Sandwich based fleet land about a quarter of the total catch at Sandwich.

### (3) Recreational Usage

The Corps has built and maintains two recreation areas along the bulkhead. A total of 910 feet of bulkhead are available for recreational usage including 560 feet on the east side and 350 feet on the west (see Figure 4). Each area provides parking, a restroom and a few picnic tables and together they attract over 250,000 visitors annually (see Table 2). Corps personnel stationed at the canal estimate that about 22 percent of them are recreational fishermen.

6

TABLE 1

COMPARISON OF SANDWICH FISH* CATCH
WITH OTHER MASSACHUSETTS PORTS

| Port | Catch in Million Pounds | | Value in Millions of Dollars | |
|---|---|---|---|---|
| | 1977 | 1978 | 1977 | 1978 |
| Gloucester | 150.9 | 185.1 | $21.5 | $28.9 |
| New Bedford | 75.5 | 71.9 | 43.2 | 54.6 |
| Boston | 22.2 | 27.3 | 6.0 | 8.1 |
| Provincetown | 17.9 | 19.9 | 6.9 | 9.1 |
| Sandwich | 15.3 | 19.0 | 5.0 | 7.8 |

Source: Fisheries of the United States, 1977, U.S. Department of Commerce,
National Oceanographic and Atmospheric Administration, National Marine
Fisheries Service, April 1978, and National Marine Fisheries Service, Statistics
Office, New Bedford, Massachusetts

TABLE 2

ATTENDANCE FIGURES 1978 AND 1979
CORPS RECREATIONAL AREAS, EAST BOAT BASIN
SANDWICH, MASSACHUSETTS

| | East Recreational Area Attendance | | West Recreational Area Attendance | |
|---|---|---|---|---|
| | 1978 | 1979 | 1978 | 1979 |
| January | 1,600 | 1,700 | 700 | 700 |
| February | 800 | 1,200 | 500 | 600 |
| March | 2,500 | 3,000 | 1,100 | 1,200 |
| April | 10,000 | 12,500 | 8,000 | 9,000 |
| May | 21,300 | 23,000 | 13,000 | 17,000 |
| June | 22,000 | 24,000 | 9,000 | 20,000 |
| July | 28,000 | 27,000 | 14,000 | 22,000 |
| August | 22,000 | 23,000 | 18,000 | 24,000 |
| September | 17,000 | 19,000 | 12,000 | 20,000 |
| October | 16,000 | 15,000 | 14,000 | 16,000 |
| November | 3,500 | 4,000 | 2,500 | 3,000 |
| December | 800 | 1,000 | 600 | 800 |
| TOTALS | 145,500 | 154,400 | 93,400 | 134,300 |

* Does not include swordfish landings

7

(4) Other Uses

In addition to usage of the bulkhead by lessees, fishing vessels, oil barges, and recreational fishermen, the bulkhead is sporadically used for tying up miscellaneous vessels. Among these are tugboats, crew launches and towing launches in the business of moving cargo vessels through the canal. There is very little mooring space available along the canal and smaller vessels cannot use the East End Mooring Basin, located across the canal from the East Boat Basin, since they cannot span the distance between the mooring dolphins.

c. Future Use

(1) General

The future demand for usage of the bulkhead and adjacent Corps properties has been projected over the life of the project. The projections take into account the rapidly expanding nature of the commercial fishing industry since implementation of the 200-mile limit and the growing importance of waterborne transportation. In addition, the town of Sandwich has proposed the expansion of the East Boat Basin to accommodate the needs of the commercial fishing industry and its effect on bulkhead usage is considered.

(2) Proposed East Boat Basin Expansion

As noted previously, the town of Sandwich has proposed the expansion of the East Boat Basin. A feasibility study undertaken by the Sandwich Board of Selectmen with financial assistance from the Massachusetts Coastal Zone Management Program was completed in April 1979. The study proposed two alternative development plans, each expanding the basin into a 22-acre parcel of land owned by the town (see Figures 5 and 6).

Each scheme provides berthing for about 100 commercial vessels ranging in length from 30 to 100 feet and 120 recreational vessels ranging in length from 20 to 50 feet. Land available for support facilities such as repair facilities, a rack storage and packing and processing plants total 20 to 24 acres. The cost of the proposed expansion is estimated at $17 to $20 million.

The town requested the Corps to study the proposed expansion. A feasibility study, now underway, is being conducted under a resolution of the U.S. House of Representatives Committee on Public Works and Transportation which was adopted 9 May 1979.

(3) Projected Future Use

Since the Coast Guard lease for the boathouse and marine railway has been terminated, they will either be demolished or converted to another use.

Northeast Petroleum Corporation is not expected to increase their demand on the bulkhead, however, it is anticipated that they will utilize larger barges with deeper drafts to avail themselves of more economical transportation.

8

The commercial fishing activity along the bulkhead is expected to remain the same yet with increasing demand and competition. Since the implementation of the 200 mile limit, the fish catch has been increasing throughout the Cape Cod and Island ports at an approximate rate of 5 percent annually. Competition for the limited docking and offloading facilities presently available within the region has become increasingly intense. It is anticipated that the limitations of the existing facilities will increasingly affect the growth of the industry throughout the area ports. For the Sandwich Bulkhead the industry is expected to continue to grow over the next decade before the facilities reach their capacity.

Fishing vessels added recently to the New Bedford based fleet range from 75 feet to over 110 feet with drafts of 12 - 13 feet. It is anticipated that this trend towards larger more economical vessels will continue in the future.

The proposed East Boat Basin Expansion could possibly be completed within the next 10 to 15 years. Should this occur the expanded Sandwich fleet from the enlarged basin would utilize the bulkhead even more in the future for offloading their catch.

Thus the factors governing the fishing industry's use of the bulkhead, including the growth of the industry, the trend towards larger vessels, and the possible expanded Sandwich fleet, indicate that competition for space by the end of the next decade will continue to be intense during peak offloading hours from early morning to noontime. It is also anticipated that this situation will continue through the entirety of the life of the project.

Usage of the bulkhead by tugs and other vessels is expected to increase with the growth in importance of waterborne transportation.

Tourism along the canal is increasing significantly. It is anticipated that recreational usage of the East Boat Basin areas will continue to show moderate increases over the life of the project.

By the end of the decade, a number of actions can be expected in an attempt to alleviate the problems due to the expansion of the commercial fishing industry. Increased pressure can be expected from the commercial fishing industry on the town of Sandwich to allow the further development of commercial offloading facilities within the East Boat Basin and the possible relocation of the commercial fishing industry from the bulkhead to the proposed new boat basin. Also increased pressure can be expected from the recreational users and various tugboat owners for the Corps to regulate use of the bulkhead. It is not known when or if these actions will be implemented, however, additional action will eventually be required to assure the availability of the bulkhead to all users.

If the bulkhead is removed, all of the users except Canal Marine, Inc. and Northeast Petroleum, Inc. (see pg 12) will be displaced. The limited offloading facilities within the area will reach their capacity so rapidly as to severely limit areal growth in the commercial fishing industry.

9

8. Alternatives Investigated

a. General. Alternatives for bulkhead rehabilitation were developed with consideration of current and projected future usage of the site, navigation, conditions of the existing facility, and suitability of the site for alternative forms of protection. Three alternative schemes of rehabilitation were compared in detail. They are:

(1) "Least Action" Alternative – Riprap Slope

(2) Steel Sheet Pile Bulkhead

(3) Prestressed Concrete Wharf

Detailed descriptions and estimates of these schemes are discussed in later paragraphs.

b. Other Alternatives Considered. In addition to the alternatives noted above, two alternative actions in lieu of rehabilitation were considered. They are "No Action" and "Continuing Maintenance under Operations and Maintenance Funding." Each were evaluated based upon the present condition of the existing facility. If the "No Action" alternative is implemented, failures of the type which occurred in 1978 can be expected with greater regularity. The most likely point of one of these failures would be in front of either of the buildings along the bulkhead as they represent points of maximum surcharge on the sheeting. Loss of property and/or personal injury or loss of life could possibly occur. For this reason "No Action" was not considered a viable alternative. "Continuing Maintenance Activities Under Operations and Maintenance Funding" will not prevent tie rod failures from reoccurring, nor will it arrest the corrosion the sheeting is experiencing. Within five years the tie rod failures and possible sheeting failures could occur so rapidly as to prevent utilization of the bulkhead. Thus "Continuing Maintenance" was not considered a viable alternative.

c. Design Considerations

The following items were considered in developing preliminary design recommendations for components of the schemes considered.

Fenders: Based upon the performance of the existing fender pile system, a replacement system is needed to adequately protect any proposed structure from the size craft presently using the bulkhead and anticipated in the future. During the Design Memorandum phase alternative systems will be evaluated and a preferred system established. For illustrative purposes a system of Greenheart fender piles, 15 inches in diameter, 50 feet long, driven 8 feet on center is shown and estimated in each scheme where applicable.

Tie Backs: As noted previously, during the Design Memorandum phase an indepth investigation of the tie rods will be conducted. For the purpose of this study, it was assumed that for those proposed schemes which require a tie back system, the existing system could be utilized. However due

10

to the conflicting information relative to their condition, it was assumed that 20 percent of the existing tie rods would be replaced and that no buildings would be affected by their replacement.

Corrosion Protection: The steel components of the proposed schemes will require protection from the corrosive action of the marine environment. During the Design Memorandum alternative methods of protection including but not limited to coal tar epoxy, inorganic zinc paint, and cathodic protection, will be compared indepth and a system will be recommended. For estimating purposes a unit cost for corrosion protection of $1.35 per square foot of exposed steel has been utilized.

Provision for Proposed East Boat Basin Expansion: Based upon preliminary investigations of the proposed East Boat Basin expansion, it is conceivable that the basin could be expanded in the future. This expansion plan provides for an entrance channel dredged to 16 feet below MLW. In order to prevent the necessity for additional bulkhead work in this area, schemes 2 and 3 will include deep sheet returns at the entrance. The additional cost to provide this deep sheeting is $50,000 for scheme 2 and $400,000 for scheme 3.

Controlling Depth: For schemes 2 and 3 in order to preserve the potential for deepening the approach to the bulkhead to accommodate deeper draft vessels, a design elevation of 16 feet below MLW has been used.

Marine Railway: As noted previously a decision will be made later relative to the disposition of the marine railway and the boathouse. However, as the disposition of the marine railway directly affects the design of a replacement for the bulkhead, for the purpose of this study it was assumed that the marine railway would be demolished and filled in.

d. Alternatives

A detailed description of the three alternative schemes follows:

(1) Scheme 1 - "Least Action" Alternative - Riprap Slope. The elimination of "no action" and "continuing maintenance" as viable alternatives can be interpreted that the "Least Action" alternative available to maintain the integrity of the canal and its banks is to replace the bulkhead with a riprap slope.

Construction of riprap slope would entail removing or cutting off the existing sheeting and placement of stone riprap on the bank. The riprap slope would be of similar design and alignment as other riprap along the canal.

Approximately 39 feet of land behind the existing bulkhead line would become part of the slope. The embankment would form a 2H:1V slope upon which a layer of filter fabric would be placed, followed by a bed of crushed stone and riprap stone cover. Figure 7 shows the layout and details of this scheme and Figure 8 shows a typical cross section of the riprap slope.

The placement of riprap in front of the existing bulkhead was considered during the development of this scheme, but was found to be too costly because of the volume and size of stone required.

A riprap slope would be the least costly form of slope protection but would eliminate bulkhead usage. However, it appears that Canal Marine, Inc. and Northeast Petroleum Corporation, Inc. would still be able to remain. To allow them to continue to operate the Corps would offer each a permanent easement to construct and maintain the following facilities, for the reasons noted.

Canal Marine, Inc. owns the property on which their main buildings are located and an offloading facility is a necessity for them to continue to operate. Property in the region with similar type facilities is extremely rare and costly. It appears that they would opt to construct a 250 foot long bulkhead similar to the existing structure as an offloading facility.

Northeast Petroleum Corporation owns the property on which their tanks are located. The alternative to barging oil to the tank farm is trucking overland which is more costly. It appears that they would construct an offloading facility consisting of a main pipeline pier extending 20 feet beyond the toe of the riprap slope with 2 mooring dolphins, 100 feet apart, connected by a catwalk.

The total estimated construction cost for this alternative including the two private structures is $2,130,000. A detailed breakdown of this estimate is shown on Table B-1, Appendix B.

2. Scheme 2 – Steel Sheet Pile Bulkhead. This alternative entails driving new corrosion resistant PZ 38 "Mariner" steel sheet piling about five feet seaward from the existing bulkhead to elevation 42.0.

The sheeting could be tied back to the existing tie rods by welding or by threaded connectors which necessitate a working space of five feet. Crushed stone would be used as fill for the working space.

Freestanding or "cantilevered" design sheeting was considered, but because of the added weight and lengths of sheeting required, it was not considered cost effective.

The live load design of the bulkhead would be 250 lbs. per square foot, as it is now, since this loading is considered adequate for projected uses of the bulkhead.

The plan for this scheme is shown on Figure 9 and a typical cross section is shown on Figure 10.

The cost estimate of this scheme including corrosion protection, a Greenheart Fender System, deep sheeting returns at the entrance to the basin, demolition of the marine railway and a 20 percent replacement rate for the tie rods, is $5.2 million. A detailed breakdown of this estimate is shown in Table B-2, Appendix B.

12

(3) Prestressed Concrete Wharf. A plan view and cross section of the prestressed concrete commercial wharf are shown in Figures 11 and 12. The pier would be constructed on piles over a USHIV riprap slope with 24-inch cap rock over crushed stone. The slopes above the riprap would be protected by PZ 27 steel sheet piles driven three feet from the existing bulkhead.

The wharf would be constructed of 30-foot concrete slabs and supported by a concrete footing at the top of the slope and 14-inch, prestressed, precast concrete piles on the canal side of the wharf. The toe of the riprap would be about 35 feet seaward of the existing bulkhead. The wharf would be designed as a commercial facility with a 250-pounds per square foot live load.

The cost estimate for this scheme, including corrosion protection, demolition of the marine railway, deep sheeting returns at the entrance to the basin and a Greenheart Fender System, is $5 million. A detailed breakdown is shown in Table B-2, Appendix B.

9. Evaluation of Alternatives. This section compares the three alternatives on the basis of economics, environmental impacts, and suitability for future needs. A recommendation is made for the implementation of the alternative which serves future needs, maximizes public benefits vs. costs, and is environmentally sound.

The three alternatives compared are:

1. "Least Action" - Riprap Slope

2. Steel Sheet Pile Bulkhead

3. Prestressed Concrete Wharf

a. Economic Analysis. The annual cost and annual benefit of each scheme were calculated and compared in order to determine the scheme which is the most cost beneficial. Calculations were made using the interest rate of 7-3/8 percent, the current rate set by the Water Resources Council for use in water resources projects.

(1) Annual Costs (See Tables B-3 and B-4, Appendix B)

The annual costs for each scheme have been calculated on the basis of a projected 50-year life. Included in the annual costs are construction costs amortized over the 50-year project life and estimated annual maintenance costs.

Tables B-3 through B-4, Appendix B show the derivation of the annual costs for each scheme. Annual Costs are summarized as follows:

13

## TABLE 3

### SUMMARY OF ANNUAL COSTS

| Scheme | Annual Costs |
|---|---|
| 1. Least Action Alternative Riprap Slope | $170,000 |
| 2. Steel Sheet Pile Bulkhead | $405,000 |
| 3. Prestressed Concrete Wharf | $390,000 |

### (2) Annual Benefits

Net benefits expected to result through implementation of a proposed project are usually calculated by comparing the economic condition after the proposed action to the economic conditions which would likely develop in the absence of a Federal action over the period of analysis. In the case of the Sandwich Bulkhead a literal interpretation of a no action plan cannot be a realistic consideration due to the fact that the bulkhead in its present condition is a hazard to life, property, and navigation. In order to maintain the integrity of the canal and its banks, the minimum improvement which the Federal Government must implement is to replace the existing bulkhead with a riprapped slope. The costs of all the alternative schemes must be analyzed in relation to the costs of this Least Action Plan.

As defined in this report, the Least Action Scheme would replace the existing bulkhead with a riprap slope of similar design and alignment as other riprap along the canal. The scheme would also allow Canal Marine, Inc. to construct a 250-foot long bulkhead to be utilized as an offloading facility for fish, and Northeast Petroleum Corporation to construct a main pipeline pier extending 20 feet into the canal (see Figure 7) to facilitate the continued receipt of petroleum products. The costs of these features, shown on Table B-1, Appendix B, would be borne by the individual private users as a direct result of implementation of the scheme. Annual costs (50 years at 7-3/8 percent interest) including the estimated annual maintenance costs are shown in Table B-4, Appendix B.

Unlike Canal Marine and Northeast Petroleum, all other present commercial users of the bulkhead would be forced to relocate by the implementation of the riprap scheme. Relocation would require the added expense to the Atlantic Coast Fillet Company, Inc., Joe's Lobster Mart, Inc., and R&D Corporation, Inc., of building demolition, building construction, and relocation of equipment, estimated as follows:

| | |
|---|---|
| Atlantic Coast Fillet Company, Inc. | $179,000 |
| Joe's Lobster Mart, Inc. | 115,000 |
| R & D Corporation, Inc. | 135,000 |
| | $429,000 |

If these total relocation costs are spread over the 50-year period of analysis at 7-3/8 percent interest, the annual costs to the three enterprises

14

combined would be $33,000. Since these costs would be incurred directly as a result of implementation of the riprap scheme, they must be considered as an economic cost of the Least Action Plan.

Each of the proposed schemes would differ in their effect on future fish landings at Sandwich. Due to the establishment of a 200-mile limit on territorial waters and the success of various management plans, fish catch has been increasing at Sandwich and throughout the Cape Cod area, at an approximate rate of 5 percent annually. Competition for mooring space and offloading facilities has become increasingly intense over the entire region.

Implementation of the Riprap Slope Scheme would obviously cause a reduction in fish landings at Sandwich as Canal Marine, Inc., would be the only commercial fishing enterprise allowed to continue operation. Landings data supplied by each individual business (see Table 4) indicates that Canal Marine accounts for only approximately 10 percent of the total Sandwich catch valued at $9,778,000 (1978).

It appears unlikely that the value of the catch currently landed by R&D Corporation, Inc., Joe's Lobster Market, and Atlantic Coast Fillet would be permanently lost to the regional economy. It is more probable that the major portion of their catch would be landed elsewhere in the Cape Cod area. Due to the shortage of support facilities in the fishing industry, however, it seems reasonable to assume that the overall effect on the regional industry would be negative. For purposes of this report, the negative economic effect due to the implementation of the riprap scheme has been estimated as equal to the projected dollar value growth that would occur at Sandwich if the three businesses that would be forced to relocate were allowed to continue operation at their present site.

Although the growth in catch value over the last few years has averaged 5 percent annually, a more conservative estimated future growth rate of 2 percent annually will be assumed for this report. Therefore, if the 1978 landings value of $9,200,000 is assumed for 1980, another conservative estimate used in the absence of actual full year data, a 2 percent growth rate would result in a total catch valued at $11,215,000 by 1990, a value expected to remain constant over the remainder of the period of analysis. This represents a total increase in ex-vessel catch value of $2,015,000 annually over a 10-year uniform growth period. Assuming the average operating cost for fishermen of the region to be 40 percent of gross haul, the annual increase in net income to fishermen after a uniform 10-year growth period that would be foregone by the Least Action Plan would total $1,209,000 the average annual equivalent of which would be $887,000 for a 50-year project life at the current Federal interest rate of 7-3/8 percent. Implementation of the riprap scheme would prevent this annual growth from occurring, while all other schemes proposed would allow it. Thus, the loss of future income to fishermen must be treated as an economic cost of the Least Action Plan.



15

## TABLE 4

FISH LANDINGS REPORTED BY FISH PACKING PLANTS

1977 AND 1978

PORT OF SANDWICH

| 1977 Company | Number of Landings | Pounds | Dollar Value |
|---|---|---|---|
| Seafood Distributors* | 35 | 1,000,000 | $2,000,000 |
| Canal Marine | 56 | 5,806,000 | 201,000 |
| Joe's Lobster Market | **200 | 244,000 | 367,000 |
| Atlantic Coast Fillet | 1,776 | 9,290,000 | 4,477,000 |
| Total | 1,921 | 16,340,000 | $7,045,000 |

| 1978 | | | |
|---|---|---|---|
| Seafood Distributors* | 40 | 1,000,000 | $2,000,000 |
| Canal Marine | 174 | 9,224,000 | 553,000 |
| Joe's Lobster Market | **200 | 151,000 | 336,000 |
| Atlantic Coast Fillet | 1,574 | 9,646,000 | 6,889,000 |
| Total | 1,988 | 20,021,000 | $9,778,000 |

* R&D Corporation, Inc. is a new tenant as of 15 July 1980. Therefore, all economic factors are based upon figures from the previous tenant, Seafood Distributors, Inc.
** Estimated

16

The economic value of the existing bulkhead to recreational fishermen was calculated through consultation with the U.S. Fish and Wildlife Service, which has developed a method of estimating the value of a facility to recreational users. The Fish and Wildlife Service recommended that a value of $2.00 per person per visit be used. Corps of Engineers records of bulkhead area visits indicate that of the nearly 290,000 annual visitors in 1979, approximately 22 percent or 64,000 use the bulkhead for fishing. Thus, the total value of the existing facility to recreational fishermen is estimated at $128,000 annually.

For purposes of this report, it is assumed that replacement of the bulkhead with riprap would result in a 50 percent decrease in use by recreational fishermen because the area would become somewhat less attractive for that purpose, with a resultant value of $64,000. It is also assumed that replacement of the existing structure with any of the two alternative bulkhead schemes would allow the same level of utilization by fishermen at the same estimated recreational value. Thus, the riprap scheme would cause a net decrease in recreational value of $64,000 while no net loss or gain would result from any of the other schemes. For the purpose of this study it was assumed that the 1979 level of 290,000 recreational visitors to the area would remain constant throughout the project life. Therefore, an additional economic cost of $64,000 would be incurred through implementation of the Least Action Plan.

No recreational boating benefits or losses are expected under any of the proposed schemes.

The possibility that the East Boat Basin may be expanded and additional facilities built during the life of the bulkhead project has been discussed in this report. Such a project would alter the future usage of the bulkhead. However, since the expansion project is in only the early planning stages, the expansion has not been considered in economic calculations for this report.

The total annual economic cost of implementing the Least Action Plan or Riprap Slope alternative is summarized in Table 5:

17

## TABLE 5

### TOTAL ECONOMIC COST OF LEAST ACTION PLAN
### RIPRAP SLOPE

| | |
|---|---|
| Total annual cost of riprap (including interest, amortization, and maintenance) | $170,000 |
| Total annual cost of relocations | 33,000 |
| Average annual equivalent loss of net income to fishermen | 887,000 |
| Annual loss in recreational value to sport fishermen | 64,000 |
| Total Economic Cost | $1,154,000 |

In the case of the Sandwich Bulkhead, the benefits of the Steel Sheet Pile Bulkhead and the Prestressed Concrete Wharf, Schemes 2 and 3, respectively, must be measured in relation to the Least Action Plan. Thus, the cost of the Least Action Plan, as detailed in Table 5, is equal to the benefit of both other plans because each would allow the same exact level of future activity.

Benefit-Cost Ratios

A comparison of annual benefits and annual costs for consideration in selection of the recommended plan for National Economic Development is shown in Table 6.

## TABLE 6

### COMPARISON OF BENEFITS AND COSTS

| Scheme | Benefit Cost Ratio | Excess Net Benefits |
|---|---|---|
| 1. Least Action Alternative Riprap Slope | — | — |
| 2. Steel Sheet Pile Bulkhead | $\frac{\$1,154,000}{405,000} \approx 2.8$ | $\$1,154,000 - 405,000 = \$749,000$ |
| 3. Prestressed Concrete Wharf | $\frac{\$1,154,000}{390,000} \approx 3.0$ | $\$1,154,000 - 390,000 = \$764,000$ |

Because Scheme 3, the Prestressed Concrete Wharf, maximizes excess net benefits, it is designated as the recommended plan for National Economic Development. Scheme 2, with a ratio of benefits to costs of 2.8, is also economically justified, with net benefits only slightly less than those offered by Scheme 3. The Riprap Slope Plan would result in an annual net loss to the National Economic Development account equal to its total economic cost of $1,154,000.

18

The scheme to be implemented must be chosen through a trade-off analysis among the economic considerations described, all environmental consequences, and technical feasibility.

b. Environmental Considerations. Construction related impacts as well as those pertaining to existence and operation of the rehabilitated bulkhead can be expected. Turbidity and siltation levels will increase as a result of rehabilitation activities in the water, including excavation dredging and placement of materials. These adverse impacts are not expected to cause any long term problems and the short term impact on marine organisms will be minimized if work in the water is done between 1 November and 1 March. The rehabilitation work should have no effect on local and regional terrestrial ecological resources. No threatened or endangered species of plants or animals are known to inhabit the project area, including adjacent waters.

Impacts normally associated with construction will cause some temporary increase in noise and dust immediately around the project site. Potentially bothersome noise levels from pile driving would occur, however, there are no noise sensitive receptors immediately surrounding the site. Increased noise from trucks delivering construction materials would be expected with trucks anticipated to be passing through residential areas. Impacts of the disposal of dredged and excavated material will depend on the site(s) selected for disposal and the associated transportation modes and routes. Potential effects of disposal will be considered during disposal site selection.

No historic archaeological resources are expected to be affected by construction of the rehabilitation project.

Short term socioeconomic impacts would occur due to the construction activity. These would be primarily site specific in nature. Increased use of roads in the area by heavy trucks transporting construction material to the site and, possibly, excavated and, or dredged materials away from the site would occur. Construction equipment in the water may interfere with boat traffic. The most significant short term impact would be the temporary suspension of, or interference with, normal bulkhead uses, including commercial and recreational activities. The businesses of the bulkhead occupants would be suspended during construction, however, construction work would be phased to minimize this impact.

The major long range adverse impact involved in either of the alternatives is the socioeconomic impact on the local and regional economy which would occur if the least action alternative was implemented. As part of this alternative the leases involving the three commercial fish plants will be terminated and they will be required to relocate. Since their operations are dependent upon direct access to fishing vessels and since the bulkhead is the only port in the town of Sandwich, it is likely that the plants will have to relocate outside the town of Sandwich. In addition, due to the present situation with regard to access to commercial offloading facilities within the region, it is likely they will be compelled to relocate off the Cape. The loss of the plants on leased properties would mean the loss of over 90 percent of the ex-vessel value of fish landed at the port of Sandwich. Based on 1977 and 1978 landings,

19



the loss would amount to $618 to $912 million. Taking into consideration the secondary impacts, or the economic activity related to these fish landings, the total loss would be $20.4 to $27.6 million per year. In addition, the fish plants directly employ approximately 30 people who may lose their jobs if the plants relocate.

All the other rehabilitation alternatives will not have this adverse impact on the local and regional economy and will in fact allow expanded utilization by the industry.

c. Comparison of Alternatives. Each scheme has been compared based upon all economic, social, environmental and engineering factors involved.

For the least action alternative, the absence of economic benefits and the adverse impact on the local and regional economies are decidedly detrimental and effectively preclude consideration of eliminating the bulkhead.

In considering the remaining two schemes, the B-C ratios developed do not point decidedly towards selection of either alternative, and there is also little difference between the two regarding their environmental and socioeconomic impacts. The major consideration between the two schemes is site adaptability to either a bulkhead or a wharf. The major factor is the distance that the wharf will project into the canal. Due to the current in the canal, the wharf will run a greater risk of experiencing ice flow damage and of impeding navigation due to traffic congestion in front of the wharf. Therefore, scheme 2 is recommended for further design and analysis.

10. Recommended Plan. Scheme 2, the Steel Sheet Pile Bulkhead, is the recommended plan. As previously noted, during the Design Memorandum phase a determination will be made regarding the fender system, the tie back system, and the methodology of corrosion protection.

The environmental impacts associated with the project will be addressed in an Environmental Assessment. Necessary Section 404 evaluation, CZM consistency and other requirements will be addressed at the same time.

A proposed schedule for preparation of the Design Memorandum, Environmental Assessment, and Plans and Specifications is shown on Table 7. The review and approval level recommended and the estimated cost of each phase of the project is also indicated on Table 7.

20

TABLE 7

MAJOR REHABILITATION PROJECT
SANDWICH BULKHEAD, CAPE COD CANAL, MASSACHUSETTS
PROJECT SCHEDULE

| Project Phase | From | Schedule To | Opers. & Maint. Funded | Estimated Cost Major Rehab. Program |
|---|---|---|---|---|
| **Design Phase** | | | | |
| Prepare Reconnaissance Report | 15 Jul 80 | 31 Oct 80 | 10,000 | |
| OCE Review of Reconnaissance Report | 3 Nov 80 | 3 Dec 30 | | |
| Prepare Design Memorandum | 8 Dec 80 | 1 Sep 81 | 60,000 | |
| Prepare Environmental Assessment | 8 Dec 80 | 1 Sep 81 | 12,000 | |
| OCE Review Env. Assessment & Design Memorandum | 1 Sep 81 | 1 Oct 81 | | |
| Prepare Plans & Specifications | 1 Oct 81 | 1 Apr 82 | 75,000 | |
| OCE Review Plans & Specs | 1 Apr 82 | 1 May 82 | | |
| **Construction Phase** | | | | |
| Construction | 14 months | | | 5,200,000 |
| S & A | | | | 300,000 |
| E D C | | | | 100,000 |
| Totals | | | 157,000* | 5,600,000 |

* September 1980 Dollars

21

ll. <u>Consequences of Nonimplementation of Recommended Repairs</u>

Due to the condition of the bulkhead, within perhaps 3 years if the proposed
schedule for the recommended repairs is not met, the Federal Government will
have no option but to implement one of three alternatives noted in this report
on an emergency basis. Due to the shortened time frame involved in
emergency repairs, the only alternative which the Corps could implement
within the abbreviated schedule would be the "Least Action" Alternative. In
addition, implementation would be so abrupt that neither Canal Marine, Inc. nor
Northeast Petroleum Corporation, Inc. would have a sufficient amount of time
to design and construct the facilities necessary to continue their operations.
Thus, the offloading capability at the port of Sandwich would be lost in its
entirety during that short period of time. The socioeconomic impacts on the
local and regional economies during that period would be significant.



CAPE COD CANAL
SANDWICH BULKHEAD
SANDWICH , MASS.

VICINITY MAP

SCALE: 1" = 37.5 Miles

LOCUS MAP

FIGURE 1



FIGURE 2



FIGURE 3





PLAN A - OPEN BASIN
PROPOSED EXPANSION
of
CAPE COD CANAL
EAST BOAT BASIN
for
TOWN OF SANDWICH
SANDWICH, MASSACHUSETTS

FIGURE 11



PLAN D - SPLIT BASIN
PROPOSED EXPANSION
of
CAPE COD CANAL
EAST BOAT BASIN
TOWN OF SANDWICH
SANDWICH, MASSACHUSETTS

FIGURE 12





NOTE: EL. 100 CAPE COD CANAL
DATUM = EL. 0.0 M.S.L.

SCHEME 1
TYPICAL CROSS SECTION
FIGURE 8

SCALE: 1" = 10'-0"

SANDWICH BULKHEAD REHABILITATION STUDY
CAPE COD CANAL
SANDWICH, MASSACHUSETTS
RIPRAP SLOPE

DEPARTMENT OF THE ARMY
NEW ENGLAND DIVISION, CORPS OF ENGINEERS
WALTHAM, MASS.                    AUGUST 1980





NEW 12"x 12" WALE
NEW 8"x 8" CHOCK
NEW C15 CAP
5'

EL 108.5

M.H.W. EL. 104.5
SPACE
M.S.L. EL. 100.0

NEW CRUSHED STONE FILL

Exist. 2" Tie Rod
6'-8" O.C.

M.L.W. EL. 95.5

NEW CONNECTION TO EXIST. TIE RODS
NEW 8"x 8" CHOCK
NEW 12"x 12" WALE
NEW 2CI0 x 20 WALES

Exist. Conc. Deadman
& Timber Pile

NEW 15" FENDER PILE

Exist. Bottom

NEW DREDGE LINE

NEW PZ 38 MARINER STEEL SHEETING
68' Lg. (ASTM A572 GRADE 55)

Exist. Bulkhead

EL. 65.5

NOTES: ALL TIMBER FOR
THE FENDER SYSTEM
TO BE GREENHEART.

EL. 100 CAPE COD CANAL
DATUM = EL. 0.0. M.S.L.

SCHEME 2

TYPICAL CROSS SECTION

FIGURE 10

SCALE : 1" = 10'- 0"

EL. 42.0

SANDWICH BULKHEAD REHABILITATION STUDY

CAPE COD CANAL

SANDWICH , MASSACHUSETTS

STEEL SHEET BULKHEAD

DEPARTMENT OF THE ARMY
NEW ENGLAND DIVISION , CORPS OF ENGINEERS
WALTHAM , MASS.                    AUGUST 1980





SCHEME 3
TYPICAL CROSS SECTION
FIGURE 12

SCALE: 1" = 10'-0"

SANDWICH BULKHEAD REHABILITATION STUDY
CAPE COD CANAL
SANDWICH, MASSACHUSETTS
PRESTRESSED CONCRETE WHARF
DEPARTMENT OF THE ARMY
NEW ENGLAND DIVISION, CORPS OF ENGINEERS
WALTHAM, MASS.          AUGUST 1980

APPENDIX A

CURRENT LEGAL AGREEMENTS

SANDWICH BULKHEAD AND ADJACENT PROPERTY

APPENDIX A

CURRENT LEGAL AGREEMENTS, SANDWICH BULKHEAD AND ADJACENT PROPERTY

| Lessee | Location | Agreement Number | Expiration Date | Permitted Use |
|---|---|---|---|---|
| Atlantic Coast Fillet Company, Inc. | East of entrance to East Boat Basin (Parcel A) (100'x100') | DACW-33-1-80-38 | 14 Jul 1985 | Docking fishing vessels for landing and storage of seafood products only |
| Joe's Lobster Mart, Inc. | Located on the bulkhead, south side of the canal (Parcel B) (100'x150') | DACW-33-1-80-39 | 14 Jul 1985 | Docking fishing vessels for landing and storage of seafood products; operation of a retail sales outlet |
| Canal Marine, Inc. | 0.24 acres at bulkhead on west side of entrance to East Boat Basin extends to face of steel bulkhead | DA-19-016 CIVENG-62-117 | 21 Jul 1986 | Boat docking and unloading |
| U.S. of America from Canal Fish Company (now Canal Marine, Inc.) | 0.16 acres on west side of entrance to East Boat Basin, adjacent to Basin | None 20 Jul 1940 | None (Perpetual) | To place and maintain upon the northeast corner thereof, such riprap or other form of protection as may be necessary to prevent washing. |
| R & D Corporation | Southerly bank of Cape Cod Canal 113' frontage on the bulkhead (Parcel C) | DACW-33-1-80-40 | 14 Jul 1985 | Privilege of docking fishing vessels at the adjacent Sandwich bulkhead area for the landing and storage of seafood products; operation of a retail sales outlet. Right to use, operate and maintain water pipeline 940 feet. |

APPENDIX A (Cont.)

| Lessee | Location | Agreement Number | Expiration Date | Permitted Use |
|---|---|---|---|---|
| Frederick F. Scudder (Easement transferred to N.E. Petroleum Corporation) | Passage to pipeline and turning area | (1939) | Perpetual | Allows passage to pipeline and construction and maintenance of turning area on government property. Scudder agrees to allow U.S. a right-of-way across his property from Town Neck, Road. Easement may be forfeited with 90 days notice. |
| Frederick F. Scudder (Easement transferred to N.E. Petroleum Corporation) | 1.5 acres east of the entrance to the Boat Basin | (1937) | Perpetual | Permits Scudder to install and lay pipelines, install subterranean tanks and erect a small building for the purpose of providing facilities for selling gasoline, fuel oils, etc. to boats, making use of the mooring facilities along the bulkhead, and to carry gasoline, fuel oils, etc. to and from the tanks on Scudder's property. |
| Dept. of Transportation (U.S. Coast Guard) | Piers A & B, East Boat Basin | DACW-33-4-73-67 Supplement Agreement No. 1 | 29 Apr 1983 | To use and occupy Piers A & B |
| Dept. of Transportation (U.S. Coast Guard) | Cable located between the existing U.S.C.G. building, the boat docks and boathouse | DACW-3-4-77-8 | 30 Dec 1981 | To use and occupy government owned land within the canal for the purpose of installing and maintaining underground low voltage communication cables. Overhead cable to be installed between existing boathouse and Radio Beacon Bldg on existing U.S.C.G. poles. |

APPENDIX A (Cont.)

| Lessee | Location | Agreement Number | Expiration Date | Permitted Use |
|--------|----------|------------------|-----------------|---------------|
| Dept. of Transportation (U.S. Coast Guard) | Tract No. XI (Adjacent to Corps recreation area east of Boat Basin entrance) | DACW-33-4-73-16 | 30 Nov 1982 (Terminated 30 May 1980) | Permitted to use and occupy a portion of Tract No. XI. Purpose of maintaining a C.G. Boathouse with necessary launching facilities. Area reduced from 1.56 acres to 0.70 acres. |
| Dept. of Transportation (U.S. Coast Guard) | Parcel A & Marine Railway at Boathouse area (0.18A) | DACW-33-4-71-1 | 29 June 1980 (Terminated) | Permitted to use and occupy Marine Railway and Parcel A. |
| Dept. of Transportation (U.S. Coast Guard) | Drainpipe located between C.G. Station and bulkhead at the Marine railway. | DACW-33-4-78-36 | 6 April 1983 | Permitted to use and occupy land for purpose of installing and maintaining drainpipe to convey surface runoff from C.G. Station to Bulkhead at the Marine Railway. |
| Dept. of Transportation (U.S. Coast Guard) | Water line between existing water supply line at the Canal Breakwater Light (Radio Beacon) Station, on the right-of-way for the Cape Cod Canal. | DACW-33-3-71-52 | 13 June 1981 | Purpose of maintaining a 1-1/2" pipeline (water supply) buried approximately 3 feet at the stated location. |

APPENDIX B

COST DATA

TABLE B-1

MAJOR REHABILITATION PROJECT
SANDWICH BULKHEAD
ESTIMATED ITEMIZED COSTS, SCHEME 1, LEAST ACTION ALTERNATIVE

1580 Linear Feet of Riprap Slope

| Description | Quantity/Unit | Unit Price | Estimated Costs |
|---|---|---|---|
| Mobilization and demobilization | ---- | --- | $  45,000 |
| Excavation and grading | 62,500 CY | $ 8.00 | 500,000 |
| Membrane filter fabric | 13,000 SY | 3.20 | 41,600 |
| 12-inch thick crushed stone bed | 4,000 CY | 32.00 | 128,000 |
| 18-inch thick riprap cap rock | 6,100 CY | 32.00 | 195,200 |
| Remove existing sheeting | 91,500 SF | 1.00 | 91,500 |
| | | SUBTOTAL | $1,001,300 |
| | CONTINGENCIES 20% | | 198,700 |
| SUBTOTAL CONSTRUCTION COST RIPRAP SLOPE | | | $1,200,000 |

B-1

TABLE B-1 (Cont.)

250-Foot Bulkhead at Canal Marine

| Description | Quantity/Unit | Unit Price | Estimated Costs |
|---|---|---|---|
| Mobilization and demobilization | —— | —— | $ 10,000 |
| Riprap removed and relaid | 300 CY | 36.00 | 10,800 |
| PZ 27 Steel Sheet piles | 472,500 Lbs. | 0.57 | 269,325 |
| Coal tar epoxy coating both sides | 35,000 SF | 1.35 | 47,250 |
| Crushed stone fill between bulkheads | 1,600 CY | 32.00 | 51,200 |
| Tie rod extension | 3,000 Lbs. | 4.20 | 12,600 |
| Steel fasteners | 3,400 Lbs. | 2.15 | 7,300 |
| Steel wales | 14,000 Lbs. | 0.85 | 11,900 |
| Greenheart fender piles 15-inch diam. | 1,600 LF | 26.50 | 42,400 |
| Greenheart chocks and wales | 9 MBM | 2,675.00 | 24,075 |
| 3-inch wood decking | 4 MBM | 2,675.00 | 10,700 |
| Cleats | 5 Ea. | 525.00 | 2,675 |
| Lighting | 8 Ea. | 3,750.00 | 30,000 |

|  |  |  |  |
|---|---|---|---|
| | SUBTOTAL | | $530,225 |
| | CONTINGENCIES 20% | | 109,775 |
| SUBTOTAL CONSTRUCTION COST BULKHEAD AT CANAL MARINE | | | $640,000 |

B-2

TABLE B-1 (Cont.)

Northeast Petroleum Mooring Facility

| Description | Quantity/Unit | Unit Price | Estimated Costs |
|---|---|---|---|
| Mobilization and demobilization | --- | --- | $ 10,000 |
| Greenheart piles 12-inch diameter | 5,000 LF | 26.50 | 132,500 |
| 3-inch treated wood decking | 7 MBM | 2,675.00 | 18,725 |
| Heavy treated wood framing | 20.3 MBM | 2,675.00 | 54,300 |
| Greenheart chocks and wales | 5 MBM | 2,675.00 | 13,375 |
| Timber connections and fasteners | 2,500 Lbs. | 2.70 | 6,750 |
| Bollard | 2 Ea. | 3,750.00 | 7,500 |
| | SUBTOTAL | | $243,150 |
| | CONTINGENCIES 20% | | 46,850 |
| SUBTOTAL CONSTRUCTION COST NORTHEAST PETROLEUM MOORING | | | $290,000 |
| ALL SUBTOTAL CONSTRUCTION COST ALL SUBTOTAL CONTINGENCIES 20% | | | $1,774,675 355,325 |
| TOTAL CONSTRUCTION COST | | | $2,130,000 |

TABLE B-2

MAJOR REHABILITATION PROJECT
SANDWICH BULKHEAD
ESTIMATED ITEMIZED COSTS, SCHEMES 2 & 3
STEEL SHEET PILE BULKHEAD AND
PRECAST PRESTRESSED CONCRETE WHARF

| DESCRIPTION | QUANTITY/UNIT | | UNIT PRICE | ESTIMATED COST | |
| --- | --- | --- | --- | --- | --- |
| | SCHEME 2 | SCHEME 3 | | SCHEME 2 | SCHEME 3 |
| Mobilization and demobilization | | | | $ 50,000 | $ 50,000 |
| Riprap removed and relaid | 1,200 CY | | $ 36.00 | 43,200 | |
| Corrosion Protection | 328,000 SF | 256,000 SF | 1.35 | 442,800 | 345,600 |
| PZ27 Steel Sheet Piling | | 1,482,000 Lbs. | 0.57 | | 844,740 |
| PZ38 Steel Sheet Piling | 4,520,000 Lbs. | | 0.57 | 2,576,400 | |
| Crushed Stone Fill | 8,000 CY | 17,000 CY | 32.00 | 256,000 | 594,000 |
| Deadman with reinforc- ing at the marine railway | 20 CY | | 520.00 | 10,400 | |
| Deadman anchor piles | 400 LF | | 15.00 | 6,000 | |
| Tie rods and turnbuckles | 34,000 Lbs. | | 1.35 | 45,900 | |
| Excavation | 7000 CY | | 15.00 | 105,000 | |
| Tie rod extension | 15,000 Lbs. | | 4.20 | 63,000 | |
| Steel Fasteners | 18,000 Lbs. | | 2.15 | 38,700 | |
| Steel Wales | 73,000 Lbs. | | 0.85 | 62,050 | |
| 3-inch Wood Decking | 30 MBM | | 2,675.00 | 80,250 | |
| Cleats | 40 Ea. | 40 Ea. | 535.000 | 21,400 | 21,400 |
| Lighting | 8 Ea. | 8 Ea. | 3,750.00 | 30,000 | 30,000 |
| Loam and Seed | 5,000 SY | 5,000 SY | 3.20 | 16,000 | 16,000 |
| Prestressed Concrete Piles | | 15,600 LF | 25.60 | | 399,360 |
| Riprap 24 inches thick | | 6,000 CY | 32,00 | | 192,000 |
| SUBTOTAL CONSTRUCTION COST | | | | $3,847,100 | $2,493,100 |

B-4

TABLE B-2 (Cont.)

| DESCRIPTION | QUANTITY/UNIT | | | ESTIMATED COST | |
| | SCHEME 2 | SCHEME 3 | UNIT PRICE | SCHEME 2 | SCHEME 3 |
| --- | --- | --- | --- | --- | --- |
| Concrete Footing between bulkheads | | 1,300 CY | 220.00 | | $ 286,000 |
| Concrete Pile Cap | | 600 CY | $320.00 | | 192,000 |
| Prestressed Concrete Slabs | | 49,000 SF | 7.00 | | 343,000 |
| 4-inch Concrete Wearing Surface | | 6,000 SY | 7.50 | | 45,000 |
| Greenheart Fender Piles 15-inch Diameter | 11,500 LF | 11,500 LF | 26.50 | 304,750 | 304,750 |
| Greenheart Chocks and Wales | 66 MBM | 66 MBM | 2,675.00 | 176,550 | 176,550 |
| Galvanized Steel Fasteners | | 4,500 Lbs. | 3.00 | | 13,500 |
| SUBTOTAL CONSTRUCTION COSTS | | | | $481,300 | $1,360,800 |

### FULL DEPTH RETURN AT BOAT BASIN ENTRANCE

| | | | | | |
| --- | --- | --- | --- | --- | --- |
| Additional Bulkhead at West side of Entrance | 64,000 Lbs. | | 0.57 | 36,480 | |
| Additional Corrosion Protection | 4,000 SF | 29,000 SF | 1.35 | 5,400 | 39,150 |
| Steel Sheet Piles | | 500,000 Lbs. | 0.57 | | 285,000 |
| Crushed Stone Fill | | 600 CY | 32.00 | | 19,200 |
| Tie Rod Extension | | 900 Lbs. | 4.20 | | 3,780 |
| Steel Fasteners | | 1,000 Lbs. | 2.15 | | 2,150 |
| Steel Wales | | 4,200 Lbs. | 0.85 | | 3,570 |
| SUBTOTAL FULL DEPTH RETURN | | | | $ 41,880 | $ 352,850 |
| ALL SUBTOTAL CONSTRUCTION COSTS | | | | 4,370,280 | 4,206,750 |
| Contingencies | | | | 829,720 | 793,250 |
| TOTAL CONSTRUCTION COSTS | | | | $5,200,000 | $5,000,000 |

NOTE:  ENR Construction Cost Index, Base Year 1913 = 100; Boston, August 1980 = 3304

## TABLE B-3

### MAJOR REHABILITATION PROJECT
### SANDWICH BULKHEAD
### ESTIMATED ANNUAL MAINTENANCE COSTS

Scheme 1 – "Least Action Alternative

| | |
|---|---:|
| Maintenance on Riprap Slope | |
| Construction Cost | $1,200,000 |
| Maintenance Required – Routine Replacement | |
| of Stone on Slope | |
| Estimated Annual Cost | 3,000 |
| | |
| Maintenance on N.E. Petroleum's Pipe Pier | |
| Construction Cost | 290,000 |
| Maintenance Required – Continual Replacement | |
| of Parts of Pier Due to Wear | |
| Estimated Annual Cost | 5,000 |
| | |
| Maintenance on Canal Marine's Bulkhead | |
| Fender System | |
| Construction Cost | 80,000 |
| Maintenance Required – Continual Replacement | |
| of Parts of System Due to Wear | |
| Estimated Annual Cost | 1,500 |

Schemes 2 & 3 – Steel Sheet Pile Bulkhead, and
Prestressed Concrete Wharf

| | |
|---|---:|
| Maintenance on Fender System | |
| Construction Cost | 520,000 |
| Maintenance Required – Continual Replacement | |
| of Parts of System Due to Wear | |
| Estimated Annual Cost | 10,000 |

TABLE B-4

MAJOR REHABILITATION PROJECT
SANDWICH BULKHEAD
COMPARISON OF ANNUAL COSTS - 50 YEAR PERIOD

| Scheme | Construction Cost | Annual Construction Cost @ 7-3/8% | Annual Maintenance Cost | Total Annual Cost @7-3/8% |
|---|---|---|---|---|
| 1. Least Action | | | | |
| Riprap Slope | $1,200,000 | $ 90,000 | $ 3,000 | $ 93,000 |
| N.E. Petroleum Pier | 290,00 | 22,000 | 5,000 | 27,000 |
| Canal Marine Bulkhead | 640,000 | 48,500 | 1,500 | 50,000 |
| Total | | $180,500 | $ 9,500 | $170,000 |
| 2. Steel Sheet Pile Bulkhead | $5,200,000 | $395,000 | $ 10,000 | $405,000 |
| 3. Prestressed Concrete Wharf | $5,000,000 | $380,000 | $ 10,000 | $390,000 |

B-7

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

JOE'S LOBSTER MART, INC. and
JOSEPH A. VAUDO,
      Plaintiffs,

                                CIVIL ACTION
                                NO. 05-      -

    v.

FRANCIS DONOVAN, DISTRICT ENGINEER,
U.S. ARMY CORPS OF ENGINEERS, NEW
ENGLAND DISTRICT, COL. THOMAS L. KONING,
U.S. ARMY CORPS OF ENGINEERS,
NEW ENGLAND DISTRICT, LTG. CARL A. STROCK,
CHIEF OF ENGINEERS & COMMANDER,
U.S. ARMY CORPS OF ENGINEERS,
HON. FRANCIS J. HARVEY, SECRETARY OF THE ARMY,
and the UNITED STATES OF AMERICA,
      Defendants.

## AFFIDAVIT OF JOSEPH A.VAUDO

I, Joseph A. Vaudo, under oath, hereby depose and state as follows:

1. I am the owner of Joe's Lobster Mart, Inc., which has operated and done business at the sandwich Bulkhead for 32 years, and for the past twenty years has leased Lot 2 from the U.S. Army Corps of Engineers ["U.S.A.C.E."].

2. My business consists of the retail and wholesale purchase and sale of fish, shellfish and seafood products, and fish processing plant, with local fisherman selling their catch to me, unloading at the bulkhead.

3. Although in 1980 there were three fish processing plants at the bulkhead, today, I am the only surviving plant – one having gone out of business, the other moved to New Bedford.

4. My gross sales are in the range of $3 to $4 million per year.

5. There are no other commercial ports in the Town of Sandwich, and there are no other fish processing plants within the Town of Sandwich.

6. Given zoning constrictions, if I remove my building, which belongs to me, no other lessee would be able to construct _any_ structure on the

site, because the lot size, at some 16,000 square feet, does not meet the current zoning requirements of at least 20,000 square feet of lot area.

7. No one has approached me about purchasing my building, equipment, licenses, etc., since the Notice of Availability was published the U.S.A.C.E.

8. I have attempted, since early this year (January), to meet with the District Engineer, Mr. Francis Donovan, to re-negotiate my lease for Lot 2, to no avail.

9. I sent a letter in April 2005, to Mr. Donovan, a copy of which is attached, to which no response was ever received.

10. In 2000, the lease was awarded to me on a non-competitive basis, and, despite the fact that the fair market rental value of the property was only some $17,000, I agreed to continue to pay nearly $29,000 per year for the lease of Lot 2, a substantial benefit to the U.S.A.C.E.

11. The fact that the 2000 lease was awarded noncompetitively was in acknowledgment of the fact that, unless I continued to lease the property, no other lessee would be allowed to build any structures on Lot 2, due to zoning restrictions – and my lease requires that I remove all structures, because they belong to me.

12. If I am unable to continue business in this location, my business is essentially destroyed.

13. There is no other place within the Town of Sandwich with commercial off-loading of fish catches available, and it is unlikely that I will be able to locate a similar location anywhere on Cape Cod, meaning I would have to locate off-Cape.

14. My customers are local people, who view my store as an institution, and in fact it is the only fish market in the Town of Sandwich.

15. Given the zoning restrictions, unless someone were to purchase my building, equipment, etc., the only use that could be made of Lot 2 would be the off-loading of fish into commercially permitted trucks to take the off-loaded catch to other fish processing plants located outside the Town of Sandwich.

16. If the U.S.A.C.E. wishes to make lots available for this purpose, there are two other lots on either side of me, Lots 1 and 3, which are available for this purpose, and, if some other person is interested in doing this, U.S.A.C.E. should offer one of those lots to such person(s).

17.  In reconstructing the Sandwich Bulkhead in 1986, the main purpose for choosing the method of construction which was undertaken was to ensure the viability of the fishing fleet in Sandwich and the fish processing plants located on the bulkhead, given the substantial negative impact the loss of the same would have on the local and regional socio-economy, as set forth in pp. 19-20 of the Reconnaissance Report.

18.  My business would be devastated if I cannot continue in business at this location.

19.  The non-competitive award of the lease of Lot 2 to me in 2000 sets a precedent that in fact it is not practicable, as set forth in 33 C.F.R. 211.8(a) to use a competitive bidding process for the lease of this lot, primarily because of the zoning considerations.

20.  The only way that this would make sense is of some person(s) had an agreement with me to purchase my building, equipment, licenses, etc (if assignable), and no one has ever approached me regarding the same.

21.  After trying to schedule a meeting with Mr. Donovan from January 2005 onward, I finally had a meeting scheduled for May 23, 2005, however, on May 21, 2005, I received the Notice of Availability of Bid for Lot 2, and it became clear that any such meeting would be fruitless, since the U.S.A.C.E. had already determined that it wished to place the lot out for competitive bid, so I cancelled that meeting.

22.  To date, we have had no response to my attorney's letter of June 6, 2005, and the bid deadline of June 21, 2005, is fast approaching.

23.  It makes absolutely no sense to place Lot 2 out for competitive bid and it is impracticable, as set forth in 33 C.F.R. 211.8(a), and the U.S.A.C.E. should instead grant me a non-competitive lease at fair market rental value.

24.  If the U.S.A.C.E. wishes to lease Lots 1 and 3 to others, it remains free to do so, subject to the local zoning limitations (and compliance with local zoning limitations is a condition of the Invitation to Bid).

25.  There is no need to jeopardize my 32-year business, as the sole remaining fish processing plant in the Town of Sandwich, particularly at a time when the fishing industry continues to decline, and with the recent outbreak of red tide, which is devastating the local shellfishing industry.

SIGNED UNDER THE PAINS AND PENALTIES OF PERJURY THIS 16TH
DAY OF JUNE 2005.

Joseph A. Vaudo, President
Joe's Lobster Mart, Inc.

# DEPARTMENT OF THE ARMY
## LEASE
### RIVER AND HARBOR OR FLOOD CONTROL PROPERTY

ON

*No.* DACW33-1-90-37

*THIS LEASE, made between the Secretary of the Army, of the first part, and*

Joe's Fish and Lobster Mart, P.O. Box 248
Sandwich, MA 02563

*of the second part, WITNESSETH:*

*That the Secretary of the Army, by virtue of the authority contained in Title 10, United States Code, section 2667, and for the consideration hereinafter set forth, hereby leases to the party of the second part, hereinafter designated as the lessee, for a term of* ten (10) years *beginning* July 15 *,19* 90 *, and ending* July 14 *, 19* 2000 *but revocable at will by the Secretary of the Army, the following described property for purposes* of loading, offloading
and processing of fish products only, over Lots 1 and 2 as shown on Exhibit "A" attached hereto and by this reference made a part hereof, and retail sales of seafood and seafood products delivered from boats unloaded at the bulkhead only.

*THIS LEASE is granted subject to the following conditions:*

*1. That the lessee shall pay to the United States rental in the amount of* forty nine
thousand ten dollars *(§* 49,010.00 *) per annum, payable* ✳
*in advance, and the lessee shall also pay to the United States on demand any sum which may have to be expended after the expiration, revocation, or termination of this lease in restoring the premises to the condition required by Condition No. 23 hereof. Compensation shall be made payable to the* Treasurer of the United States *and forwarded by the lessee direct to*
FAO-USAED-NE

Division Engineer at
address shown in Condition
No. 26.

the payments of $ 12,252.50.

2. That ~~in addition to the laws and regulations to which reference is made in Condition No. xx of this lease~~, the use and occupation of the property leased hereby shall be subject to the general supervision and approval of the officer having immediate jurisdiction over said property, hereinafter referred to as "said officer", and to such rules and regulations regarding ingress, egress, safety, sanitation, and security as may be prescribed by him from time to time.

3. That, as of the commencement date of this lease, an inventory and condition report of all personal property and improvements of the Government included in this lease shall be made by a representative of the Government and a representative of the lessee to reflect the then present condition of said property. A copy of said inventory and condition report shall be attached hereto and become a part hereof, as fully as if originally incorporated herein. Upon the expiration, revocation, or termination of this lease a similar inventory and condition report shall be prepared and submitted to the said officer, said inventory and condition report to constitute the basis for settlement by the lessee with said officer for leased property shown to be lost, damaged, or destroyed, any such property to be either replaced or restored to the condition required by Condition No. 23 hereof, or at the election of the Government reimbursement made therefor by the lessee at the then current market value thereof.

4. That the lessee has inspected and knows the condition of the leased property and it is understood that the same is hereby leased without any representation or warranty by the Government whatsoever, and without obligation on the part of the Government to make any alterations, repairs, or additions thereto.

5. That, subject to the limitations of Condition No. 23 hereof with respect to the restoration of the leased property, all portions of the leased property shall at all times be protected and maintained in good order and condition by and at the expense of the lessee.

6. That the lessee shall neither transfer nor assign this lease or any property on the demised premises, nor sublet the demised premises or any part thereof or any property thereon, nor grant any interest, privilege, or license whatsoever in connection with this lease ~~without permission in writing from the said officer.~~

7. That the right is hereby reserved to the United States, its officers, agents, and employees, to enter upon the said premises at any time and for any purpose necessary or convenient in connection with river and harbor and flood-control work, to remove timber therefrom, and to flood the leased premises whenever necessary, and the lessee shall have no claim for damages of any character on account thereof against the United States or any officer, agent, or employee thereof.

8. That the United States shall not be responsible for damages to property or injuries to persons which may arise from or be incident to the use and occupation of the said premises, or for damages to the property of the lessee, or for injuries to the person of the lessee (if an individual), or for damages to the property or injuries to the person of the lessee's officers, agents, servants, or employees, or others who may be on said premises at their invitation or the invitation of any one of them, arising from or incident to the flooding of the said premises by the Government or flooding from any other cause, or arising from or incident to any other Governmental activities; and the lessee shall hold the United States harmless from any and all such claims.

9. That the lessee shall at all times exercise due diligence in the protection of the demised premises against damage or destruction by fire and other causes.

10. That any property of the United States damaged or destroyed by the lessee incident to the lessee's use and occupation of the said property shall be promptly repaired or replaced by the lessee to the satisfaction of the said officer, or in lieu of such repair or replacement the lessee shall, if so required by the said officer, pay to the United States money in an amount sufficient to compensate for the loss sustained by the United States by reason of damages to or destruction of Government property.

11. That the lessee shall cut no timber, conduct no mining or drilling operations, remove no sand, gravel, or kindred substances from the ground, except in the exercise of mineral rights here-

tofore reserved to the record owner thereof, commit no waste of any kind, or in any manner substantially change the contour or condition of the property hereby leased, except changes required in carrying out soil and water conservation measures; but the lessee may salvage fallen or dead timber as may be required for use as firewood.

12. That the lessee shall comply with all applicable laws, ordinances, and regulations of the State, county, and municipality wherein the said demised premises are located, with regard to ~~construction,~~ sanitation, licenses or permits to do business, ~~and with respect to.~~

13. That the lessee shall not construct any permanent structure on the said demised premises, and shall not construct any temporary structure or advertising sign thereon without the prior written consent of the said officer.

14. That the lessee shall pay to the proper authority, when and as the same becomes due and payable, all taxes, assessments, and similar charges, which, at any time during the term of this lease, may be taxed, assessed, or imposed upon the Government or upon the lessee with respect to or upon the leased premises. In the event any taxes, assessments, or similar charges are imposed with the consent of the Congress upon property owned by the Government and included in this lease (as opposed to the leasehold interest of the lessee therein), this lease shall be renegotiated so as to accomplish an equitable reduction in the rental provided above, which shall not be greater than the difference between the amount of such taxes, assessments, or similar charges and the amount of any taxes, assessments, or similar charges which were imposed upon such lessee with respect to his leasehold interest in the premises prior to the granting of such consent by the Congress; provided that, in the event that the parties hereto are unable to agree, within ninety (90) days from the date of imposition of such taxes, assessments, or similar charges, on a rental which, in the opinion of the said officer constitutes a reasonable return to the Government on the leased property, then, in such event, the said officer shall have the right to determine the amount of the rental, which determination shall be binding on the lessee subject to appeal in accordance with Condition No. 15 of this lease.

15. (a) That, except as otherwise provided in this lease, any dispute concerning a question of fact arising under this lease which is not disposed of by agreement shall be decided by the said officer, who shall reduce his decision to writing and mail or otherwise furnish a copy thereof to the lessee. The decision of the said officer shall be final and conclusive unless, within 30 days from the date of receipt of such copy, the lessee mails or otherwise furnishes to the said officer a written appeal addressed to the Secretary of the Army. The decision of the Secretary or his duly authorized representative for the determination of such appeals shall be final and conclusive unless determined by a court of competent jurisdiction to have been fraudulent, or capricious, or arbitrary, or so grossly erroneous as necessarily to imply bad faith, or not supported by substantial evidence. In connection with any appeal proceeding under this condition, the lessee shall be afforded an opportunity to be heard and to offer evidence in support of its appeal. Pending final decision of a dispute hereunder, the lessee shall proceed diligently with the performance of the contract and in accordance with the said officer's decision.

(b) This Condition does not preclude consideration of law questions in connection with decisions provided for in paragraph (a) above: Provided, that nothing in this Condition shall be construed as making final the decision of any administrative official, representative, or board on a question of law.

16. That this lease may be terminated by the lessee at any time by giving to the Secretary of the Army, through the said officer, at least ten (10) days' notice in writing provided that, in case of such termination, no refund by the United States of any rental theretofore paid shall be made, and provided further, that in the event the said notice is not given at least ten (10) days prior to the rental due date, the lessee shall be required to pay the rental for the period or term shown in Condition No. 1 hereof.

17. That the lessee shall pay the cost, as determined by the said officer, of producing and/or supplying any utilities and other services furnished by the Government or through Government-owned facilities for the use of the lessee, including the lessee's proportionate share of the cost of

operation and maintenance of the Government-owned facilities by which such utilities or services are produced or supplied. The Government shall be under no obligation to furnish utilities or services. Payment shall be made in the manner prescribed by the said officer upon bills rendered monthly.

18. That for such period as the lessee is in possession of the leased property pursuant to the provisions and conditions of this lease the lessee shall procure and maintain at the lessee's cost a standard fire and extended coverage insurance policy or policies on the leased property to the full insurable value thereof. The lessee shall procure such insurance from any responsible company or companies. The policy or policies evidencing such insurance shall provide that in the event of loss thereunder the proceeds of the policy or policies, at the election of the Government, shall be payable to the lessee to be used solely for the repair, restoration, or replacement of the property damaged or destroyed, any balance of the proceeds not required for the repair, restoration, or replacement of the property damaged or destroyed to be paid to the Government, and that in the event the Government does not elect by notice in writing to the insurer within sixty (60) days after the damage or destruction occurs to have the proceeds paid to the lessee for the purposes hereinabove set forth, then such proceeds shall be paid to the Government, provided however, that the insurer, after payment of any proceeds to the lessee in accordance with the provisions of the policy or policies, shall have no obligation or liability with respect to the use or disposition of the proceeds by the lessee. Nothing herein contained shall be construed as an obligation upon the Government to repair, restore, or replace the leased property or any part thereof.

19. That no Member of or Delegate to Congress or Resident Commissioner shall be admitted to any share or part of this lease or to any benefits to arise therefrom. Nothing, however, herein contained shall be construed to extend to any incorporated company, if the lease be for the general benefit of such corporation or company.

20. That the lessee shall maintain, in a manner satisfactory to the said officer, terraces and other soil and water conservation structures that may be in existence upon said premises at the beginning of or that may be constructed during the term of this lease, and the use of the said leased premises by the lessee shall be in accordance with good soil conservation practices ~~and with the land-~~ ~~use regulations as checked hereto and made a part of this lease.~~

21. That the lessee shall not sell or deal in beer, wine, or any intoxicating liquors on the said leased premises, or permit on the said premises any gambling or games of chance, or install and operate or permit to be installed or operated any device or conduct any activities thereon which in the opinion of the said officer are contrary to good morals or are otherwise objectionable.

22. That the lessee will cooperate in programs for the management and improvement of fish and wildlife and in furtherance thereof the leased premises will be subject to free public use for fishing and hunting. Hunting and fishing are permitted in accordance with all applicable Federal, State and local laws for the protection of fish and game, except in prohibited areas designated by the said officer.

(See 23 Alternate)

23. That, on or before the date of expiration of this lease or its termination by the lessee, the lessee shall at the lessee's cost vacate the leased property, remove the property of the lessee therefrom, and restore the leased property to as good order and condition as that existing upon the date of commencement of the term of this lease, less ordinary wear and tear and damage to the leased property covered by insurance and for which the Government shall receive or has received insurance funds in lieu of having the damaged property repaired, replaced, or restored. If, however, this lease is revoked, the lessee shall vacate the leased property, remove the property of the lessee therefrom, and restore the leased property to the condition aforesaid, within such time as the Secretary of the Army may designate except as otherwise provided in Condition No. 28 hereof. In either event, and except as otherwise provided in Condition No. 28 hereof, if the lessee shall fail or neglect to remove the property of the lessee and so restore the leased property, then, at the option of the Secretary of the Army, the property of the lessee shall either become the property of the United States without compensation therefor, or the Secretary of the Army may cause it to be removed and the leased property to be so restored at the expense of the lessee, and no claim for damages against the United States or its officers or agents shall be created by or made on account of such removal and restoration work.

23. *(ALTERNATE). That, on or before the date of expiration of this lease, or its termination by the lessee, the lessee shall at the lessee's cost vacate the leased property, remove the property of the lessee therefrom, and restore the premises to as good order and condition as that existing upon the date of commencement of the term of this lease, damages beyond the control of the lessee and due to fair wear and tear excepted. If, however, this lease is revoked, the lessee shall vacate the leased property, remove the property of the lessee therefrom, and restore the leased property to the condition aforesaid within such time as the Secretary of the Army may designate except as otherwise provided in Condition No. 28 hereof. In either event, and except as otherwise provided in Condition No. 28 hereof, if the lessee shall fail or neglect to remove the property of the lessee and so restore the leased property, then, at the option of the Secretary of the Army, the property of the lessee shall either become the property of the United States without compensation therefor, or the Secretary of the Army may cause it to be removed and the leased property so to be restored at the expense of the lessee, and no claim for damages against the United States or its officers or agents shall be created by or made on account of such removal and restoration work.*

24. *That if more than one lessee is named in this lease the obligations of said lessees herein contained shall be joint and several obligations.*

25. *That, except as otherwise specifically provided, any reference herein to "Division Engineer," "District Engineer," or "said officer" shall include his duly appointed successors and his authorized representatives.*

26. *That all notices to be given pursuant to this lease shall be addressed, if to the lessee, to* Joe's Fish and Lobster Mart, P.O. Box 248, Sandwich, Massachusetts

*if to the Government, to the*     New England Division, Corps of Engineers

ATTN:  Real Estate Division, 424 Trapelo Rd., Waltham, MA 02254-9149

*or as may from time to time otherwise be directed by the parties. Notice shall be deemed to have been duly given if and when inclosed in a properly sealed envelope, or wrapper, addressed as aforesaid, and deposited postage prepaid (or, if mailed by the Government, deposited under its franking privilege) in a post office or branch post office regularly maintained by the United States Government.*

27. *The lessee warrants that no person or selling agency has been employed or retained to solicit or secure this lease upon an agreement or understanding for a commission, percentage, brokerage, or contingent fee, excepting bona fide employees or bona fide established commercial or selling agencies maintained by the lessee for the purpose of securing business. For breach or violation of this warranty the Government shall have the right to annul this lease without liability or in its discretion to require the lessee to pay, in addition to the lease rental or consideration, the full amount of such commission, percentage, brokerage, or contingent fee.*

28. *That in the event the United States revokes this lease or in any other manner materially reduces the area covered thereby or materially affects its use by the lessee prior to the date of expiration thereof, an equitable adjustment in the rental paid or thereafter to be paid under this lease shall be made. If the leased premises are used for agricultural purposes, the lessee shall have the right to harvest, gather, and remove from said land such crops as may have been planted or grown on said land, or, in the alternative, the said officer may require the lessee to vacate immediately and, if funds are available, compensation will be made to the lessee for the value of the crops remaining upon said land. Such adjustment of rental or right to harvest, gather, and remove said crops shall be evidenced by a supplemental agreement, in writing, executed by the said officer and the lessee: PROVIDED, HOWEVER, That none of the provisions of this paragraph shall apply in the event of revocation because of a breach by the lessee of any of the terms and conditions of this lease and the crops remaining upon said land shall become the property of the United States upon the effective date of such revocation.*

*Before the execution of this lease, conditions were deleted, revised and added in the following manner:*

Conditions 3,18,22 and 1st Condition 23- deleted.
Conditions 2,12, and 20 certain word deleted.
Condtion 29 thru 49 (inclusive) are hereby added on attached pages and
by the reference made a part hereof.

*IN WITNESS WHEREOF I have hereunto set my hand by authority of the Secretary of the Army this _____ 7th day of ___Sept___ , 19 90 ___*

Richard T. Bogaczyk

Director of Real Estate

*THIS LEASE is also executed by the lessee this _____ day of _____ , 19 ____*

*Signed and sealed in the presence of:*

Joe's Fish & Lobster Mart, Inc.

....................................................................

.................................................................. [SEAL]

By: _____

Title: _____

JOE'S LOBSTER MART, INC.
P. O. BOX 240
SANDWICH, MASS. 02563

Address

29. The bulkhead adjacent to the leased area will be made available to the Engineer-in-Charge for emergency dockage purposes on an as-needed basis, immediately upon verbal notification.

30. Vessels engaged in the business of the lessee shall not be left unattended along the face of the bulkhead. A responsible person with authority to authorize and/or accomplish vessel movement shall be available at the bulkhead at all times.

31. The lessee must <u>actively</u> conduct business from the leased premises. Failure to comply with this provision for a period of ninety (90) calendar days shall provide cause for termination of the lease agreement at the option of the Government.

32. Lessee shall be responsible for familiarizing himself with Canal Navigation Regulations, 33CFR 207.20, and complying with said regulations.

33. The lessee will be required to erect a building with a minimum floor area of 600 square feet. Construction of a building on the leased premises will be limited to a one-story type structure, with roof slope not less than 5-inches on 12-inches. The building shall have maximum overall dimensions of not more than 50 feet wide by 100 feet long. The building shall be located on leased land between lines formed by the bulkhead and the northernmost line, or extension thereto, of paved area. The building shall be set back a minimum of twenty (20) feet from the face of the bulkhead and ten (10) feet from the east and west lease limits.

34. Unit structural loading, including both dead and live loads, shall not exceed 250 pounds per square foot within the land area fifty (50) feet perpendicular from the face of the bulkhead.

35. Construction of ramps or docks for loading trucks, with finished surface elevations below the level of the top of the bulkhead or the existing grade of the adjacent land, will not be permitted.

36. The lessee shall have the right to keep the leased premises locked and secured at all times subject to the rights reserved by the government for access to and use of the bulkhead and the rights of adjacent lessees. If the lessee elects to secure his area, the methods and materials to be used by the lessee to secure the leased premises including the width and location of gate openings and fence heights shall be subject to the approval of the Engineer-in-Charge, prior to installation.

7.

37. The lessee shall be responsible for providing and maintaining safety railing as necessary along the portion of the bulkhead abutting the leased area.

38. A bollard for the use of oil barges has been located on Lot No. 1. This bollard must be made available and accessible immediately whenever a barge is brought to the bulkhead. Vessels obstructing the use of this bollard will be relocated by the lessee. Otherwise the bollard may be used by the lessee. A pedestrian gate in the chain link fence at the northwest corner of Lot No. 1 is for the exclusive use of the terminal operators only.

39. A paved parking lot on leased land shall be available for the use of the lessee(s) for their employees and customers in common with all three (3) leases. No commercial truck vehicles will be parked or stored in this parking area. Parking will not be permitted along the northerly side of the parking area to facilitate the maneuvering of commercial vehicles for common access to the lessee's buildings. Each lessee may submit an alternative plan or proposal for common use of the no-parking area to the Engineer-in-Charge for consideration.

40. All commercial trucks and vehicles owned or leased by the lessee and his associated customers shall be parked on leased land within limits described as follows:

> North Limit - 20 feet landward of bulkhead
>
> East Limit - boundary of leased area
>
> South Limit - straight line extension of the northernmost edge of existing pavement as shown on Drawing No. D.S. 29/85, dated 15 Feb 85.
>
> West Limit - boundary of leased area

41. The northerly limit of the leased property shall abut but not include the bulkhead structure.

42. Plans for building on and grading of the leased area will be submitted to the Division Engineer for review and approval prior to any construction. All surfaces shall be sloped to drain toward the Canal without ponding. Penetration of the bulkhead for openings or installations of any type will not be permitted.

8.

All surfaces shall be sloped to drain toward the Canal without ponding. Penetration of the bulkhead for openings or installations of any type will not be permitted.

43. Installation of electric and telephone lines shall be the responsibility of the lessee. Plans for these utilities shall be submitted to the Division Engineer for review and approval prior to any construction. Underground lines will not be permitted.

44. Late Payments. The United States will impose an interest charge, the amount to be determined by law or regulation, on late payment of rent. Interest will accrue from the due date. An administrative charge to cover the costs of processing and handling each late payment will also be imposed. In addition, the U.S. will impose a penalty charge on any payment or portion thereof more than 90 days past due, penalty shall accrue from the date of delinquency and will continue to accrue until the debt is paid in full.

45. A water meter pit located on Lot No. 2 will be shared by all lessees. A 4-inch government owned water line is provided to this pit. Each lessee will make his own arrangements, including monthly payments, with the Town of Sandwich Water District on Tupper Road, to provide metered water service to their respective buildings.

46. Retail sales will be limited to sales of sea-food delivered from boats unloaded at the bulkhead.

47. Public fishing will not be permitted from the bulkhead in front of leased area for safety reasons.

48. The sale or storage of alcoholic beverages will not be permitted.

49. After the first five years of the lease the rental will be reviewed and adjusted to reflect current rental rates, if required. The decision of the District Engineer as to the amount of fair value shall be final.

9.

Lease No. DACW33-1-90-37
Cape Cod Canal, MA

CORPORATE CERTIFICATE

I, _____ , certify that I am the

_____ of the corporation named as Lessee herein,

that _____ , who signed this lease on behalf of

the Lessee was then _____ of the corporation; that

said lease was duly signed for and in behalf of said

corporation by authority of its governing body, and is within

the scope of its corporate powers.

AFFIX SEAL

_____
(Signature)

REPLACING LEASE NO. DACW33-1-90-37

LEASE NO. DACW33-1-00-090

## DEPARTMENT OF THE ARMY LEASE

### CAPE COD CANAL PROJCET

### BARNSTABLE COUNTY, MASSACHUSTTS

THIS LEASE, made on behalf of the United States, between the SECRETARY OF THE ARMY, hereinafter referred to as the Secretary, and JOE'S FISH AND LOBSTER MART, hereinafter referred to as the Lessee.

WITNESSETH:

That the Secretary, by the authority of Title 10, United States Code, Section 2667, and for the consideration hereinafter set forth, hereby leases to the Lessee the property known as Lot 2, identified in Exhibit A, attached hereto and made a part hereof, hereinafter referred to as the premises, for purposes of loading, offloading, and processing of fish products only, and retail sales of seafood and seafood products delivered from boats unloaded at the bulkhead only.

THIS LEASE is granted subject to the following conditions:

1.   TERM

Said premises are hereby leased for a term of five (5) years, beginning July 15, 2000 and ending July 14, 2005, but revocable at will by the Secretary.

2.   CONSIDERATION

a. The Lessee shall pay rental in advance to the United States in the amount of twenty-eight thousand five hundred seventy-five dollars ($28,575.00) per annum, payable in four equal quarterly payments of $7,143.75 to the order of the Finance and Accounting officer, New England District, and delivered to Chief, Real Estate Division, U.S. Army Corps of Engineers, 696 Virginia Road, Concord, MA 01742.

b. All rent and other payments due under the terms of this lease must be paid on or before the date they are due in order to avoid the mandatory sanctions imposed by the Debt Collection Act of 1982, (31 U.S.C. Section 3717). This statute requires the imposition of an interest charge for the late payment of debts owed to the United States; an administrative charge to cover the costs of processing and handling delinquent debts; and the

assessment of an additional penalty charge on any portion of a debt that is more than 90 days past due. The provisions of the statute will be implemented as follows:

(1) The United States will impose an interest charge, the amount to be determined by law or regulation, on late payment of rent. Interest will accrue from the due date. An administrative charge to cover the cost of processing and handling each late payment will also be imposed.

(2) In addition to the charges set forth above, the United States will impose a penalty charge of six percent (6%) per annum on any payment, or portion thereof, more than ninety (90) days past due. The penalty shall accrue from the date of delinquency and will continue to accrue until the debt is paid in full.

(3) All payments received will be applied first to any accumulated interest, administrative and penalty charges and then to any unpaid rental or other payment balance. Interest will not accrue on any administrative or late payment penalty charge.

3.    NOTICES

All correspondence and notices to be given pursuant to this lease shall be addressed, if to the Lessee, to Joe's Fish and Lobster Mart, P.O. Box 248, Sandwich, MA 02563 and, if to the United States, to the District Engineer, Attention: Chief, Real Estate Division, 696 Virginia Road, Concord, MA 01742, or as may from time to time otherwise be directed by the parties. Notice shall be deemed to have been duly given if and when enclosed in a properly sealed envelope, or wrapper, addressed as aforesaid, and deposited postage prepaid in a post office regularly maintained by the United States Postal Service.

4.    AUTHORIZED REPRESENTATIVES

Except as otherwise specifically provided, any reference herein to "Secretary", "District Engineer", or "said officer" shall include their duly authorized representatives. Any reference to "Lessee" shall include any sublessees, assignees, transferees, successors and their duly authorized representatives.

5.    SUPERVISION BY THE DISTRICT ENGINEER

The use and occupation of the premises shall be subject to the general supervision and approval of the District Engineer hereinafter referred to as said officer, and to such rules and

2

LEASE NO. DACW33-1-00-090

regulations as may be prescribed from time to time by said
officer.

6.    APPLICABLE LAWS AND REGULATIONS

The Lessee shall comply with all applicable Federal, state,
county and municipal laws, ordinances and regulations wherein the
premises are located.

7.    CONDITION OF PREMISES

The Lessee acknowledges that it has inspected the premises,
knows its condition, and understands that the same is leased
without any representations or warranties whatsoever and without
obligation on the part of the United States to make any
alterations, repairs, or additions thereto.

8.    TRANSFERS AND ASSIGNMENTS

Without prior written approval of the District Engineer, the
Lessee shall neither transfer nor assign this lease, nor sublet
the premises or any part thereof, nor grant any interest,
privilege or license whatsoever in connection with this lease.
Failure to comply with this condition shall constitute a
noncompliance for which the lease may be revoked immediately by
the District Engineer.

9.    COST OF UTILITIES

The Lessee shall pay the cost, as determined by the officer
having jurisdiction over the premises, of producing and/or
supplying any utilities and other services furnished by the
government or through government owned facilities for the use of
the Lessee, including the Lessee's proportionate share of the
cost of operation and maintenance of the government owned
facilities by which such utilities or services are produced or
supplied. The government shall be under no obligation to furnish
utilities or services. Payment shall be made in the manner
prescribed by the officer having such jurisdiction.

10.    PROTECTION OF PROPERTY

The Lessee shall keep the premises in good order and in a
clean, safe condition by and at the expense of the Lessee.  The
Lessee shall be responsible for any damage that may be caused to
property of the United States by the activities of the Lessee
under this lease, and shall exercise due diligence in the
protection of all property located on the premises against fire

3

or damage from any and all other causes. Any property of the
United States damaged or destroyed by the Lessee incident to the
exercise of the privileges herein granted shall be promptly
repaired or replaced by the Lessee to a condition satisfactory to
said officer, or at the election of said officer, reimbursement
made therefor by the Lessee in an amount necessary to restore or
replace the property to a condition satisfactory to said officer.

## 11. INSURANCE

a. At the commencement of this lease, the Lessee shall
obtain, from a reputable insurance company, or companies,
liability insurance. The insurance shall provide an amount not
less than that which is prudent, reasonable and consistent with
sound business practices or a minimum combined single limit of $2
million, whichever is greater, for any number of persons or
claims arising from any one incident with respect to bodily
injuries or death resulting therefrom, property damage, or both,
suffered or alleged to have been suffered by any person or
persons resulting from the operations of the Lessee under the
terms of this lease. The Lessee shall require its insurance
company to furnish to the District Engineer a copy of the policy
or policies, or if acceptable to the District Engineer,
certificates of insurance evidencing the purchase of such
insurance. The minimum amount of liability insurance coverage is
subject to revision by the District Engineer every three years or
upon renewal or modification of this lease.

b. The insurance policy or policies shall be of
comprehensive form of contract and shall specifically provide
protection appropriate for the types of facilities, services and
activities involved. The Lessee shall require that the insurance
company give the District Engineer thirty (30) days written
notice of any cancellation or change in such insurance. The
District Engineer may require closure of any or all of the
premises during any period for which the Lessee does not have the
required insurance coverage.

c. As to those structures and improvements on the premises
constructed by or owned by the United States, for such periods as
the Lessee is in possession of the premises pursuant to the terms
and conditions of this lease, the Lessee shall procure and
maintain at the Lessee's cost a standard fire and extended
coverage insurance policy or policies on the leased premises to
the full insurable value thereof. The Lessee shall procure such
insurance from a reputable company or companies. The insurance
policy shall provide that in the event of loss thereunder, the
proceeds of the policy or policies, at the election of the United
States, shall be payable to the Lessee to be used solely for the

4

LEASE NO. DACW33-1-00-090

~~repair, restoration or replacement of the property damaged or
destroyed, and any balance of the proceeds not required for such
repair, restoration or replacement shall be paid to the United
States. If the United States does not elect by notice in writing
to the insurer within sixty (60) days after the damage or
destruction occurs to have the proceeds paid to the Lessee for
the purposes hereinabove set forth, then such proceeds shall be
paid to the United States, provided however that the insurer,
after payment of any proceeds to the lessee in accordance with
the provision of the policy or policies, shall have no obligation
or liability with respect to the use or disposition of the
proceeds by the lessee. Nothing herein contained shall be
construed as an obligation upon the United States to repair,
restore or replace the leased premises or any part thereof.~~

## 12. RIGHT TO ENTER AND FLOOD

The right is reserved to the United States, its officers,
agents, and employees to enter upon the premises at any time and
for any purpose necessary or convenient in connection with
government purposes; to make inspections, to remove timber or
other material, except property of the Lessee, to flood the
premises, to manipulate the level of the lake or pool in any
manner whatsoever and/or to make any other use of the lands as
may be necessary in connection with government purposes, and the
Lessee shall have no claim for damages on account thereof against
the United States or any officer, agent, or employee thereof.

## 13. INDEMNITY

The United States shall not be responsible for damages to
property or injuries to persons which may arise from or be
incident to the exercise of the privileges herein granted, or for
damages to the property of the Lessee, or for damages to the
property or injuries to the person of the Lessee's officers,
agents or employees or others who may be on the premises at their
invitation or the invitation of any one of them, and the Lessee
shall hold the United States harmless from any and all such
claims not including damages due to the fault or negligence of
the United States or its contractors.

## 14. RESTORATION

On or before the expiration of this lease or its termination
by the Lessee, the Lessee shall vacate the premises, remove the
property of the Lessee, and restore the premises to a condition
satisfactory to said officer. If, however, this lease is re-
voked, the Lessee shall vacate the premises, remove said property
and restore the premises to the aforesaid condition within such
time as the said officer may designate or as otherwise specified

5

by the provisions of the condition on **RENTAL ADJUSTMENT**.  In
either event, if the Lessee shall fail or neglect to remove said
property and restore the premises, then, at the option of the
said officer, the property shall either become the property of
the United States without compensation therefor, or the said
officer may cause the property to be removed and no claim for
damages against the United States or its officers or agents shall
be created by or made on account of such removal and restoration
work.  The Lessee shall also pay the United States on demand any
sum which may be expended by the United States after the expira-
tion, revocation, or termination of this lease in restoring the
premises.

### 15.  NON-DISCRIMINATION

The Lessee shall not discriminate against any person or
persons or exclude them from participation in the Lessees
operations, programs or activities conducted on the leased
premises, because of race, color, religion, sex, age, handicap or
national origin.  The Lessee will comply with the Americans with
Disabilities Act and attendant Americans with Disabilities Act
Accessibility Guidelines (ADAAG) published by the Architectural
and Transportation Barriers Compliance Board.

### 16.  SUBJECT TO EASEMENTS

This lease is subject to all existing easements, or those
subsequently granted as well as established access routes for
roadways and utilities located, or to be located, on the
premises, provided that the proposed grant of any new easement or
route will be coordinated with the Lessee, and easements will not
be granted which will, in the opinion of the District Engineer,
interfere with the use of the premises by the Lessee.

### 17.  SUBJECT TO MINERAL INTERESTS

This lease is subject to all outstanding mineral interests.
As to federally owned mineral interests, it is understood that
they may be included in present or future mineral leases issued
by the Bureau of Land Management (BLM) which has responsibility
for mineral development on  federal lands.  The Secretary  will
provide lease stipulations to BLM for inclusion in said mineral
leases that are designed to protect the premises from activities
that would interfere with the lessee's operations or would be
contrary to local law.

### 18.  TERMINATION

This lease may be terminated by the Lessee at any time by

6

LEASE NO. DACW33-1-00-090

giving the District Engineer at least thirty (30) days notice in writing provided that no refund by the United States of any rental previously paid shall be made, and provided further, that in the event that said notice is not given at least thirty (30) days prior to the rental due date, the Lessee shall be required to pay the rental for the period shown in the condition on **CONSIDERATION**.

## 19. RENTAL ADJUSTMENT

In the event the United States revokes this lease or in any other manner materially reduces the leased area or materially affects its use by the Lessee prior to the expiration date, an equitable adjustment will be made in the rental paid or to be paid under this lease. Such adjustment of rental shall be evidenced by a supplemental agreement in writing; PROVIDED however, that none of the provisions of this paragraph shall apply in the event of revocation because of noncompliance by the Lessee with any of the terms and conditions of this lease.

## 20. PROHIBITED USES

a. The Lessee shall not permit gambling on the premises or install or operate, or permit to be installed or operated thereon, any device which is illegal; or use the premises or permit them to be used for any illegal business or purpose. There shall not be conducted on or permitted upon the premises any activity which would constitute a nuisance. The Lessee shall not sell, store or dispense, or permit the sale, storage, or dispensing of beer or other intoxicating liquors on the premises.

b. The Lessee shall not construct or place any structure, improvement or advertising sign or allow or permit such construction or placement without prior written approval of the District Engineer.

## 21. NATURAL RESOURCES

The Lessee shall cut no timber, conduct no mining operations, remove no sand, gravel, or kindred substances from the ground, commit no waste of any kind, nor in any manner substantially change the contour or condition of the premises except as authorized in writing by the District Engineer.

## 22. DISPUTES CLAUSE

a. Except as provided in the Contract Disputes Act of 1978 (41 U.S.C. 601-613) (the Act), all disputes arising under or

LEASE NO. DACW33-1-00-090

relating to this lease shall be resolved under this clause and
the provisions of the Act.

b. "Claim", as used in this clause, means a written demand
or written assertion by the Lessee seeking, as a matter of right,
the payment of money in a sum certain, the adjustment of inter-
pretation of lease terms, or other relief arising under or
relating to this lease. A claim arising under this lease, unlike
a claim relating to this lease, is a claim that can be resolved
under a lease clause that provides for the relief sought by the
Lessee. However, a written demand or written assertion by the
Lessee seeking the payment of money exceeding $100,000 is not a
claim under the Act until certified as required by subparagraph
c.(2) below. The routine request for rental payments that is not
in dispute is not a claim under the Act. The request may be
converted to a claim under the Act, by this clause, if it is
disputed either as a liability or amount or is not acted upon in
a reasonable time.

c. (1) A Claim by the Lessee shall be made in writing and
submitted to the District Engineer for a written decision. A
claim by the Government against the Lessee shall be subject to a
written decision by the District Engineer.

(2) For Lessee claims exceeding $100,000, the Lessee shall
submit with the claim a certification that--

(i) the claim is made in good faith; and

(ii) supporting data are accurate and complete to the
best of the Lessee's knowledge and belief;

(iii) and the amount requested accurately reflects the
lease adjustment for which the Lessee believes the
Government is liable.

(3) If the Lessee is an individual, the certificate shall
be executed by that individual. If the Lessee is not an
individual, the certification shall be executed by --

(i) a senior company official in charge of the Lessee's
location involved; or

(ii) an officer or general partner of the lessee having
overall responsibility of the conduct of the Lessee's
affairs.

d. For Lessee claims of $100,000 or less, the District
Engineer must, if requested in writing by the Lessee, render a

8

decision within 60 days of the request. For lessee-certified
claims over $100,000, the District Engineer must, within 60 days,
decide the claim or notify the Lessee of the date by which the
decision will be made.

e. The District Engineer's decision shall be final unless
the Lessee appeals or files a suit as provided in the Act.

f. At the time a claim by the Lessee is submitted to the
District Engineer or a claim by the Government is presented to
the lessee, the parties, by mutual consent, may agree to use
alternative means of dispute resolution. When using alternate
dispute resolution procedures, any claim, regardless of amount,
shall be accompanied by the certificate described in paragraph
c.(2) of this clause, and executed in accordance with paragraph
c.(3) of this clause.

g. The Government shall pay interest or the amount found due
and unpaid by the Government from (1) the date the District
Engineer received the claim (properly certified if required), or
(2) the date payment otherwise would be due, if that date is
later, until the date of payment. Simple interest on claims
shall be paid at the rate, fixed by the Secretary of the Treasury
as provided in the Act, which is applicable to the period during
which the District Engineer receives the claim and then at the
rate applicable for each 6-month period as fixed by the Treasury
Secretary during the pendency of the claim. Rental amounts due
to the Government by the Lessee will have interest and penalties
as set out in the condition on CONSIDERATION.

h. The Lessee shall proceed diligently with the performance
of the lease, pending final resolution of any request for relief,
claim, or action arising under the lease, and comply with any
decision of the District Engineer.

23. ENVIRONMENTAL PROTECTION

a. Within the limits of their respective legal powers, the
parties to this lease shall protect the premises against
pollution of its air, ground, and water. The Lessee shall comply
with any laws, regulations, conditions, or instructions affecting
the activity hereby authorized if and when issued by the
Environmental Protection Agency, or any Federal, state,
interstate or local governmental agency having jurisdiction to
abate or prevent pollution. The disposal of any toxic or
hazardous materials within the premises is specifically
prohibited. Such regulations, conditions, or instructions in
effect or prescribed by said Environmental Protection Agency, or

9

any Federal, State, interstate or local governmental agency are hereby made a condition of this lease. The Lessee shall not discharge waste or effluent from the premises in such a manner that the discharge will contaminate streams or other bodies of water or otherwise become a public nuisance.

b. The Lessee will use all reasonable means available to protect the environment and natural resources, and where damage nonetheless occurs from activities of the lessee, the Lessee shall be liable to restore the damaged resources.

c. The Lessee must obtain approval in writing from said officer before any pesticides or herbicides are applied to the premises.

24. ENVIRONMENTAL BASELINE SURVEY (EBS)

An Environmental Baseline Survey (EBS) documenting the known history of the property with regard to the storage, release or disposal of hazardous substances thereon, is attached hereto and made a part hereof as Exhibit B. Upon expiration, revocation or relinquishment of this lease another EBS shall be prepared which will document the environmental condition of the property at that time. A comparison of the two assessments will assist the said officer in determining any environmental restoration require-ments. Any such requirements will be completed by the Lessee in accordance with the condition on RESTORATION.

25. HISTORIC PRESERVATION

The Lessee shall not remove or disturb, or cause or permit to be removed or disturbed, any historical, archeological, architectural or other cultural artifacts, relics, remains or objects of antiquity. In the event such items are discovered on the premises, the Lessee shall immediately notify said officer and protect the site and the material from further disturbance until said officer gives clearance to proceed.

26. SOIL AND WATER CONSERVATION

The Lessee shall maintain, in a manner satisfactory to said officer, all soil and water conservation structures that may be in existence upon said premises at the beginning of or that may be constructed by the Lessee during the term of this lease, and the Lessee shall take appropriate measures to prevent or control soil erosion within the premises. Any soil erosion occurring outside the premises resulting from the activities of the Lessee shall be corrected by the Lessee as directed by the said officer.

LEASE NO. DACW33-1-00-090

## 27. TAXES

Any and all taxes imposed by the state or its political subdivisions upon the property or interest of the Lessee in the premises shall be paid promptly by the Lessee. If and to the extent that the property owned by the Government is later made taxable by State or local governments under an Act of Congress, the lease shall be renegotiated.

## 28. COVENANT AGAINST CONTINGENT FEES

The Lessee warrants that no person or selling agency has been employed or retained to solicit or secure this lease upon an agreement or understanding for a commission, percentage, brokerage, or contingent fee, excepting bona fide employees or established commercial or selling agencies maintained by the Lessee for the purpose of securing business. For breach or violation of this warranty, the United States shall have the right to annul this lease without liability or, in its discretion, to require the Lessee to pay, in addition to the lease rental or consideration, the full amount of such commission, percentage, brokerage, or contingent fee.

## 29. OFFICIALS NOT TO BENEFIT

No member of or delegate to congress or resident commissioner shall be admitted to any share or part of this lease or to any benefits to arise therefrom. However, nothing herein contained shall be construed to extend to any incorporated company if this lease is for the general benefit of such corporation or company.

## 30. SEVERAL LESSEES

If more than one Lessee is named in this lease the obligations of said Lessees herein contained shall be joint and several obligations.

## 31. MODIFICATIONS

This lease contains the entire agreement between the parties hereto, and no modification of this agreement, or waiver, or consent hereunder shall be valid unless the same be in writing, signed by the parties to be bound or by a duly authorized representative and this provision shall apply to this condition as well as all other conditions of this lease.

LEASE NO. DACW33-1-00-090

## 32. DISCLAIMER

This lease is effective only insofar as the rights of the
United States in the premises are concerned; and the Lessee shall
obtain any permit or license which may be required by Federal,
state, or local statute in connection with the use of the
premises. It is understood that the granting of this lease does
not preclude the necessity of obtaining a Department of the Army
permit for activities which involve the discharge of dredge or
fill material or the placement of fixed structures in the waters
of the United States, pursuant to the provisions of Section 10 of
the Rivers and Harbors Act of 3 March 1899 (33 USC 403), and
Section 404 of the Clean Waters Act (33 USC 1344).

## 33. ADDITIONAL CONDITIONS

a.   The bulkhead adjacent to the leased area will be made
available at no cost to the Engineer-in-Charge for emergency
dockage purposes on an as-needed basis, immediately upon oral
notification.

b.   Vessels engaged in the business of the Lessee shall not
be left unattended along the face of the bulkhead. A responsible
person with authority to authorize and/or accomplish vessel
movement shall be present at the bulkhead at all times.

c.   The Lessee must actively conduct business from the
leased premises.  Failure to comply with this provision for a
period of ninety (90) calendar days shall provide cause for
termination of the lease agreement at the option of the
Government.

d.   The Lessee shall be responsible for complying with Canal
Navigation Regulations, 33 CFR 207.20, and shall comply with said
regulations.

e.   The Lessee shall maintain a building with a minimum
floor area of 600 square feet.  The building on the leased
premises will be limited to a one-story type structure, with roof
slope not less than 5-inches on 12-inches.  The building shall
have maximum overall dimensions of not more than 50 feet wide by
100 feet long.  The building shall be located on leased land
between lines formed by the bulkhead and the northernmost line,
or extension thereto, of paved area.  The building shall be set
back a minimum of twenty (20) feet from the face of the bulkhead
and ten (10) feet from the east and west lease limits.

12

LEASE NO. DACW33-1-00-090

f.   Unit structural loading, including both dead and live loads, shall not exceed 250 pounds per square foot within the land area fifty (50) feet perpendicular from the face of the bulkhead.

g.   Construction of ramps or docks for loading trucks, with finished surface elevations below the level of the top of the bulkhead or the existing grade of the adjacent land, will not be permitted.

h.   The Lessee shall have the right to keep the leased premises locked and secured at all times subject to the rights reserved by the Government for access to and use of the bulkhead and the rights of adjacent lessees.  If the Lessee elects to secure his area, the methods and materials to be used by the Lessee to secure the leased premises including the width and location of gate openings and fence heights shall be subject to the approval of the Engineer-in-Charge, prior to installation.

i.   The Lessee shall be responsible for providing and maintaining safety railing as necessary along the portion of the bulkhead abutting the leased area.

j.   A paved parking lot on leased land shall be available for the use of the lessee(s) for their employees and customers in common with other Government Lessees.  No commercial truck vehicles will be parked or stored in this parking area.  Parking will not be permitted along the northerly side of the parking area to facilitate the maneuvering of commercial vehicles for common access to the Lessee's building

k.   All commercial trucks and vehicles owned or leased by the Lessee and his associated customers shall be parked on leased land within limits described as follows:

        North Limit - 20 feet landward of bulkhead

        East Limit - boundary of leased area

        South Limit - straight line extension of the
                      northernmost edge of existing pavement
                      as shown on Drawing No. D.S. 29/85, dated
                      15 Feb 85.

        West Limit - boundary of leased area

l.   The northerly limit of the leased property shall abut but not include the bulkhead structure.

13

# Town Of Sandwich
**THE OLDEST TOWN ON CAPE COD**





Sandwich Glass Works

# PROTECTIVE ZONING BY-LAW
# MAY 2004

1

Such non-conforming lots may be changed in size or shape or their land area recombined without losing this exemption, so long as the change does not increase the actual or potential number of buildable lots.

**2555.** Any legally created lot with an area of at least 20,000 square feet, and frontage of at least 125 feet, which, while buildable for single family residential use, was held in separate ownership from all adjoining property and which has been held in such separate ownership at all times thereafter, shall be buildable for single family residential use notwithstanding lack of compliance with the dimensional requirements of Section 2600. Buildings constructed on such lot shall conform to the setbacks required for the lot when the lot was created. (Added ATM 5/6/96).

**2560.** *Reserved. (Deleted ATM 92)*

**2570.** *Reserved. (Deleted ATM 94)*

**2580.** Residential condominium shall comply with the regulations for multi-family dwellings. (See Section 4600).

**2590.** **Water Resource Overlay District**. Residential uses located within a Water Resource District shall be governed by the lot area requirements of the R-2 District if more restrictive than otherwise applicable requirements. This requirement shall not apply to lots created on plans recorded prior to January 1, 1985.

**2600.** **INTENSITY OF USE SCHEDULE**

(See Section 4640 for Multi-family dwelling requirements)

|  | R-1 | BL-1 (a) MAR S | BL-2 | IND | R-2 GD | RD |
|---|---|---|---|---|---|---|
| Minimum lot size in square feet (b, h, l) | 40,000 | 20,000 | 40,000 | 40,000 | 60,000 | 60,000 |
| Minimum lot frontage in feet | 150 | 125 | 150 | 150 | 200 | 200 |
| Minimum front yard in feet (c) | 30 | 30 | 30 (f) | 30 (f) | 50 | 40 |
| Minimum side rear yard in feet (d, e, i) | 25 | 0 | 0 | 30 (m) | 45 | 30 |
| Maximum lot coverage % | 25 | none | none | none | 25 | 25 |
| Maximum building height (g) in feet (Amended STM 4/1/96) | 35 | 35 | 35 | 45 | 35 | 35 |
| Maximum shape factor (k) | 22 | 22 | 22 | 22 | 22 | 22 |

**Intensity Of Use Schedule Notes:**

a. Permitted residential uses must conform to the requirements at the nearest residential district.

b. Hotels, motels, motor courts, lodging houses and cottage colonies must meet this requirement and must provide not less than 12,000 square feet per dwelling or guest unit.

c. On special permit from the Board of Appeals, may be reduced to the lesser of thirty percent (30%) of lot depth or the average of the setbacks of the buildings on the lot next thereto on either side, a vacant lot or a lot occupied by a building set back more than the minimum requirement being counted as though occupied by a building set back by the minimum.

d. One-story accessory buildings may be located within a required yard, but not less than ten (10) feet from lot lines other than street lines; except an accessory building of one hundred (100) square feet or less may be located no closer than six (6) feet to the line.

e. No building or any part thereof, except steps, shall be built within twelve (12) feet of any other building.

f. If abutting an arterial street, sixty (60) feet front yard setback is required and to be

18

# NOTICE OF AVAILABILITY NO. DACW33-9-05-02

## FOR LEASE OF
## GOVERNMENT REAL PROPERTY

NAME OF PROPERTY     Cape Cod Canal
                     Massachusetts

LOCATION             As shown on Exhibit "A"

CONSISTING OF        Bulkhead Lot 2, Sandwich

PURPOSE              Loading, offloading, processing of fish products and retail
                     sales of seafood and seafood products

### SEALED PROPOSALS WILL BE OPENED:

DATE:       Tuesday, June 21, 2005, 2:00 p.m.  Eastern Standard Time

LOCATION:   U.S. Army Corps of Engineers
            New England District
            Real Estate Division
            696 Virginia Road
            Concord, MA 01742-2751

*Molly McCabe*
*978.318-8570*

DEPARTMENT OF THE ARMY
New England District
Corps of Engineers
696 Virginia Road
Concord, Massachusetts 01742-2751

INVITATION NO. DACW33-9-05-02

INVITATION FOR BIDS
FOR LEASING REAL PROPERTY

BULKHEAD LOT 2, SANDWICH

CAPE COD CANAL, MASSACHUSETTS
May 17, 2005

1.  Sealed bids, subject to the conditions contained herein, will be received until 2:00
p.m. Eastern Daylight Saving Time on **Tuesday June 21, 2005** for leasing of land known
as Lot 2 at the Cape Cod Canal, Massachusetts, shown as Lot 2 on the attached map
identified as "Exhibit A". *Prospective bidders are encouraged to consider that any
building(s) that is on Lot 2 at the time of this Invitation for Bids does not currently belong
to the government and may be removed by the current owner before the end of his lease.
This invitation is for the lease of land only, and no representation is made as to whether
any building(s) will exist on the land at the time the lease commences.* The property as
shown on the map is believed to be correct, but any error or omission shall not constitute
any ground or reason for nonperformance of the provisions and conditions of the lease or
claim by the lessee for any refund or deduction from the rental. Further information may
be obtained from:

Mr. Francis Donovan
Canal Manager
Cape Cod Canal Field Office
Buzzards Bay, Massachusetts 02532
Telephone 978-318-8501

2.  The use of the leased area is for loading, offloading, and processing of fish products,
and retail sales of seafood and seafood products.

3.  The authority of law for the granting of the lease is Title 10, U.S. Code, Section 2667.

4.  Bidders are advised that a parcel of land on the bulkhead, or a portion of same, to the
west of Lot 2, and north of the Sandwich Marina will be offered by the Government to
the Town of Sandwich for use in connection with the existing Sandwich Marina. The
Sandwich Marina intends to make this area available for servicing the marina slip
holders. During the term of the lease of Lot 2, Sandwich Marina slip holders will be

*Invitation No. DACW33-9-05-02*
*May 17, 2005*
*Bulkhead Lot 2, Sandwich*
*Cape Cod Canal, MA*

authorized to use the aforementioned bulkhead area to load or offload fishing vessels or to take on bait and ice from suppliers. The slip holders will be under no obligation to notify the lessee of Lot 2 or to use any offloading services offered by the lessee of Lot 2.

5.  Bidders are advised that a parcel of land (Lot 1) south of the government bulkhead and to the west of Lot 2 will be open to the public for recreational use, including parking.

6.  The successful bidder will be required to enter into a lease with the United States substantially in accordance with the form attached hereto ("Lot 2 Sample Lease") and the conditions of this Invitation for Bid. The lease will be subject to any existing easements for electric power transmission lines, telephone or telegraph lines, water, gas, gasoline, oil, or sewer pipelines, or other facilities needed on the property covered by said lease.

7.  The lease will be for a term five (5) years, beginning on or about July 15, 2005. At the end of the five year period, Lot 2 will no longer be available for leasing. There will be no extension to the length of this lease.

8.  Annual rental to the United States will be payable in advance in equal quarterly payments. The first installment, less the sum deposited as a guarantee with the bid, will be made at the time of delivery of the lease to the lessee.

9.  The United States will impose an interest charge, the amount to be determined by law or regulation, on late payment of rent. Interest will accrue from the due date. An administrative fee to cover the costs of processing and handling each late payment will also be imposed. In addition, the United States will impose a penalty charge on any payment or portion thereof more than 90 days past due, penalty shall accrue from the date of delinquency and will continue to accrue until the debt is paid in full.

10. The property is available for inspection by prospective bidders. Arrangements for such inspection may be made with the Canal Manager, Cape Cod Canal, on weekdays during normal working hours. Bidders are expected to inspect the property and form their own conclusions as to its suitability for their purposes. The failure of any bidder to make such inspection will not constitute grounds for any claim for adjustment or for the withdrawal of his bid after the time of opening bids. It is to be understood and agreed that there is no warranty of any character other than that expressly stated in this Invitation for Bids.

11. The northerly limit of the leased property shall abut but not include the bulkhead structure.

*Invitation No. DACW33-9-05-02*
*May 17, 2005*
*Bulkhead Lot 2, Sandwich*
*Cape Cod Canal, MA*

12. The bulkhead adjacent to the leased area will be made available to the Canal Manager for emergency dockage purposes on an as needed basis, immediately upon verbal notification.

13. Vessels engaged in the business of the Lessee shall not be left unattended along the face of the bulkhead. A responsible person with authority to authorize and/or accomplish vessel movement shall be present at the bulkhead whenever a vessel is tied to the bulkhead. Vessels may only remain at the bulkhead for the time necessary to load or off-load the vessel, and must then immediately vacate the bulkhead area.

14. Fueling of vessels over the Government bulkhead is prohibited.

15. Rafting of vessels along the Government bulkhead is prohibited.

16. The lessee will be responsible for repairing any damage caused by a vessel to the bulkhead adjacent to the leased area or for providing restitution for such damage. In cases where the vessel causing the damage is identified, the owner of that vessel is responsible for providing prompt repair or restitution.

17. No equipment, gear, goods, or other portable items may be stored or left unattended outside the building at the leased area or at the bulkhead adjacent to the leased area while the property is not occupied by the Lessee or an employee of the Lessee.

18. The lessee must actively conduct business from the leased premises. Failure to comply with this provision shall provide cause for immediate termination of the lease agreement at the option of the Government.

19. The lessee shall be responsible for familiarizing himself/herself with Canal Navigation Regulations, 33CFR 207.20, and complying with said regulations.

20. If there is no building on the premises meeting the criteria of this paragraph, the lessee will be required to erect a building with a minimum floor area of 600 square feet. Construction of a building on the leased premises will be limited to a one-story type structure, with roof slope not less than 5-inches on 12-inches. The building shall have maximum overall dimensions of not more than 50 feet wide by 100 feet long. The building shall be located on leased land between lines formed by the bulkhead and the northernmost line, or extension thereto, of paved area. The building shall be set back a minimum of twenty (20) feet from the face of the bulkhead and ten (10) feet from the east and west lease limits.

*Invitation No. DACW33-9-05-02*
*May 17, 2005*
*Bulkhead Lot 2, Sandwich*
*Cape Cod Canal, MA*

21.  Unit structural loading, including both dead and live loads, shall not exceed 250 pounds per square foot within the land area fifty (50) feet perpendicular from the face of the bulkhead.

22.  The lessee is prohibited from constructing ramps or docks (for loading trucks) with finished surface elevations below the level of the top of the bulkhead or the existing grade of the adjacent land.

23.  Prior to using or occupying the premises under this lease, the Lessee shall furnish to the Government a Performance Bond (Standard Form 25) in the amount of $50,000 to provide surety for completion of the demolition of structures and restoration of the premises. The bond shall be for a period of not less than five years and in any event shall continue in effect until the removal of the facilities and restoration of the land has been completed and approved in writing by the Government.

24.  The lessee shall have the right to keep the leased premises locked and secured at all times subject to the rights reserved by the Government for access to and use of the bulkhead. If the lessee elects to secure his area, the methods and materials to be used by the lessee to secure the leased premises, including the width and location of gate openings and fence heights, shall be approved by the Canal Manager, prior to installation.

25.  The lessee shall be responsible for providing and maintaining safety railings as necessary along the portion of the leased area that abuts the bulkhead.

26.  A paved parking lot adjacent to the leased land shall be available for the use of the lessee for their employees and customers in common with public recreational parking, including bus parking. No commercial vehicles will be parked or stored in this parking area.

27.  All commercial trucks and vehicles owned or leased by the lessee and his associated customers shall be parked on leased land only.

28.  The lessee must make his own arrangements, including monthly payments, with the Town of Sandwich Water District on Tupper Road, to provide metered water service to any buildings. A water meter pit located on Lot No. 2 may be used by the lessee. A 4-inch Government-owned water line is provided to this pit.

29.  Plans for building any structures or grading the leased area must be submitted to the District Engineer for review and approval prior to any construction. All surfaces shall be sloped to drain toward the Canal without ponding. Penetration of the bulkhead for openings or installations of any type is prohibited.

*Invitation No. DACW33-9-05-02*
*May 17, 2005*
*Bulkhead Lot 2, Sandwich*
*Cape Cod Canal, MA*

30.  Installation of electric and telephone lines shall be the responsibility of the lessee. Plans for these utilities must be submitted to the District Engineer for review and approval prior to any construction. Underground lines are encouraged.

31.  The property is served by an existing septic system located off the leased premises. The Lessee may use this septic system at no additional charge. However, if the Lessee chooses to use the septic system, the Lessee is responsible for the operation, maintenance, and repair of the septic system and complying with all local, state, and Federal laws and regulations governing septic systems.

32.  Retail sales will be limited to sales of seafood and seafood products.

33.  Public fishing is prohibited from the bulkhead in front of the leased area.

34.  The sale or storage of alcoholic beverages is prohibited.

35.  Deposit Required. No bid will be considered unless it is accompanied by a deposit in an amount approximately equal to and not less than ten (10) percent of the amount of the annual rental offered, to guarantee that the bidder will enter into a written lease and pay the balance of the rental due within ten (10) days after the date of receipt of written notice of acceptance of his bid and a draft of lease for execution. Such guarantee must be in the form of a money order or check, payable to FAO, USAED, NAE. The deposit of the successful bidder will be retained by the Government to apply against payment of the balance of the annual rental offered and deposits of unsuccessful bidders will be returned, without interest, as promptly as possible after rejection, provided, however, that in the event of default by any bidder hereunder, that bidder's deposit may be applied by the Government to any loss, cost and expense incurred in leasing the property and including any difference between the amount specified in the bid and the amount for which the Government may lease the property, if the latter amount be less than the former.  The bidder is liable for the full amount of damages sustained by the Government because of his default; such liability is not limited to the amount of the bidder's deposit.

36.  Acceptance of Bids. All bids will remain open for acceptance or rejection for a period of 10 days from the date of opening bids. Notice of award will be given to successful bidders as soon after the date of opening bids as practicable. Notice by the Government of acceptance of bid, if not given to the successful bidder personally or to a duly authorized representative of such bidder, will be deemed to have been sufficiently given when mailed in a postpaid or franked envelope to the bidder at the address indicated in his bid.

*Invitation No. DACW33-9-05-02*
*May 17, 2005*
*Bulkhead Lot 2, Sandwich*
*Cape Cod Canal, MA*

37. Rejection of Bids. The right is reserved, as the interests of the Government may require, to reject any and all bids and to waive any informality in bids received, and to accept or reject any items of any bid, unless such bid is qualified by specific limitation.

38. Award of Lease. A lease will be awarded to the highest bidder complying with the conditions of this Invitation for Bids, provided that the bidder is responsible, his bid is reasonable, and it is in the interest of the United States to accept it.

39. Default. In the event of failure on the part of the successful bidder to enter into a lease and to pay the balance of the rental due within ten (10) days after the date of receipt of notification by the Government that his bid has been accepted and the presentation to him of a draft of lease for execution, or in the event of failure of the successful bidder to otherwise comply with the terms of this Invitation for Bids, the Government may declare the bidder in default and the deposit will be retained as liquidated damages.

## INSTRUCTIONS TO BIDDERS

a. Bids subject to these terms. All bids submitted shall be deemed to have been made with full knowledge of all the terms, conditions, and requirements herein contained.

b. Bid Form. Bids must be submitted on the bid form attached hereto. Additional copies of the Invitation for Bids and bid form may be obtained from Army Corps of Engineers, ATTN: Real Estate Division, 696 Virginia Road, Concord, MA 01742-2751 or Canal Manager, Cape Cod Canal, Massachusetts.

c. Execution of Bids. Each bid must give the full address of the bidder and be signed by the bidder. A bid executed by an attorney or agent on behalf of the bidder shall be accompanied by two authenticated copies of his power of attorney, or other evidence of his authority to act on behalf of the bidder. If the bidder is a corporation, the Certificate of Corporate Bidder must be executed. (Attached hereto as Exhibit "C"). If the bid is signed by the secretary of the corporation, the Certificate must be executed by some other officer of the corporation under the corporate seal. In lieu of the Certificate of the Corporate Bidder, there may be attached to the bid copies of so much of the records of the corporation as will show the official character and authority of the officer signing, duly certified by the secretary or assistant secretary, under the corporate seal, to be true copies.

d. Submission of Bids. It will be the duty of each bidder to see that his bid is delivered by the time and at the place prescribed in the Invitation. *The Government strongly recommends that the offer be sent by registered or certified mail, return receipt requested, no later than June 15, and that the applicant retain the mailing receipt. The*

*Invitation No. DACW33-9-05-02*
*May 17, 2005*
*Bulkhead Lot 2, Sandwich*
*Cape Cod Canal, MA*

*applicant should request the postal clerk to place a legible bull's-eye postmark on both the receipt and the envelope or wrapper.* Offers sent by facsimile will not be accepted. Bids received prior to the time of opening will be securely kept, unopened. The person whose duty it is to open them will decide when the specified time has arrived, and no bid or modifications will be considered, except that those received before award is made, but delayed in the mails by occurrences beyond control of the bidder, may be considered if written certification is furnished by authorized postal authorities to that effect or other such documentation is provided to the satisfaction of the person whose duty it is to open bids. No responsibility will attach for the premature opening of a bid not properly addressed and identified. All modifications of a bid or withdrawals of a bid must be in writing. Telegraphic or fascimile-sent bids will not be considered, but modifications or withdrawals by telegraph or facsimile machine already submitted will be considered if received prior to the time set for opening bids.

e.  Waiver of Informality. The right is reserved, as the interests of the Government may require, to reject any and all applications and to waive any informality in applications received, and to accept or reject any items of any offer, unless such offer is qualified by specific limitation.

f.  Withdrawal of Bids. Bids may be withdrawn on written, telegraphic, or facsimile requests received from bidders prior to the time fixed for opening. Negligence on the part of the bidder in preparing his bid confers no right to withdraw the bid after it has been open.

g.  Opening of Bids. At the time fixed for the opening of bids, their contents will be made public for the information of bidders and others properly interested, who may be present either in person or by representative.

h.  Marking and Sealing Bids. Each bid must be enclosed in a sealed envelope, marked and addressed as follows

> ATTN:  Chief, Real Estate Division
> U.S. Army Corps of Engineers
> New England District
> 696 Virginia Road
> Concord, MA 01742-2751

Sealed Bid for Lease of Real Property
To be opened:
2:00 p.m. on 20 June 2005
Invitation No. DACW33-9-05-02

*Invitation No. DACW33-9-05-02*
*May 17, 2005*
*Bulkhead Lot 2, Sandwich*
*Cape Cod Canal, MA*

## BID

### FOR LEASING UNITED STATES REAL PROPERTY AT
### CAPE COD CANAL, MASSACHUSETTS

The undersigned, _____, (a corporation existing under the
laws of the State of _____) (a partnership consisting of
_____) (an individual doing business as _____), with an
address of _____, and a telephone
number of _____, in accordance with Invitation for Bids
No. **DACW33-9-05-02** dated May 17, 2005, for the leasing of property at Cape Cod
Canal, and subject to all the conditions and requirements thereof, which, so far as they
relate to this bid, are made a part of it, proposes to enter into a lease for the property
described in said Invitation, and hereby bids and agrees to pay the rental of
$_____ per annum or portion thereof.

Bidder represents:
a.  That he has ___ / has not___ employed or retained any company or person (other
than a full-time bona fide employee working solely for the bidder) to solicit or secure this
contract; and
b.  That he has ___ / has not___ paid or agreed to pay to any company or persons
(other than a full-time bona fide employee working solely for the bidder) any fee,
commission, percentage or brokerage fee, contingent upon or resulting from the award of
this contract, and
Bidder agrees to furnish information relating to a. and b. above as requested by the
District Engineer, New England District, 696 Virginia Road, Concord, MA 01742-2751.

Enclosed is a check or money order payable to FAO USAED-NAE in the amount of
$_____ to cover the required deposit (not less than 10% of the
annual rental bid).

I/we make this bid with full knowledge of all the conditions and requirements set forth
herein and will enter into a written lease within ten days after the date of receipt of
written notice of the acceptance of this bid and a draft of lease for execution.

_____
Signature

_____
Signature

(Bid must be signed)



EXHIBIT "A"

LOT 2 SAMPLE LEASE

LEASE NO. DACW33-1-05-xxx

## DEPARTMENT OF THE ARMY LEASE

## CAPE COD CANAL PROJECT
BARNSTABLE COUNTY, MASSACHUSETTS

THIS LEASE, made on behalf of the United States, between the SECRETARY OF THE ARMY, hereinafter referred to as the Secretary, and _____,
hereinafter referred to as the Lessee.

### WITNESSETH:

That the Secretary, by the authority of Title 10, United States Code, Section 2667, and for the consideration hereinafter set forth, hereby leases to the Lessee the property known as the bulkhead area Lot 2 of the Cape Cod Canal Project, which Lot is a part of Tract No. XI and is identified in Exhibit A, attached hereto and made a part hereof, hereinafter referred to as the premises, for purposes of loading, offloading, and processing of fish products, and retail sales of seafood and seafood products.

THIS LEASE is granted subject to the following conditions:

### 1.    TERM

Said premises are hereby leased for a term of five (5) years, beginning July 15, 2005 and ending July 14, 2010, but revocable at will by the Secretary. At the end of the five year period, Lot 2 will no longer be available for leasing. There will be no extension to the length of this lease.

### 2.    CONSIDERATION

a. The Lessee shall pay rental in advance to the United States in the amount of XXXXXXXXX Dollars (Sxxxxxxxxxx) per annum, payable in ___ equal _____ annual payments of xxxxxxxxxxxxxxxx dollars (Sxxxxxxxx.00) to the order of the Finance and Accounting Officer, New England District, and delivered to 696 Virginia Road, Concord, Massachusetts 01742-2751.

b. All rent and other payments due under the terms of this lease must be paid on or before the date they are due in order to avoid the mandatory sanctions imposed by the Debt Collection Act of 1982 (31 U.S.C. Section 3717). This statute requires the imposition of an interest charge

1

for the late payment of debts owed to the United States; an administrative charge to cover the costs of processing and handling delinquent debts; and the assessment of an additional penalty charge on any portion of a debt that is more than 90 days past due. The provisions of the statute will be implemented as follows:

(1) The United States will impose an interest charge, the amount to be determined by law or regulation, on late payment of rent. Interest will accrue from the due date. An administrative charge to cover the cost of processing and handling each late payment will also be imposed.

(2) In addition to the charges set forth above, the United States will impose a penalty charge of six percent (6%) per annum on any payment, or portion thereof, more than ninety (90) days past due. The penalty shall accrue from the date of delinquency and will continue to accrue until the debt is paid in full.

(3) All payments received will be applied first to any accumulated interest, administrative and penalty charges and then to any unpaid rental or other payment balance. Interest will not accrue on any administrative or late payment penalty charge.

## 3. NOTICES

All correspondence and notices to be given pursuant to this lease shall be addressed, if to the Lessee, to _____ and, if to the United States, to the District Engineer, Attention: Chief, Real Estate Division, 696 Virginia Road, Concord, Massachusetts 01742-2751, or as may from time to time otherwise be directed by the parties. Notice shall be deemed to have been duly given if and when enclosed in a properly sealed envelope, or wrapper, addressed as aforesaid, and deposited postage prepaid in a post office regularly maintained by the United States Postal Service.

## 4. AUTHORIZED REPRESENTATIVES

Except as otherwise specifically provided, any reference herein to "Secretary", "District Engineer", or "said officer" shall include their duly authorized representatives. Any reference to "Lessee" shall include any sublessees, assignees, transferees, successors and their duly authorized representatives.

## 5. SUPERVISION BY THE DISTRICT ENGINEER

The use and occupation of the premises shall be subject to the general supervision and approval of the District Engineer, New England District, hereinafter referred to as said officer, and to such rules and regulations as may be prescribed from time to time by said officer.

2

## 6.    APPLICABLE LAWS AND REGULATIONS

The Lessee shall comply with all applicable Federal, state, county and municipal laws, ordinances and regulations wherein the premises are located.

## 7.    CONDITION OF PREMISES

The Lessee acknowledges that it has inspected the premises, knows its condition, and understands that the same is leased without any representations or warranties whatsoever and without obligation on the part of the United States to make any alterations, repairs, or additions thereto.

## 8.    TRANSFERS AND ASSIGNMENTS

Without prior written approval of the District Engineer, the Lessee shall neither transfer nor assign this lease, nor sublet the premises or any part thereof, nor grant any interest, privilege or license whatsoever in connection with this lease. Failure to comply with this condition shall constitute a noncompliance for which the lease may be revoked immediately by the District Engineer.

## 9.    ~~COST OF UTILITIES~~

~~The Lessee shall pay the cost, as determined by the officer having jurisdiction over the premises, of producing and/or supplying any utilities and other services furnished by the government or through government-owned facilities for the use of the Lessee, including the Lessee's proportionate share of the cost of operation and maintenance of the government-owned facilities by which such utilities or services are produced or supplied. The government shall be under no obligation to furnish utilities or services. Payment shall be made in the manner prescribed by the officer having such jurisdiction.~~

## 10.   PROTECTION OF PROPERTY

The Lessee shall keep the premises in good order and in a clean, safe condition by and at the expense of the Lessee. The Lessee shall be responsible for any damage that may be caused to property of the United States by the activities of the Lessee under this lease, and shall exercise due diligence in the protection of all property located on the premises against fire or damage from any and all other causes. Any property of the United States damaged or destroyed by the Lessee incident to the exercise of the privileges herein granted shall be promptly repaired or replaced by the Lessee to a condition satisfactory to said officer, or at the election of said officer, reimbursement made therefor by the Lessee in an amount necessary to restore or replace the property to a condition satisfactory to said officer.

3

LEASE NO. DACW33-1-05-xxx

## 11.   INSURANCE

a. At the commencement of this lease, the Lessee shall obtain, from a reputable insurance company, or companies, liability insurance. The insurance shall provide an amount not less than that which is prudent, reasonable and consistent with sound business practices or a minimum combined single limit of $2 million, whichever is greater, for any number of persons or claims arising from any one incident with respect to bodily injuries or death resulting therefrom, property damage, or both, suffered or alleged to have been suffered by any person or persons resulting from the operations of the Lessee under the terms of this lease. The Lessee shall require its insurance company to furnish to the District Engineer a copy of the policy or policies, or if acceptable to the District Engineer, certificates of insurance evidencing the purchase of such insurance. The minimum amount of liability insurance coverage is subject to revision by the District Engineer every three years or upon modification of this lease.

b. The insurance policy or policies shall be of comprehensive form of contract and shall specifically provide protection appropriate for the types of facilities, services and activities involved. The Lessee shall require that the insurance company give the District Engineer thirty (30) days written notice of any cancellation or change in such insurance. The District Engineer may require closure of any or all of the premises during any period for which the Lessee does not have the required insurance coverage.

~~c. As to those structures and improvements on the premises constructed by or owned by the United States, for such periods as the Lessee is in possession of the premises pursuant to the terms and conditions of this lease, the Lessee shall procure and maintain at the Lessee's cost a standard fire and extended coverage insurance policy or policies on the leased premises to the full insurable value thereof. The Lessee shall procure such insurance from a reputable company or companies. The insurance policy shall provide that in the event of loss thereunder, the proceeds of the policy or policies, at the election of the United States, shall be payable to the Lessee to be used solely for the repair, restoration or replacement of the property damaged or destroyed, and any balance of the proceeds not required for such repair, restoration or replacement shall be paid to the United States. If the United States does not elect by notice in writing to the insurer within sixty (60) days after the damage or destruction occurs to have the proceeds paid to the Lessee for the purposes hereinabove set forth, then such proceeds shall be paid to the United States, provided however that the insurer, after payment of any proceeds to the lessee in accordance with the provision of the policy or policies, shall have no obligation or liability with respect to the use or disposition of the proceeds by the lessee. Nothing herein contained shall be construed as an obligation upon the United States to repair, restore or replace the leased premises or any part thereof.~~

## 12.   RIGHT TO ENTER AND FLOOD

The right is reserved to the United States, its officers, agents, and employees to enter upon the premises at any time and for any purpose necessary or convenient in connection with

4

LEASE NO. DACW33-1-05-xxx

government purposes; to make inspections, to remove ~~timber or other~~ material, except property of the Lessee, ~~to flood the premises, to manipulate the level of the lake or pool in any manner whatsoever~~ and/or to make any other use of the lands as may be necessary in connection with government purposes, and the Lessee shall have no claim for damages on account thereof against the United States or any officer, agent, or employee thereof.

## 13.   INDEMNITY

The United States shall not be responsible for damages to property or injuries to persons which may arise from or be incident to the exercise of the privileges herein granted, or for damages to the property of the Lessee, or for damages to the property or injuries to the person of the Lessee's officers, agents or employees or others who may be on the premises at their invitation or the invitation of any one of them, and the Lessee shall hold the United States harmless from any and all such claims not including damages due to the fault or negligence of the United States or its contractors.

## 14.   RESTORATION

On or before the expiration of this lease or its termination by the Lessee, the Lessee shall vacate the premises, remove the property of the Lessee, and restore the premises to a condition satisfactory to said officer. If, however, this lease is revoked, the Lessee shall vacate the premises, remove said property and restore the premises to the aforesaid condition within such time as the said officer may designate or as otherwise specified by the provisions of the condition on RENTAL ADJUSTMENT. In either event, if the Lessee shall fail or neglect to remove said property and restore the premises, then, at the option of the said officer, the property shall either become the property of the United States without compensation therefore, or the said officer may cause the property to be removed and no claim for damages against the United States or its officers or agents shall be created by or made on account of such removal and restoration work. The Lessee shall also pay the United States on demand any sum, which may be expended by the United States after the expiration, revocation, or termination of this lease in restoring the premises.

## 15.   NON-DISCRIMINATION

The Lessee shall not discriminate against any person or persons or exclude them from participation in the Lessees operations, programs or activities conducted on the leased premises, because of race, color, religion, sex, age, handicap or national origin. The Lessee will comply with the Americans with Disabilities Act and attendant Americans with Disabilities Act Accessibility Guidelines (ADAAG) published by the Architectural and Transportation Barriers Compliance Board.

5

## 16. SUBJECT TO EASEMENTS

This lease is subject to all existing easements, or those subsequently granted as well as established access routes for roadways and utilities located, or to be located, on the premises, provided that the proposed grant of any new easement or route will be coordinated with the Lessee, and easements will not be granted which will, in the opinion of the District Engineer, interfere with the use of the premises by the Lessee.

## 17. SUBJECT TO MINERAL INTERESTS

This lease is subject to all outstanding mineral interests. As to federally owned mineral interests, it is understood that they may be included in present or future mineral leases issued by the Bureau of Land Management (BLM) which has responsibility for mineral development on federal lands. The Secretary will provide lease stipulations to BLM for inclusion in said mineral leases that are designed to protect the premises from activities that would interfere with the lessee's operations or would be contrary to local law.

## 18. TERMINATION

This lease may be terminated by the Lessee at any time by giving the District Engineer at least thirty (30) days notice in writing provided that no refund by the United States of any rental previously paid shall be made, and provided further, that in the event that said notice is not given at least thirty (30) days prior to the rental due date, the Lessee shall be required to pay the rental for the period shown in the condition on CONSIDERATION.

## 19. RENTAL ADJUSTMENT

In the event the United States revokes this lease or in any other manner materially reduces the leased area or materially affects its use by the Lessee prior to the expiration date, an equitable adjustment will be made in the rental paid or to be paid under this lease. Such adjustment of rental shall be evidenced by a supplemental agreement in writing; PROVIDED however, that none of the provisions of this paragraph shall apply in the event of revocation because of noncompliance by the Lessee with any of the terms and conditions of this lease.

## 20. PROHIBITED USES

a. The Lessee shall not permit gambling on the premises or install or operate, or permit to be installed or operated thereon, any device which is illegal; or use the premises or permit them to be used for any illegal business or purpose. There shall not be conducted on or permitted upon the premises any activity which would constitute a nuisance. The Lessee shall not sell, store or dispense, or permit the sale, storage, or dispensing of beer or other intoxicating liquors on the premises.

6

b. The Lessee shall not construct or place any structure, improvement or advertising sign or allow or permit such construction or placement without prior written approval of the District Engineer.

## 21. NATURAL RESOURCES

The Lessee shall ~~cut no timber, conduct no mining operations~~, remove no sand, gravel, or kindred substances from the ground, commit no waste of any kind, nor in any manner substantially change the contour or condition of the premises except as authorized in writing by the District Engineer.

## 22. DISPUTES CLAUSE

a. Except as provided in the Contract Disputes Act of 1978 (41 U.S.C. 601-613) (the Act), all disputes arising under or relating to this lease shall be resolved under this clause and the provisions of the Act.

b. "Claim", as used in this clause, means a written demand or written assertion by the Lessee seeking, as a matter of right, the payment of money in a sum certain, the adjustment of interpretation of lease terms, or other relief arising under or relating to this lease. A claim arising under this lease, unlike a claim relating to this lease, is a claim that can be resolved under a lease clause that provides for the relief sought by the Lessee. However, a written demand or written assertion by the Lessee seeking the payment of money exceeding $100,000 is not a claim under the Act until certified as required by subparagraph c.(2) below. The routine request for rental payments that is not in dispute is not a claim under the Act. The request may be converted to a claim under the Act, by this clause, if it is disputed either as a liability or amount or is not acted upon in a reasonable time.

c. (1) A Claim by the Lessee shall be made in writing and submitted to the District Engineer for a written decision. A claim by the Government against the Lessee shall be subject to a written decision by the District Engineer.

(2) For Lessee claims exceeding $100,000, the Lessee shall submit with the claim a certification that--

(i) the claim is made in good faith; and

(ii) supporting data are accurate and complete to the best of the Lessee's knowledge and belief;

(iii) and the amount requested accurately reflects the lease adjustment for which the Lessee believes the Government is liable.

(3) If the Lessee is an individual, the certificate shall be executed by that individual. If

7

the Lessee is not an individual, the certification shall be executed by --

        (i) a senior company official in charge of the Lessee's location involved; or

        (ii) an officer or general partner of the lessee having overall responsibility of the conduct of the Lessee's affairs.

d. For Lessee claims of $100,000 or less, the District Engineer must, if requested in writing by the Lessee, render a decision within 60 days of the request. For lessee-certified claims over $100,000, the District Engineer must, within 60 days, decide the claim or notify the Lessee of the date by which the decision will be made.

e. The District Engineer's decision shall be final unless the Lessee appeals or files a suit as provided in the Act.

f. At the time a claim by the Lessee is submitted to the District Engineer or a claim by the Government is presented to the lessee, the parties, by mutual consent, may agree to use alternative means of dispute resolution. When using alternate dispute resolution procedures, any claim, regardless of amount, shall be accompanied by the certificate described in paragraph c.(2) of this clause, and executed in accordance with paragraph c.(3) of this clause.

g. The Government shall pay interest or the amount found due and unpaid by the Government from (1) the date the District Engineer received the claim (properly certified if required), or (2) the date payment otherwise would be due, if that date is later, until the date of payment. Simple interest on claims shall be paid at the rate, fixed by the Secretary of the Treasury as provided in the Act, which is applicable to the period during which the District Engineer receives the claim and then at the rate applicable for each 6-month period as fixed by the Treasury Secretary during the pendency of the claim. Rental amounts due to the Government by the Lessee will have interest and penalties as set out in the condition on **CONSIDERATION**.

h. The Lessee shall proceed diligently with the performance of the lease, pending final resolution of any request for relief, claim, or action arising under the lease, and comply with any decision of the District Engineer.

## 23. ENVIRONMENTAL PROTECTION

a. Within the limits of their respective legal powers, the parties to this lease shall protect the premises against pollution of its air, ground, and water. The Lessee shall comply with any laws, regulations, conditions, or instructions affecting the activity hereby authorized if and when issued by the Environmental Protection Agency, or any Federal, state, interstate or local governmental agency having jurisdiction to abate or prevent pollution. The disposal of any toxic or hazardous materials within the premises is specifically prohibited. Such regulations, conditions, or instructions in effect or prescribed by said Environmental Protection Agency, or

8

LEASE NO. DACW33-1-05-xxx

any Federal, State, interstate or local governmental agency are hereby made a condition of this lease. The Lessee shall not discharge waste or effluent from the premises in such a manner that the discharge will contaminate streams or other bodies of water or otherwise become a public nuisance.

b. The Lessee will use all reasonable means available to protect the environment and natural resources, and where damage nonetheless occurs from activities of the lessee, the Lessee shall be liable to restore the damaged resources.

c. The Lessee must obtain approval in writing from said officer before any pesticides or herbicides are applied to the premises.

## 24.   ENVIRONMENTAL BASELINE SURVEY (EBS)

An Environmental Baseline Survey (EBS) documenting the known history of the property with regard to the storage, release or disposal of hazardous substances thereon, is attached hereto and made a part hereof as Exhibit _____. Upon expiration, revocation or relinquishment of this lease another EBS shall be prepared which will document the environmental condition of the property at that time. A comparison of the two assessments will assist the said officer in determining any environmental restoration requirements. Any such requirements will be completed by the Lessee in accordance with the condition on RESTORATION.

## 25.   HISTORIC PRESERVATION

The Lessee shall not remove or disturb, or cause or permit to be removed or disturbed, any historical, archeological, architectural or other cultural artifacts, relics, remains or objects of antiquity. In the event such items are discovered on the premises, the Lessee shall immediately notify said officer and protect the site and the material from further disturbance until said officer gives clearance to proceed.

## 26.   SOIL AND WATER CONSERVATION

The Lessee shall maintain, in a manner satisfactory to said officer, all soil and water conservation structures that may be in existence upon said premises at the beginning of or that may be constructed by the Lessee during the term of this lease, and the Lessee shall take appropriate measures to prevent or control soil erosion within the premises. Any soil erosion occurring outside the premises resulting from the activities of the Lessee shall be corrected by the Lessee as directed by the said officer.

## 27.   TAXES

Any and all taxes imposed by the state or its political subdivisions upon the property or interest of the Lessee in the premises shall be paid promptly by the Lessee. If and to the extent

9

that the property owned by the Government is later made taxable by State or local governments under an Act of Congress, the lease shall be renegotiated.

## 28. COVENANT AGAINST CONTINGENT FEES

The Lessee warrants that no person or selling agency has been employed or retained to solicit or secure this lease upon an agreement or understanding for a commission, percentage, brokerage, or contingent fee, excepting bona fide employees or established commercial or selling agencies maintained by the Lessee for the purpose of securing business. For breach or violation of this warranty, the United States shall have the right to annul this lease without liability or, in its discretion, to require the Lessee to pay, in addition to the lease rental or consideration, the full amount of such commission, percentage, brokerage, or contingent fee.

## 29. OFFICIALS NOT TO BENEFIT

No member of or delegate to congress or resident commissioner shall be admitted to any share or part of this lease or to any benefits to arise therefrom. However, nothing herein contained shall be construed to extend to any incorporated company if this lease is for the general benefit of such corporation or company.

## 30. SEVERAL LESSEES

If more than one Lessee is named in this lease the obligations of said Lessees herein contained shall be joint and several obligations.

## 31. MODIFICATIONS

This lease contains the entire agreement between the parties hereto, and no modification of this agreement, or waiver, or consent hereunder shall be valid unless the same be in writing, signed by the parties to be bound or by a duly authorized representative and this provision shall apply to this condition as well as all other conditions of this lease.

## 32. DISCLAIMER

This lease is effective only insofar as the rights of the United States in the premises are concerned; and the Lessee shall obtain any permit or license which may be required by Federal, state, or local statute in connection with the use of the premises. It is understood that the granting of this lease does not preclude the necessity of obtaining a Department of the Army permit for activities which involve the discharge of dredge or fill material or the placement of fixed structures in the waters of the United States, pursuant to the provisions of Section 10 of the Rivers and Harbors Act of 3 March 1899 (33 USC 403), and Section 404 of the Clean Waters Act (33 USC 1344).

LEASE NO. DACW33-1-05-xxx

## 33.   ADDITIONAL CONDITIONS:

a.   The bulkhead adjacent to the leased area is not a part of the leased premises. It will be available at no cost to the Canal Manager for emergency dockage purposes on an as-needed basis, immediately upon oral notification.

b.   Vessels and/or vehicles engaged in the business of the Lessee shall not be left unattended along the face of the bulkhead. A responsible person with authority to authorize and/or accomplish vessel movement shall be present at the bulkhead whenever a vessel is tied to the bulkhead. Vessels may only remain at the bulkhead for the time necessary to load or off-load the vessel, and must then immediately vacate the bulkhead area.

c.   Fueling of vessels over the Government bulkhead is prohibited.

d.   Rafting of vessels along the Government bulkhead is prohibited.

e.   The lessee will be responsible for repairing any damage caused by a vessel to the bulkhead adjacent to the leased area or for providing restitution for such damage. In cases where the vessel causing the damage is identified, the owner of that vessel is responsible for providing prompt repair or restitution.

f.   No equipment, gear, goods, or other portable items may be stored or left unattended outside the building at the leased area or at the bulkhead adjacent to the leased area while the property is not occupied by the Lessee or an employee of the Lessee.

g.   The Lessee must actively conduct business from the leased premises. Failure to comply with this provision shall provide cause for termination of the lease agreement at the option of the Government.

h.   Pursuant to Condition 6 above, the Lessee shall be responsible for complying with Canal Navigation Regulations, 33CFR 207.20.

i.   If there is no building on the premises meeting the criteria of this paragraph, the lessee will be required to erect a building with a minimum floor area of 600 square feet. Construction of a building on the leased premises will be limited to a one-story type structure, with roof slope not less than 5-inches on 12-inches. The building shall have maximum overall dimensions of not more than 50 feet wide by 100 feet long. The building shall be located on leased land between lines formed by the bulkhead and the northernmost line, or extension thereto, of paved area. The building shall be set back a minimum of twenty (20) feet from the face of the bulkhead and ten (10) feet from the east and west lease limits.

j.   Unit structural loading, including both dead and live loads, shall not exceed 250 pounds per square foot within the land area fifty (50) feet perpendicular from the face of the bulkhead.

11

k. The Lessee is prohibited from constructing ramps or docks (for loading trucks) with finished surface elevations below the level of the top of the bulkhead or the existing grade of the adjacent land.

l. Prior to using or occupying the premises under this lease, the Lessee shall furnish to the Government a Performance Bond (Standard Form 25) in the amount of $50,000 to provide surety for completion of the demolition of structures and restoration of the premises as provided in Condition 14 above. The bond shall be for a period of not less than five years and in any event shall continue in effect until the removal of the facilities and restoration of the land has been completed and approved in writing by the Government.

m. The Lessee shall have the right to keep the leased premises locked and secured at all times subject to the rights reserved by the Government for access to and use of the bulkhead. If the lessee elects to secure his area, the methods and materials to be used by the lessee to secure the leased premises, including the width and location of gate openings and fence heights, shall be approved by the Canal Manager, prior to installation.

n. The lessee shall be responsible for providing and maintaining safety railings as necessary along the portion of the leased area that abuts the bulkhead.

o. A paved parking lot adjacent to the leased land shall be available for the use of the lessee for their employees and customers in common with public recreational parking, including bus parking. No commercial vehicles will be parked or stored in this parking area.

p. All commercial trucks and vehicles owned or leased by the lessee and his associated customers shall be parked on leased land only.

q. Plans for building any structures or grading the leased area must be submitted to the District Engineer for review and approval prior to any construction. All surfaces shall be sloped to drain toward the Canal without ponding. Penetration of the bulkhead for openings or installations of any type is prohibited.

r. Installation of electric and telephone lines shall be the responsibility of the lessee. Plans for these utilities must be submitted to the District Engineer for review and approval prior to any construction. Underground lines are encouraged.

s. The Lessee must make his own arrangements, including monthly payments, with the Town of Sandwich Water District on Tupper Road, to provide metered water service to any buildings. A water meter pit located on Lot No. 2 may be used by the lessee. A 4-inch Government-owned water line is provided to this pit.

t. Retail sales will be limited to sales of seafood and seafood products.

12

LEASE NO. DACW33-1-05-xxx

u.   Public fishing is prohibited from the bulkhead in front of the leased premises.

v.   Garbage, trash, rubbish, litter, or any other waste material shall be promptly removed by the lessee from the leased area. The disposal of petroleum products, fish gurry, and related material is strictly forbidden on the leased premises or on any Government premises.

w.   The property is served by an existing septic system located off the leased premises. The Lessee may use this septic system at no additional charge. However, if the Lessee chooses to use the septic system, the Lessee is responsible for the operation, maintenance, and repair of the septic system and complying with all local, state, and Federal laws and regulations governing septic systems.

PRIOR to the execution of this lease, Condition Nos. 9 and 11.c. were deleted, certain words in Condition Nos. 12 and 21 were deleted, and Condition Nos. 33.a-w were added.

THIS LEASE is not subject to Title 10, United States Code, Section 2662, as amended.

IN WITNESS WHEREOF, I have hereunto set my hand by authority of the Secretary of the _____, this _____ day of _____, 2005.

UNITED STATES OF AMERICA

_____
JOSEPH M. REDLINGER
Chief, Real Estate Division

THIS LEASE is also executed by the Lessee this _____ day of _____, 2005.

Lessee

By: _____
Title:

13

LEASE NO. DACW33-1-05-xxx

## CERTIFICATE OF AUTHORITY

I, _____, certify that I am
the_____ of _____; and that
_____,who signed the foregoing instrument on
behalf of the grantee, was then _____ of
_____. I further certify that the said officer
was acting within the scope of powers delegated to this officer by
the governing body of the grantee in executing said instrument.


Date _____                    _____
                                            (signature)

14



EXHIBIT "A"

| | 6/25/87 | ENLARGEMENT OF LOT 2 | | PAS |
| △ | 9/12/85 | ADJUSTMENT OF LOT BOUNDRIES | | PAS |
| REVISION | DATE | DESCRIPTION | | |

DEPARTMENT OF THE ARMY
NEW ENGLAND DIVISION
CORPS OF ENGINEERS
WALTHAM, MASS.

CAPE COD CANAL, MASS.

BULKHEAD LEASES

| DR. BY W.H. | TR. BY | CK.BY F.A.H. | |
| SUBMITTED BY | | | |
| APPROVED | | APPROVED | DATE 15 FEB 1985 |

## PROPOSED LEASE

### LEASE NO.  DACW33-l-05~xxx

### DEPARTMENT OF THE ARMY LEASE

### CAPE COD CANAL PROJECT
BARNSTABLE COUNTY, MASSACHUSETTS

**THIS LEASE,** made on behalf of the United States, between the **SECRETARY OF THE ARMY,** hereinafter referred to as the Secretary, and __Joe's Lobster Mart, Inc.,__ hereinafter referred to as the Lessee.

#### WITNESSETH:

That the Secretary, by the authority of Title 10, United States Code, Section 2667, and for the consideration hereinafter set forth, hereby leases to the Lessee the property known as the bulkhead area Lot 2 of the Cape Cod Canal Project, which Lot is a part of Tract No. XI and is identified in Exhibit A, attached hereto and made a part hereof, hereinafter referred to as the premises, for purposes of loading, offloading, and processing offish products, and retail sales of seafood and seafood products.

**THIS LEASE** is granted subject to the following conditions:

#### 1.   TERM

Said premises are hereby leased for a term of ten (10) years, beginning July 15, 2005 and ending July 14, 2015, but revocable at will by the Secretary.

#### 2.   CONSIDERATION

a. The Lessee shall pay rental in advance to the United States in the amount of Fair Market Rental Value ($FMV) per annum, payable in _4_ equal ____ annual payments of _____·____ dollars ($____ ) to the order of the Finance and Accounting Officer, New England District, and delivered to 696 Virginia Road, Concord, Massachusetts 01742-2751.

b. All rent and other payments due under the terms of tins lease must be paid on or before the date they are due in order to avoid the mandatory sanctions imposed by the Debt Collection Act of 1982 (31 U.S.C. Section 3717). This statute requires the imposition of an interest charge

**LEASE NO. DACW33-1-05-XXX**

for the late payment of debts owed to the United States; an administrative charge to cover the costs of processing and handling delinquent debts; and the assessment of an additional penalty charge on any portion of a debt that is more than 90 days past due. The provisions of the statute will be implemented as follows:

(1) The United States will impose an interest charge, the amount to be determined by law or regulation, on late payment of rent. Interest will accrue from the due date. An administrative charge to cover the cost of processing and handling each late payment will also be imposed.

(2) In addition to the charges set forth above, the United States will impose a penalty charge of six percent (6%) per annum on any payment, or portion thereof, more than ninety (90) days past due. The penalty shall accrue from the date of delinquency and will continue to accrue until the debt is paid in full.

(3) AH payments received will be applied first to any accumulated interest, administrative and penalty charges and then to any unpaid rental or other payment balance. Interest will not accrue on any administrative or late payment penalty charge.

## 3.    NOTICES

All correspondence and notices to be given pursuant to this lease shall be addressed, if to the Lessee, to _Joe's Lobster Mart, Inc., P.O. Box 248, Sandwich MA 02563_ and, if to the United States, to the District Engineer, Attention: Chief, Real Estate Division, 696 Virginia Road, Concord, Massachusetts 01742-2751, or as may from time to time otherwise be directed by the parties. Notice shall be deemed to have been duly given if and when enclosed in a properly sealed envelope, or wrapper, addressed as aforesaid, and deposited postage prepaid in a post office regularly maintained by the United States Postal Service.

## 4.    AUTHORIZED REPRESENTATIVES

Except as otherwise specifically provided, any reference herein to "Secretary", "District Engineer", or "said officer" shall include their duly authorized representatives. Any reference to "Lessee" shall include any sublessees, assignees, transferees, successors and their duly authorized representatives.

## 5.    SUPERVISION BY THE DISTRICT ENGINEER

The use and occupation of the premises shall be subject to the general supervision and approval of the District Engineer, New England District, hereinafter referred to as said officer, and to such rules and regulations as may be prescribed from time to time by said officer.

2

LEASE NO.  DACW33-1-05-XXX

### 6.    APPLICABLE LAWS AND REGULATIONS

The Lessee shall comply with all applicable Federal, state, county and municipal laws, ordinances and regulations wherein the premises are located.

### 7.    CONDITION OF PREMISES

The Lessee acknowledges that it has inspected the premises, knows its condition, and understands that the same is leased without any representations or warranties whatsoever and without obligation on the part of the United States to make any alterations, repairs, or additions thereto.

### 8.    TRANSFERS AND ASSIGNMENTS

Without prior written approval of the District Engineer, the Lessee shall neither transfer nor assign this lease, nor sublet the premises or any part thereof, nor grant any interest, privilege or license whatsoever in connection with this lease. Failure to comply with this condition shall constitute a noncompliance for which the lease may be revoked immediately by the District Engineer.

### 9.    COST OF

~~The Lessee shall pay the cost, as determined by the officer having jurisdiction over the premises, of producing and/or supplying any utilities and other services furnished by the government or through government owned facilities for the use of the Lessee, including the lessee's proportionate share of the cost of operation and maintenance of the government o facilities by which such utilities or services ore produced or supplied. The government shall be under no obligation to furnish utilities or services. Payment shall be made in the manner prescribed by the officer having such jurisdiction.~~

### 10.    PROTECTION OF PROPERTY

The Lessee shall keep the premises in good order and in a clean, safe condition by and at the expense of the Lessee. The Lessee shall be responsible for any damage that may be caused to property of the United States by the activities of the Lessee under this lease, and shall exercise due diligence in the protection of all property located on the premises against fire or damage from any and all other causes. Any property of the United States damaged or destroyed by the Lessee incident to the exercise of the privileges herein granted shall be promptly repaired or replaced by the Lessee to a condition satisfactory to said officer, or at the election of said officer, reimbursement made therefore by the Lessee in an amount necessary to restore or replace the property to a condition satisfactory to said officer.

**LEASE NO.  DACW33-l-05-xxx**

## 11.   INSURANCE

a. At the commencement of this lease, the Lessee shall obtain, from a reputable insurance company, or companies, liability insurance. The insurance shall provide an amount not less than that which is prudent, reasonable and consistent with sound business practices or a minimum combined single limit of $2 million., whichever is greater, for any number of persons or claims arising from any one incident with respect to bodily injuries or death, resulting there from, property .damage, or both, suffered or alleged to have been suffered by any person or persons resulting from the operations of the Lessee under the terms of this lease. The Lessee shall require its insurance company to furnish to the District Engineer a copy of the policy or policies, or if acceptable to the District Engineer, certificates of insurance evidencing the purchase of such insurance. The minimum amount of liability insurance coverage is subject to revision by the District Engineer every three years or upon modification of this lease.

b. The insurance policy or policies shall be of comprehensive form of contract and shall specifically provide protection appropriate for the types of facilities, services and activities involved. The Lessee shall require that the insurance company give the District Engineer thirty (30) days written notice of any cancellation or change in such insurance. The District Engineer may require closure of any or all of the premises during any period for which the Lessee does not have the required insurance coverage.

c. As to those structures  and improvements on the premises constructed by or owned by fee United States, for such periods as the Lessee is in possession of the premises pursuant to the terms and conditions of this lease, the Lessee shall procure and maintain at the Lessee's cost a standard fire and extended coverage insurance policy or policies on the leased premises to the full insurable value fee roof. The Lessee shall procure such insurance from a reputable company or companies. The insurance policy shall provide that in  the event of loss there under, the proceeds of the policy or policies, at the election of the United States, shall he payable to the Lessee to be used solely for the repair, restoration or replacement of the property damaged of destroyed, and any balance of the proceeds not required for such repair, restoration or replacement shall be paid to the United States. If the United States does not elect by notice to  the insurer within sixty (60) days after the damage  or destruction occurs to have the proceeds paid to the Lessee for the purposes hereinabove set forth, then such proceeds shall be the United States, provided however that the insurer, after payment of any proceeds to the lessee in accordance with the provision of the policy or policies, shall have no obligation or liability with respect to  the use or disposition of the proceeds by the lessee. Nothing herein contained shall be construed as an obligation upon the United States to repair, restore or replace the leased premises or any part thereof.

4

**LEASE NO. DACW33-1-05-XXX**

### 12.   RIGHT TO ENTER AND FLOOD

The right is reserved to the United States, its officers, agents, and employees to enter upon the premises at any time and for any purpose necessary or convenient in connection with government purposes; to make inspections, to remove ~~timber or other~~ material, except property of the Lessee, ~~to flood the premises, to manipulate the level of the lake or pool in any manner whatsoever~~ and/or to make any other use of the lands as may be necessary in connection with government purposes, and the Lessee shall have no claim for damages on account thereof against the United States or any officer, agent, or employee thereof.

### 13.   INDEMNITY

The United States shall not be responsible for damages to property or injuries to persons which may arise from or be incident to the exercise of the privileges herein granted, or for damages to the property of the Lessee, or for damages to the property or injuries to the person of the Lessee's officers, agents or employees or others who may be on the premises at their invitation or the invitation of any one of them, and the Lessee shall hold the United States harmless from any and all such claims not including damages due to the fault or negligence of the United States or its contractors.

### 14.   RESTORATION

On or before the expiration of this lease or its termination by the Lessee, the Lessee shall vacate the premises, remove the property of the Lessee, and restore the premises to a condition satisfactory to said officer. If, however, this lease is revoked, the Lessee shall vacate the premises, remove said property and restore the premises to the aforesaid condition within such time as the said officer may designate or as otherwise specified by the provisions of the condition on **RENTAL ADJUSTMENT.** In either event, if the Lessee shall fail or neglect to remove said property and restore the premises, then, at the option of the said officer, the property shall either become the property of the United States without compensation therefore, or the said officer may cause the property to be removed and no claim for damages against the United States or its officers or agents shall be created by or made on account of such removal and restoration work. The Lessee shall also pay the United States on demand any sum, which may be expended by the United States after the expiration, revocation, or termination of this lease in restoring the premises.

### 15.   NON-DISCRIMINATION

The Lessee shall not discriminate against any person or persons or exclude them from participation in the Lessees operations, programs or activities conducted on the leased premises, because of race, color, religion, sex, age, handicap or national origin. The Lessee will comply with the Americans with Disabilities Act and attendant Americans with Disabilities Act Accessibility Guidelines (ADAAG) published by the Architectural and Transportation Barriers Compliance Board.

**LEASE NO.   DACW33-l-05-xxx**

### 16.   SUBJECT TO EASEMENTS

This lease is subject to all existing easements, or those subsequently granted as well as established access routes for roadways and utilities located, or to be located, on the premises, provided that the proposed grant of any new easement or route will be coordinated with the Lessee, and easements will not be granted which will, in the opinion of the District Engineer, interfere with the use of the premises by the Lessee,

### 17. SUBJECT TO MINERAL INTERESTS

This lease is subject to all outstanding mineral interests. As to federally owned mineral interests, it is understood that they may be included in present or future mineral leases issued by the Bureau of Land Management (BLM) which has responsibility for mineral development on federal lands. The Secretary will provide lease stipulations to BLM for inclusion in said mineral leases that are designed to protect the premises from activities that would interfere with the lessee's operations or would be contrary to local law.

### 18.   TERMINATION

This lease may be terminated by the Lessee at any time by giving the District Engineer at least thirty (30) days notice in writing provided that no refund by the United States of any rental previously paid shall be made, and provided further, that in the event that said notice is not given at least thirty (30) days prior to the rental due date, the Lessee shall be required to pay the rental for the period shown in the condition on **CONSIDERATION.**

### 19.   RENTAL ADJUSTMENT

In the event the United States revokes this lease or in any other manner materially reduces the leased area or materially affects its use by the Lessee prior to the expiration date, an equitable adjustment will be made in the rental paid or to be paid under this lease. Such adjustment of rental shall be evidenced by a supplemental agreement in writing; PROVIDED however, that none of the provisions of this paragraph shall apply in the event of revocation because of noncompliance by the Lessee with any of the terms and conditions of this lease.

### 20.   PROHIBITED USES

a. The Lessee shall not permit gambling on the premises or install or operate, or permit to be installed or operated thereon, any device which is illegal; or use the premises or permit them to be used for any illegal business or purpose. There shall not be conducted on or permitted upon the premises any activity which would constitute a nuisance, The Lessee shall not sell, store or dispense, or permit the sale, storage, or dispensing of beer or other intoxicating liquors on the premises.

6

LEASE NO. DACW33-1-05-XXX

b. The Lessee shall not construct or place any structure, improvement or advertising sign or allow or permit such construction or placement without prior written approval of the District Engineer.

## 21.    NATURAL RESOURCES

The Lessee shall ~~cut no timber, conduct no mining operations,~~ remove no sand, gravel, or kindred substances from the ground, commit no waste of any kind, nor in any manner substantially change the contour or condition of the premises except as authorized in writing by the District Engineer.

## 22.    DISPUTES CLAUSE

a. Except as provided in the Contract Disputes Act of 1978 (41 U.S.C. 601 -613) (the Act), all disputes arising under or relating to this lease shall be resolved under this clause and the provisions of the Act.

b. "Claim", as used in this clause, means a written demand or written assertion by the Lessee seeking, as a matter of right, the payment of money in a sum certain, the adjustment of interpretation of lease terms, or other relief arising under or relating to this lease. A claim arising under this lease, unlike a claim relating to this lease, is a claim that can be resolved under a lease clause that provides for the relief sought by the Lessee. However, a written demand or written assertion by the Lessee seeking the payment of money exceeding $100,000 is not a claim under the Act until certified as required by subparagraph c,(2) below. The routine request for rental payments that is not in dispute is not a claim under the Act. The request may be converted to a claim under the Act, by this clause, if it is disputed either as a liability or amount or is not acted upon in a reasonable time.

c, (1) A Claim by the Lessee shall be made in writing and submitted to the District Engineer for a written decision; A claim by the Government against the Lessee shall be subject to a written decision by the District Engineer.

(2) For Lessee claims exceeding $100,000, the Lessee shall submit with the claim a certification that—

(i) the claim is made in good faith; and

(ii) supporting data are accurate and complete to the best of the Lessee's knowledge and belief;

(iii) and the amount requested accurately reflects the lease adjustment for which the Lessee believes the Government is liable.

(3) If the Lessee is an individual, the certificate shall be executed by that individual. If

7

**LEASE NO. DACW33-1-05-XXX**

the Lessee is not an individual, the certification shall be executed by —

(i) a senior company official in charge of the Lessee's location involved; or

(ii) an officer or general partner of the lessee having overall responsibility of the conduct of the Lessee's affairs.

d. For Lessee claims of $100,000 or less, the District Engineer must, if requested in writing by the Lessee, render a decision within 60 days of the request. For lessee-certified claims over $100,000, the District Engineer must, within 60 days, decide the claim or notify the Lessee of the date by which the decision will be made.

e. The District Engineer's decision shall be final unless the Lessee appeals or files a suit as provided in the Act.

f. At the time a claim by the Lessee is submitted to the District Engineer or a claim by the Government is presented to the lessee, the parties, by mutual consent, may agree to use alternative means of dispute resolution. When using alternate dispute resolution procedures, any claim, regardless of amount shall be accompanied by the certificate described in paragraph c.(2) of this clause, and executed in accordance with paragraph c.(3) of this clause,

g. The Government shall pay interest or the amount found due and unpaid by the Government from (1) the date the District Engineer received the claim (properly certified if required), or (2) the date payment otherwise would be due, if that date is later, until the date of payment. Simple interest on claims shall be paid at the rate, fixed by the Secretary of the Treasury as provided in the Act, which is applicable to the period during which the District Engineer receives the claim and then at the rate applicable for each 6-month period as fixed by the Treasury Secretary during the pendency of the claim. Rental amounts due to the Government by the Lessee will have interest and penalties as set out in the condition on **CONSIDERATION.**

h. The Lessee shall proceed diligently with the performance of the lease, pending final resolution of any request for relief, claim, or action arising under the lease, and comply with any decision of the District Engineer.

## 23. ENVIRONMENTAL PROTECTION

**a.** Within the limits of their respective legal powers, the parties to this lease shall protect the premises against pollution of its air, ground, and water. The Lessee shall comply with any laws, regulations, conditions, or instructions affecting the activity hereby authorized if and when issued by the Environmental Protection Agency, or any Federal, state, interstate or local governmental agency having jurisdiction to abate or prevent pollution. The disposal of any toxic or hazardous materials within the premises is specifically prohibited. Such regulations, conditions, or instructions in effect or prescribed by said Environmental Protection Agency, or any Federal, State, interstate or local governmental agency are hereby made a condition of this lease. The Lessee shall not discharge waste or effluent from the premises in such a manner that the discharge will contaminate streams or other bodies of water or otherwise become a public nuisance.

**b.** The Lessee will use all reasonable means available to protect the environment and natural resources, and where damage nonetheless occurs from activities of the lessee, the Lessee shall be liable to restore the damaged resources.

**c.** The Lessee must obtain approval in writing from said officer before any pesticides or herbicides are applied to the premises.

## 24.    ENVIRONMENTAL BASELINE SURVEY (EBS)

An Environmental Baseline Survey (EBS) documenting the known history of the property with regard to the storage, release or disposal of hazardous substances thereon, is attached hereto and made a part hereof as Exhibit ___. Upon expiration, revocation or relinquishment of this lease another EBS shall be prepared which will document the environmental condition of the property at that time. A comparison of the two assessments will assist the said officer in determining any environmental restoration requirements. Any such requirements will be completed by the Lessee in accordance with the condition on **RESTORATION.**

## 25.    HISTORIC PRESERVATION

The Lessee shall not remove or disturb, or cause or permit to be removed or disturbed, any historical, archeological, architectural or other cultural artifacts, relics, remains or objects of antiquity, hi the event such items are discovered on the premises, the Lessee shall immediately notify said officer and protect the site and the material from further disturbance until said officer gives clearance to proceed.

## 26.  SOIL AND WATER CONSERVATION

The Lessee shall maintain, in a manner satisfactory to said officer, all soil and water conservation structures that may be in existence upon said premises at the beginning of or that may be constructed by the Lessee during the term of this lease, and the Lessee shall take appropriate measures to prevent or control soil erosion within the premises. Any soil erosion occurring outside the premises resulting from the activities of the Lessee shall be corrected by the Lessee as directed by the said officer.

## 27.  TAXES

Any and all taxes imposed by the state or its political subdivisions upon the property or interest of the Lessee in the premises shall be paid promptly by the Lessee. If and to the extent that the property owned by the Government is later made taxable by State or local governments under an Act of Congress, the lease shall be renegotiated.

## 28.  COVENANT AGAINST CONTINGENT FEES

The Lessee warrants that no person or selling agency has been employed or retained to solicit or secure this lease upon an agreement or understanding for a commission, percentage, brokerage, or contingent fee, excepting bona fide employees or established commercial or selling agencies maintained by the Lessee for the purpose of securing business. For breach or violation of this warranty, the United States shall have the right to annul this lease without liability or, in its discretion, to require the Lessee to pay, in addition to the lease rental or consideration, the full amount of such commission, percentage, brokerage, or contingent fee.

## 29.  OFFICIALS NOT TO BENEFIT

No member of or delegate to congress or resident commissioner shall be admitted to any share or part of this lease or to any benefits to arise there from. However, nothing herein contained shall be construed to extend to any incorporated company if this lease is for the general benefit of such corporation or company.

## 30.  SEVERAL LESSEES

If more than one Lessee is named in this lease the obligations of said Lessees herein contained shall be joint and several obligations.

## 31.  MODIFICATIONS

This lease contains the entire agreement between the parties hereto, and no modification of this agreement, or waiver, or consent hereunder shall be valid unless the same be in writing, signed by the parties to be bound or by a duly authorized representative and this provision shall apply to this condition as well as all other conditions of this lease,

10

## 32.   DISCLAIMER

This lease is effective only insofar as the rights of the United States in the premises are concerned; and the Lessee shall obtain any permit or license which may be required by Federal, state, or local statute in connection with the use of the premises. It is understood that the granting of this lease does not preclude the necessity of obtaining a Department of the Army permit for activities which involve the discharge of dredge or fill material or the placement of fixed structures in the waters of the United States, pursuant to the provisions of Section 10 of the Rivers and Harbors Act of 3 March 1899 (33 USC 403), and Section 404 of the Clean Waters Act (33 USC 1344).

### 33.   ADDITIONAL CONDITIONS:

a.  The bulkhead adjacent to the leased area is not a part of the leased premises. It will be available at no cost to the Canal Manager for emergency dockage purposes on an as-needed basis, immediately upon oral notification.

b.  Vessels and/or vehicles engaged in the business of the Lessee shall not be left unattended along the face of the bulkhead. A responsible person with authority to authorize and/or accomplish vessel movement shall be present at the bulkhead whenever a vessel is tied to the bulkhead. Vessels may only remain at the bulkhead for the time necessary to load or off-load the vessel, and must then immediately vacate the bulkhead area.

c.  Fueling of vessels over the Government bulkhead is prohibited.

d.  Rafting of vessels along the Government bulkhead is prohibited.

e.  The lessee will be responsible for repairing any damage caused by a vessel to the bulkhead adjacent to the leased area or for providing restitution for such damage, hi cases where the vessel causing the damage is identified, the owner of that vessel is responsible for providing prompt repair or restitution.

f.  No equipment, gear, goods, or other portable items may be stored or left unattended outside the building at the leased area or at the bulkhead adjacent to the leased area while the property is not occupied by the Lessee or an employee of the Lessee.

g,  The Lessee must actively conduct business from the leased premises. Failure to comply with this provision shall provide cause for termination of the lease agreement at the option of the Government.

h.  Pursuant to Condition 6 above, the Lessee shall be responsible for complying with Canal Navigation Regulations, 33CFR 207.20.

i.  If there is no building on the premises meeting the criteria of this paragraph, the lessee will be required to erect a building with a minimum floor area of 600 square feet. Construction of a building on the leased premises will be limited to a one-story type structure, with roof slope not less than 5-inches on 12-inches. The building shall have maximum overall dimensions of not more than 50 feet wide by 100 feet long. The building shall be located on leased land between lines formed by the bulkhead and the

northernmost line, or extension thereto, of paved area. The building shall be set back a minimum of twenty (20) feet from the face of the bulkhead and ten (10) feet from the east and west lease limits.

j. Unit structural loading, including both dead and live loads, shall not exceed 250 pounds per square foot within the land area fifty (50) feet perpendicular from the face of the bulkhead.

k. The Lessee is prohibited from constructing ramps or docks (for loading trucks) with finished surface elevations below the level of the top of the bulkhead or the existing grade of the adjacent land.

l. Prior to using or occupying the premises under this lease, the Lessee shall furnish to the Government a Performance Bond (Standard Form 25) in the amount of $50,000 to provide surety for completion of the demolition of structures and restoration of the premises as provided in Condition 14 above. The bond shall be for a period of not less than Five years and in any event shall continue in effect until the removal of the facilities and restoration of the land has been completed and approved in writing by the Government,

m. The Lessee shall have the right to keep the leased premises locked and secured at all times subject to the rights reserved by the Government for access to and use of the bulkhead. If the lessee elects to secure his area, the methods and materials to be used by the lessee to secure the leased premises, including the width and location of gate openings and fence heights, shall be approved by the Canal Manager, prior to installation.

n. The lessee shall be responsible for providing and maintaining safety railings as necessary along the portion of the leased area that abuts the bulkhead.

o. A paved parking lot adjacent to the leased land shall be available for the use of the lessee for their employees and customers in common with public recreational parking, including bus parking. No commercial vehicles will be parked or stored in this parking area.

p. All commercial trucks and vehicles owned or leased by the lessee and his associated customers shall be parked on leased land only.

q. Plans for building any structures or grading the leased area must be submitted to the District Engineer for review and approval prior to any construction. All surfaces shall be sloped to drain toward the Canal without ponding. Penetration of the bulkhead for openings or installations of any type is prohibited.

r. Installation of electric and telephone lines shall be the responsibility of the lessee. Plans for these utilities must be submitted to the District Engineer for review and approval prior to any construction. Underground lines are encouraged.

s. The Lessee must make his own arrangements, including monthly payments, with the Town of Sandwich Water District on Tupper Road, to provide metered water service to any buildings. A water meter pit located on Lot No. 2 may be used by the lessee. A 4-inch Government-owned water line is provided to this pit.

t. Retail sales will be limited to sales of seafood and seafood products.

**LEASE NO. DACW33-1-05-XXX**

u.  Public fishing is prohibited from the bulkhead in front of the leased premises.

v.  Garbage, trash, rubbish, litter, or any other waste material shall be promptly removed by the lessee from the leased area. The disposal of petroleum products, fish gurry, and related material is strictly forbidden on the leased premises or on any Government premises.

w.  The property is served by an existing septic system located off the leased premises. The Lessee may use this septic system at no additional charge. However, if the Lessee chooses to use the septic system, the Lessee is responsible for the operation, maintenance, and repair of the septic system and complying with all local, state, and Federal laws and regulations governing septic systems.

**PRIOR** to the execution of this lease, Condition Nos. 9 and 11 .c. were deleted, certain words in Condition Nos. 12 and 21 were deleted, and Condition Nos. 33.a~w were added,

**THIS** LEASE is not subject to Title 10, United States Code, Section 2662, as amended.

**IN WITNESS WHEREOF,** I have hereunto set my hand by authority of the Secretary of the _____, this _____ day of _____, 2005.

UNITED STATES OF AMERICA

JOSEPH M. REDLINGER
Chief, Real Estate Division

**THIS LEASE** is also executed by the Lessee this _____ day of _____,2005.

Lessee

By:_____
Title:

13

**LEASE NO. DACW33-1-05-XXX**

**CERTIFICATE OF AUTHORITY**

I, __Joseph A. Vaudo__ , certify that I am the __President__ of __Joe's Lobster Mart, Inc.__ ; and ~~that~~ ~~( who signed the~~ ~~foregoing instrument on behalf of the grantee, was then~~ ~~of~~ ~~.~~ I further certify that the said officer was acting within the scope of powers delegated to this officer by the governing body of the grantee in executing said instrument.

Date: ___6/14/05___                    _____
                                                            (signature)

14



6/26/87 ENLARGEMENT OF
C/IE/B5 ADJUSTMENT OF LOT
DEPARTMENT OF THE NEW ENGLAND DIVISION
CORPS OF ENGINEERS WALTHAM.MASS.

J. COURT MOLLOY, ESQ.
379 ROUTE 6A
EAST SANDWICH MA 02537

| *Telephone* | *E-mail* | *Facsimile* |
| (508) 833-3707 | *jcourtmolloy@verizon.net* | (508) 833-3711 |

*Via Federal Express – Overnight Delivery*

June 6, 2005

Col. Thomas L. Koning
U.S. Army Corps of Engineers
New England District
696 Virginia Road
Concord, Massachusetts 01742-2751

      *Re:   Joe's Lobster Mart – Lease Renewal*
             *Notice of Availability No. DACW33-9-05-02*

Dear Colonel Koning:

Please be advised that I represent Joe's Lobster Mart, Inc., owned by Mr. Joseph Vaudo. Mr. Vaudo has leased land from the U.S. Army Corps of Engineers [hereinafter referred to as "ACE"] at the Sandwich Bulkhead [hereinafter "Bulkhead"] at the eastern end of the Cape Cod Canal for some 32 years, where he operates his business, Joe's Lobster Mart, Inc., loading, offloading, processing of fish products, retail sales of seafood and seafood products. The purpose of this letter is: (1) to object to using the competitive bid process at this time for lot 2, pursuant to the Notice of Availability No. DACW33-9-05-02 [hereinafter referred to as "NOA"], and to the terms set forth in the bid, which we believe violate 31 U.S.C. s. 1301, et seq.; (2) to request that you award the lease to Mr. Vaudo for the fair market value, established pursuant to the appraisal process set forth in 32 C.F.R. 643.53, and for a ten year period, as authorized by 32 C.F.R. 643.52. Before setting forth the rationale for these requests, I provide you with some background history:

Factual Background

As noted, Mr. Vaudo has leased property from the ACE for some 32 years. Initially, he leased a parcel of land east of the Museum (the former Coast Guard Boat House). For the last 20 years, since 1985, he has leased Lot 2 on the Bulkhead, initially under a lease for a five year period, from 1985 to 1990, then under a ten year lease, and under his current five year lease, set to expire July 15, 2005.

Although the leases for the period from 1985 through 2000 were awarded pursuant to a competitive bid process, in 2000, it was determined that the

Col. Thomas L. Koning
June 6, 2005
Page 2

competitive bid process was impracticable, pursuant to 32 C.F.R. 643.24(5), since
in 1985 no other bids were received, the decline in the fishing industry overall,
and the fact that no bidder other than Mr. Vaudo would be able to meet the terms
set forth in the past leases, and which are set forth in the current NOA and
sample lease. In fact, although the fair market appraised value of the land in
2000 was only some $17,000, Mr. Vaudo and the ACE agreed that his annual
lease payments would be some $29,000, a substantial benefit provided to the
ACE over the past five years.

On November 1, 1985, the 99th Congress enacted Public Law 99-141, Title I
of which appropriated funds to the ACE for maintenance and repair of "rivers and
harbors, flood control, beach erosion, and related purposes." 99 Stat. 564. In
considering this appropriation, Congress reviewed an October 1980
Reconnaissance Report [hereinafter "Report"] prepared by the ACE New England
Division, entitled "Major Rehabilitation Project, Sandwich Bulkhead, Cape Cod
Canal, Sandwich, Massachusetts." This Report reviewed the three alternatives to
rehabilitating the Bulkhead, and concluded that the best alternative was Scheme
2, the Steel Sheet Pile Bulkhead, in large part due to the adverse economic effect
Scheme 1, which called for rip-rap, would have on the local economy and fishing
industry, including the three fish processing plants then operating at the
Bulkhead. See Report, pp. 19-20. To quote, the Report stated:

> The major long range adverse impact involved in either of
> the alternatives is the socioeconomic impact on the local and
> regional economy which would occur if the least action alternative
> [the rip-rap, Scheme 1] was implemented. As part of this
> alternative the leases involving the three commercial fish plants will
> be terminated and they will be required to relocate. Since their
> operations are dependent upon direct access to fishing vessels and
> *since the bulkhead is the only port in the town of Sandwich, it is*
> *likely that the plants will have to relocate outside the town of*
> *Sandwich. In addition, due to the present situation with regard to*
> *access to commercial offloading facilities within the region, it is*
> *likely they will be compelled to relocate off the Cape.* The loss of
> the plants on leased properties would mean the loss of over 90
> percent of the ex-vessel value of fish landed at the port of Sandwich.
> Based on 1977 and 1978 landings, *this loss would amount to $6.8 to*
> *$9.2 million. Taking into consideration the secondary impacts, or*
> *the economic activity related to these fish landings, the total loss*
> *would be $20.4 to $27.6 million per year.* In addition, the fish
> plants directly employ approximately 30 people who may lose their
> jobs if the plants relocate.

Col. Thomas L. Koning
June 6, 2005
Page 3

> All the other rehabilitation alternatives will not have this
> adverse impact on the local and regional economy and will in fact
> allow expanded utilization by the industry.

See Report, pp. 19-20 (emphasis added).

The 99th Congress enacted Public Law 99-141 included FY 1986
appropriations to repair the Sandwich Bulkhead, and the rehabilitation project
was completed in 1986. Since that time, the two other fish processing plants have
either moved or gone out of business, leaving Mr. Vaudo's plant the only one in
the Town of Sandwich. The fishing industry has continued to decline since 1986,
a trend which continues today, and is exacerbated by the recent highly publicized
red tide infestation, which will have a tremendous adverse impact on shellfish
industry this year.

During the period from 1990 to 2000, Mr. Vaudo bid on and was awarded
a lease for Lot 3, as well as Lot 2, and another bidder was awarded the lease for
Lot 1. Neither Mr. Vaudo nor the successful bidder were able to obtain the
necessary permits from the Town of Sandwich to construct any structures on Lots
1 and 3 because of changes in the zoning by-laws, requiring 20,000 square feet of
lot area. Compliance with all applicable Federal, state, county and municipal
laws, ordinances and regulations has always been a requirement of the leases
issued by the ACE. See Lease No. DACW33-1-00-090, para. 6; and Lease No.
DACW33-1-90-37, para. 12; attached hereto.

Last week I had a discussion with Mr. Francis Donovan, and inquired why
the sample lease attached to the NOA contained the provision stating that Lot 2
would not be available for lease beyond July 14, 2010. He responded that he had
decided to go in a different direction, and when pushed indicated that he
contemplated giving it to the Town of Sandwich for use in connection with the
Marina Expansion Plan (which has not yet been approved, and would likely
require Congressional action). I have spoken with members of the Board of
Selectmen of the Town of Sandwich, and am informed that the Town of
Sandwich's plans for expansion of the Marina do not in any way contemplate
usage of the Bulkhead.

Moreover, if in fact the ACE is contemplating such action, in effect it is
contemplating leasing the property, but has simply already decided to whom it
will lease the property, on a noncompetitive bid process – an action that Attorney
McCabe of your office indicated to me, again in discussion last week, was not the
proper procedure (although as noted above, it is authorized pursuant to 32 C.F.R.
643.52, when the circumstances warrant it. Attorney McCabe also indicated
surprise that Mr. Donovan indicated he intended to give the property to the Town
of Sandwich, as set forth above. I contacted Attorney McCabe, on Mr. Donovan's

Col. Thomas L. Koning
June 6, 2005
Page 4

suggestion, to inquire who was the other party who had expressed an interest, as
Mr. Donovan declined to respond. Attorney McCabe also declined to respond,
indicating that I should send a FOIA request, which I had already done on May
31, 2005, addressed to Mr. Donovan, and a copy of which is now included with
this letter for your review.

I also note that I am including two sets of regulations for the Sandwich
Marina obtained from the Town, one effective January 1, 1993, and the second
effective June 11, 1993. I would like to know whether in fact these regulations
were approved by the ACE, in light of the absence of a limitation on commercial
vessels greater than 65 feet in length in the June 11, 1993, regulations. It is my
understanding that that has always been a condition of the lease and previously a
regulation for the marina, since boats over 65 feet in length can cause damage to
the rip-rap and infrastructure of the marina due to their size and speed. At
present, there are two commercial fishing vessels docked at the Marina that are
72 feet in length.

Back to the issue of Mr. Vaudo's lease: Since January 2005, Mr. Vaudo
has been attempting to meet with Mr. Donovan to negotiate a lease. On April 11,
2005, Mr. Vaudo sent Mr. Donovan the letter enclosed, requesting a meeting and
consideration of the fact that he has been a lessee of the ACE at the Bulkhead for
some 32 years, and requesting that, in light of all of the circumstances that the
lease be awarded to him on a noncompetitive basis, as was done in 2000, since
the circumstances and rationale for doing so have not changed. Mr. Donovan has
never responded in writing or acknowledged receipt of this letter. Mr. Donovan
did finally return one of Mr. Vaudo's telephone calls – Mr. Donovan called from
his cell phone as he was golfing, during working hours – but unfortunately, Mr.
Vaudo was out of town.

A meeting had been scheduled to taken place on May 31, 2005, last week,
but Mr. Vaudo felt there was no point in meeting, given that he had received the
NOA and sample lease on Saturday, May 28, 2005. I called Mr. Donovan on the
morning of May 31, 2005, and left a message indicating that Mr. Vaudo was
canceling the meeting, and requested that if he had any questions, to call me. He
did not do so. The following day, I called him, and again left a message asking
that he call me. He did finally return my call, just past 6:00 p.m. and we did
speak, and he essentially directed me to Attorney McCabe. I suspect that Mr.
Donovan waited until after 6:00 p.m. to return my call with the hope that I would
not be in my office, however I was. The following day, I spoke with Attorney
McCabe, as noted above. In fact during my discussion with Mr. Donovan, he did
not honestly anticipate that any one other than Mr. Vaudo would bid on the lease.

In sum, Mr. Vaudo has diligently attempted to negotiate a lease, to no
avail, despite the fact that he has been an exemplary tenant for some 32 years,

Col. Thomas L. Koning
June 6, 2005
Page 5

and has grossly overpaid rent over the past five years, given that the appraisal
indicated the fair rental value was just over $17,000, and yet, Mr. Vaudo's been
paying nearly double that amount, $28,575. Now to address the objections set
forth at the beginning:

I.     Objection to Competitive Bidding Process for this Lease:

       a.    *Fishing Industry Continues to Decline*

       The fishing industry has continued to decline, as demonstrated by the
enclosed print-outs from the Massachusetts Department of Fisheries and
Wildlife. It is impossible that any one other than Mr. Vaudo to operate an
establishment for the "loading, offloading, processing of fish products and retail
sales of seafood and seafood products," as set forth in the "Purpose" on the cover
sheet of the NOA, or construct a building with a minimum floor area of 600
square feet, and no larger than 5,000 square feet, if Mr. Vaudo is not the
successful bidder, unless the successful bidder wishes to buy Mr. Vaudo's
building, equipment and licenses/permits (assuming they are transferable) from
him, because of zoning issues. To date, no one has approached Mr. Vaudo
concerning the purchase of his building, equipment and licenses/permits.

       b.    *Current Zoning Prohibits the Construction of the Building as set forth
             in NOA and Sample Lease*

       The reason no one could build the required structure is due to Town of
Sandwich zoning by-laws. Lot 2 is located in the Marina District, which requires
a minimum lot size of 20,000 square feet of lot area for building purposes. See
Sandwich Zoning By-laws, Section 2500. Lot 2 contains only approximately
16,510 square feet. Mr. Vaudo first commenced operations at the Bulkhead in
1973, when the zoning by-laws only required 15,000 square feet of lot area. As an
existing building, he was grandfathered when the Bulkhead reconstruction
project was completed, and, since only 60% of the project was completed, and his
previous location had been reconstructed with rip-rap, he was allowed to move
his building to Lot 2. Accordingly, a vacant lot would not be buildable, absent a
variance from the Board of Appeals, or the purchase of Mr. Vaudo's building,
equipment, etc. Variances are rarely granted, and may only be granted "only
where such permit granting authority finds all of the following:

       a.  A literal enforcement of the provisions of this bylaw would
           involve a substantial hardship, financial or otherwise, to the
           petitioner or appellant.

Col. Thomas L. Koning
June 6, 2005
Page 6

---

b. The hardship is owing to circumstances relating to the soil
   conditions, shape, or topography of such land or structures but
   not affecting generally the zoning district in which it is located.

c. Desirable relief may be granted without either:

   i.    Substantial detriment to the public good; or
   ii.   Nullifying or substantially derogating from the intent
         or purpose of this by-law.

Before a variance may be authorized, the Board of Appeals _shall_, as
required by Chapter 40A, Section 10 of the General Laws, _find that
all of the conditions of this section have been me_t. The Board of
Appeals shall impose such limitations on time and use or such other
conditions as it may deem desirable to protect the public interest
and ensure that the variance granted is not greater in degree or
duration than is justified by the hardship to be relieved. The Board
of Appeals shall not impose conditions, safeguards or limitations
based upon the continued ownership of the land or structures to
which the variance pertains by the appellant, petitioner or any
owner. The Board of Appeals shall record its findings in each case.

If the rights authorized by a variance are not exercised within one
year of the date of grant of such variance, such rights shall lapse,
provided however, that the permit granting authority in its
discretion and upon written application by the grantee of such
rights may extend the time for exercise of such rights for a period
not to exceed six months; and provided, further, that the
application for such extension is filed with such permit granting
authority prior to the expiration of such one year period. If the
permit granting authority does not grant such extension within
thirty (30) days of the date of the application therefore, and upon
the expiration of the original one year period, such rights may be re-
established only after notice and a new hearing pursuant to the
provisions of this section. Variances granted prior to effective date
of this ordinance but limited in time may be extended on the same
terms and conditions that were in effect for such variance upon said
effective date.

See Sandwich Zoning By-laws, Section 1321 (amended 5/4/98)

"Unless circumstances relating to the soil conditions of the land, the shape
of the land, or topography of the land cause the hardship, no variance may be
granted." Tsagronis v. Board of Appeals of Wareham, 415 Mass. 329, 331, 613

Col. Thomas L. Koning
June 6, 2005
Page 7

N.E.2d 893 (1993). There is nothing relating to the circumstances of the soil conditions of the land, the shape of the land, or the topography of the Lot 2, making it unique and distinct from surrounding land, which would warrant the issuance of a variance. Therefore, it is unlikely, if not impossible, that any other bidder could obtain permits to construct the structure required under the sample lease (para. 33(i)) and the NOA (para. 20).

This problem is why the ACE decided not to offer Lots 1 and 3 for bid in 2000, because both Mr. Vaudo, who had bid on and won the lease for lot 3, and the other successful bidder for Lot 1, both had been unable to obtain building permits, because these lots do not meet the 20,000 square foot lot area requirement. Lot 1 is approximately 16,215 square feet in lot area, and Lot 3 is even smaller.

c. *NOA Should Specify That Successful Bidders Must Have in Hand All Necessary Permits and Licenses*

Beyond the zoning issues, the NOA is defective insofar as it fails to require bidders to demonstrate that they have in hand all licenses and permits necessary to operate as called for under the lease in hand at the time of submission of the bid. In order to so operate, the lessee must have the following licenses and permits:

1. Federal permit regarding multi-species;
2. Federal Fisheries Permit from U.S. Department of Commerce;
3. Wholesale Dealer Permit from the Commonwealth of Massachusetts, Department of Fish & Wildlife, Environmental Law Enforcement Division, which is issued only a lengthy certification process administered by the FDA;
4. Town Board of Health Permit to Sell Food;
5. Massachusetts Division of Marine Fisheries – Quota Managed Fisheries Permit;
6. Permit from the Massachusetts Department of Public Health, Food Protection Program for shellfish, which requires an closed purification system, and requires weekly and monthly reports of water quality samples;
7. Federal Permit to pump water from and to the canal (which are no longer given out).

In addition, a retail seafood sales establishment is subject to inspections as follows: (1) Semi-annual FDA inspections; (2) Annual County Inspection; and (3) Mandatory Federal Reporting on every species purchased. Mr. Vaudo has all of the above permits and complies with all inspection and reporting requirements. It is unlikely that any other bidder would have all of these permits. In any event,

Col. Thomas L. Koning
June 6, 2005
Page 8

the bid should require that the bidder demonstrate that he has all these requisite permits, otherwise he is unqualified by virtue of paragraph 6 of the sample lease, and his bid should be rejected.

  d.   *Limitation Contained in Para. 1 of Sample Lease Violates the Purposes for which the Appropriation to Rehabilitate the Bulkhead were Made, in Violation of 31 U.S.C. S. 1301, et seq.*

Paragraph 1 of the Sample Lease states that Lot 2 will not be made available for leasing after July 14, 2010. The FY 1986 Appropriations to rehabilitate the Bulkhead were made in large part based upon the adverse socioeconomic impact, set forth in full under the Background section, if Scheme 2 were not implemented. This appropriation clearly took into account the commercial fishing industry and the commercial fish processing plants use of the Bulkhead. As such, the ACE cannot unilaterally terminate that use of the Bulkhead, without Congressional permission and authorization, as such action would violate 31 U.S.C. 1301, especially in light of the ACE's duties with regards to rivers and harbors, under the Rivers and Harbors Act, 31 U.S.C. s. 541, et seq., which provides, in part:

. . .

> And in the consideration of such works and projects the board shall have in view the amount and character of commerce existing or reasonably prospective which will be benefited by the improvement, and the relation of the ultimate cost of such work, both as to cost of construction and maintenance, to the public commercial interests involved, and the public necessity for the work and propriety of its construction, continuance, or maintenance at the expense of the United States. . . .

31 U.S.C. s. 541, in pertinent part.

Indeed, 31 U.S.C. ss. 547 and 547a, require that ACE report to Congress the local and regional economic impacts of proposed activities, further supporting the argument that the continuation of those economic activities should continue through the life of the project. Accordingly, that provision should be removed from any lease – particularly in light of the fact that Mr. Donovan indicated in fact his intent was to lease the same to the Town of Sandwich in connection with the Marina – so in fact ACE does intend to lease the property, and the statement in the Sample Lease is false, and evidently it intends to do so on a noncompetitive basis. As previously noted, members of the Board of Selectmen and the Economic Development Committee have confirmed with me that they have no interest in the Bulkhead area in connection with the marina expansion plans.

Mr. Vaudo, now 54 years of age, would like to retire at age 64. However, if Lot 2 is not leased to him, as noted in the 1980 Reconnaissance Report, he likely would have to relocate his business off-Cape, with no guarantee of any success in finding such a location, thus wreaking socioeconomic havoc on the local and regional economy, since the Bulkhead is the only commercial port within the Town, and there are few, if any, alternate locations on Cape. Given the decline in the fishing industry, it is unlikely that attempts to establish a new business off-Cape would be successful. Of the three fish processing plants in existence in 1980, the fact that only one is left illustrates the decline in the industry.

Since Lots 1 and 3 are unbuildable, and, unless the lease is awarded to Mr. Vaudo or another person is awarded the lease and purchases Mr. Vaudo's building, equipment, etc., continuation of commercial fish processing in Sandwich will be eliminated. I understand from Attorney McCabe that another person has expressed an interest in the property. No such interest has been expressed to Mr. Vaudo about purchasing his building, etc. The only type of activity that any other person could engage in on either Lot 1 or Lot 3 would be the off-loading of fish to certified trucks for transportation to fish processing facilities outside of Sandwich, as is now done in the parking area adjacent to the marina.

These fish landings travel outside of Sandwich, and bring no economic benefit to the Town of Sandwich. Mr. Vaudo's operation brings great economic benefit to the Town of Sandwich, selling products locally, paying property taxes on his building and equipment to the Town, generates sales and revenues taxes for the Commonwealth, employs approximately 20 local residents, buys fish from Sandwich commercial fisherman, and pays substantial rent to ACE.

II.    Request Noncompetitive Lease be Awarded to Joe's Lobster Mart, Inc. for 10-Year Period for Lot 2

Given the various limitations, zoning and otherwise, if some other person has expressed an interest in the bulkhead area, absent purchase of Mr. Vaudo's building, the only type of activity that could be engaged in on Lots 1 or 2 is the offloading of fish to permitted trucks for transportation to a fish processing plant outside of Sandwich. As previously noted, Mr. Vaudo has not been approached by anyone expressing any interest in purchasing his building, etc. Accordingly, in light of all of the factors set forth above, we suggest and request that ACE award Joe's Lobster Mart, Inc., a noncompetitive lease for Lot 2, for a ten-year term (as was done 1990-2000, and is permissible pursuant to 32 C.F.R. 643.52, at the fair market rental value, to be established by an appraisal, as set forth in 32 C.F.R. 643.53 and 644.42. Upon information and belief, it seems ACE no longer wants responsibility for these properties. If so, Mr. Vaudo is interested in purchasing the same.

Col. Thomas L. Koning
June 6, 2005
Page 10

With regard to the person who expressed an interest, given the limits of what type of activities he could actually conduct, we suggest that that person be offered either of those lots, 1 or 3, at fair market rental value, for the off-loading of fish to be transported to other fish processing plants.

Finally, please be advised that we are prepared to seek Court action to enjoin the bidding process, in light of the flaws set forth above, and to pursue federal and Congressional investigations regarding how this matter has been handled. Thank you for your attention in this matter. If there are any questions, please do not hesitate to call me at (508) 833-3707.

Very truly yours,

Julie C. Molloy

c:      Mr. Joseph Vaudo
        Maureen McCabe, Esq.
        Mr. Francis Donovan
        Jacob M. Atwood, Esq.
        Hon. Jeffrey Perry, State Representative,
        Hon. Thomas Keyes, Selectman, Town of Sandwich
        Hon. Francis J. Harvey, Secretary of the Army
        LTG Carl A. Strock, Chief of Engineers and Commander,
            US Army Corps of Engineers
        Hon. Senator Edward M. Kennedy
        Hon. Senator John F. Kerry
        Hon. Representative William Delahunt

Enclosures
        ■ May 31, 2005 FOIA letter
        ■ Lease No. DACW33-1-90-37
        ■ Lease No. DACW33-1-00-99
        ■ October 1980 Reconnaissance Report
        ■ NOA No. DACW33-9-05-02 & Sample Lease
        ■ Marina Regulations eff. January 1, 1993
        ■ Marina Regulations eff. June 11, 1993

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

1. Title of case (name of first party on each side only) _Joe's Lobster Mart, Inc. v. Francis Donovan, District Engineer, US Army Corps of Engineers, et al._

2. Category in which the case belongs based upon the numbered nature of suit code listed on the civil cover sheet. (See local rule 40.1(a)(1)).

___ I.  160, 410, 470, 535, R.23, REGARDLESS OF NATURE OF SUIT.

___ II.  195, 196, 368, 400, 440, 441-446, 540, 550, 555, 625, 710, 720, 730,   *Also complete AO 120 or AO 121
        740, 790, 791, 820*, 830*, 840*, 850, 890, 892-894, 895, 950.        for patent, trademark or copyright cases

_X_ III.  110, 120, 130, 140, 151, 190, 210, 230, 240, 245, 290, 310,
        315, 320, 330, 340, 345, 350, 355, 360, 362, 365, 370, 371,
        380, 385, 450, 891.

___ IV.  220, 422, 423, 430, 460, 480, 490, 510, 530, 610, 620, 630, 640, 650, 660,
        690, 810, 861-865, 870, 871, 875, 900.

___ V.  150, 152, 153.

3. Title and number, if any, of related cases. (See local rule 40.1(g)). If more than one prior related case has been filed in this district please indicate the title and number of the first filed case in this court.

_____

4. Has a prior action between the same parties and based on the same claim ever been filed in this court?

                                           YES ☐      NO ☒

5. Does the complaint in this case question the constitutionality of an act of congress affecting the public interest?   (See 28 USC §2403)

                                           YES ☒      NO ☐

   If so, is the U.S.A. or an officer, agent or employee of the U.S. a party?

                                           YES ☒      NO ☐

6. Is this case required to be heard and determined by a district court of three judges pursuant to title 28 USC §2284?

                                           YES ☐      NO ☒

7. Do all of the parties in this action, excluding governmental agencies of the united states and the Commonwealth of Massachusetts ("governmental agencies"), residing in Massachusetts reside in the same division? - (See Local Rule 40.1(d)).

                                           YES ☒      NO ☐

   A.  If yes, in which division do all of the non-governmental parties reside?

       Eastern Division  ☒        Central Division  ☐        Western Division  ☐

   B.  If no, in which division do the majority of the plaintiffs or the only parties, excluding governmental agencies, residing in Massachusetts reside?

       Eastern Division  ☐        Central Division  ☐        Western Division  ☐

8. If filing a Notice of Removal - are there any motions pending in the state court requiring the attention of this Court? (If yes, submit a separate sheet identifying the motions)

                                           YES ☐      NO ☐

(PLEASE TYPE OR PRINT)
ATTORNEY'S NAME _Julie C. Molloy_
ADDRESS _379 Route 6A, East Sandwich MA 02537_
TELEPHONE NO. _(508) 833-5707_

(CategoryForm.wpd -5/2/05)

🖐JS 44   (Rev. 11/04)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

## I. (a)   PLAINTIFFS

JOE'S LOBSTER MART, INC
JOSEPH A. VAUDO

DEFENDANTS FRANCIS DONOVAN, DISTRICT
ENGINEER, US ARMCORPS OF ENGINEERS et al.;

**(b)** County of Residence of First Listed Plaintiff   BARNSTABLE
(EXCEPT IN U.S. PLAINTIFF CASES)

County of Residence of First Listed Defendant   BARNSTABLE
(IN U.S. PLAINTIFF CASES ONLY)

NOTE:   IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE
LAND INVOLVED.

**(c)** Attorney's (Firm Name, Address, and Telephone Number)
(508) 833 3707
Julie C. Molloy   BBO # 555170
379 Rte 6A, E. Sandwich MA 02537

Attorneys (If Known)

## II. BASIS OF JURISDICTION   (Place an "X" in One Box Only)

☐ 1   U.S. Government
Plaintiff

☐ 3   Federal Question
(U.S. Government Not a Party)

☒ 2   U.S. Government
Defendant

☐ 4   Diversity
(Indicate Citizenship of Parties in Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES (Place an "X" in One Box for Plaintiff
(For Diversity Cases Only)                                    and One Box for Defendant)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☒ 1 | ☒ 1 | Incorporated or Principal Place of Business in This State | ☒ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☒ 2 | Incorporated and Principal Place of Business in Another State | ☐ 5 | ☒ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV.  NATURE OF SUIT   (Place an "X" in One Box Only)

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 362 Personal Injury - | ☐ 620 Other Food & Drug | ☐ 423 Withdrawal | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product | Med. Malpractice | ☐ 625 Drug Related Seizure | 28 USC 157 | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | Liability | ☐ 365 Personal Injury - | of Property 21 USC 881 | | ☐ 450 Commerce |
| ☐ 150 Recovery of Overpayment | ☐ 320 Assault, Libel & | Product Liability | ☐ 630 Liquor Laws | **PROPERTY RIGHTS** | ☐ 460 Deportation |
| & Enforcement of Judgment | Slander | ☐ 368 Asbestos Personal | ☐ 640 R.R. & Truck | ☐ 820 Copyrights | ☐ 470 Racketeer Influenced and |
| ☐ 151 Medicare Act | ☐ 330 Federal Employers' | Injury Product | ☐ 650 Airline Regs. | ☐ 830 Patent | Corrupt Organizations |
| ☐ 152 Recovery of Defaulted | Liability | Liability | ☐ 660 Occupational | ☐ 840 Trademark | ☐ 480 Consumer Credit |
| Student Loans | ☐ 340 Marine | **PERSONAL PROPERTY** | Safety/Health | | ☐ 490 Cable/Sat TV |
| (Excl. Veterans) | ☐ 345 Marine Product | ☐ 370 Other Fraud | ☐ 690 Other | | ☐ 810 Selective Service |
| ☐ 153 Recovery of Overpayment | Liability | ☐ 371 Truth in Lending | **LABOR** | **SOCIAL SECURITY** | ☐ 850 Securities/Commodities/ |
| of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 380 Other Personal | ☐ 710 Fair Labor Standards | ☐ 861 HIA (1395ff) | Exchange |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle | Property Damage | Act | ☐ 862 Black Lung (923) | ☐ 875 Customer Challenge |
| ☐ 190 Other Contract | Product Liability | ☐ 385 Property Damage | ☐ 720 Labor/Mgmt. Relations | ☐ 863 DIWC/DIWW (405(g)) | 12 USC 3410 |
| ☐ 195 Contract Product Liability | ☐ 360 Other Personal | Product Liability | ☐ 730 Labor/Mgmt.Reporting | ☐ 864 SSID Title XVI | ☐ 890 Other Statutory Actions |
| ☐ 196 Franchise | Injury | | & Disclosure Act | ☐ 865 RSI (405(g)) | ☐ 891 Agricultural Acts |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 740 Railway Labor Act | **FEDERAL TAX SUITS** | ☐ 892 Economic Stabilization Act |
| ☐ 210 Land Condemnation | ☐ 441 Voting | ☐ 510 Motions to Vacate | ☐ 790 Other Labor Litigation | ☐ 870 Taxes (U.S. Plaintiff | ☐ 893 Environmental Matters |
| ☐ 220 Foreclosure | ☐ 442 Employment | Sentence | ☐ 791 Empl. Ret. Inc. | or Defendant) | ☐ 894 Energy Allocation Act |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/ | **Habeas Corpus:** | Security Act | ☐ 871 IRS—Third Party | ☐ 895 Freedom of Information |
| ☐ 240 Torts to Land | Accommodations | ☐ 530 General | | 26 USC 7609 | Act |
| ☐ 245 Tort Product Liability | ☐ 444 Welfare | ☐ 535 Death Penalty | | | ☐ 900Appeal of Fee Determination |
| ☒ 290 All Other Real Property | ☐ 445 Amer. w/Disabilities - | ☐ 540 Mandamus & Other | | | Under Equal Access |
| | Employment | ☐ 550 Civil Rights | | | to Justice |
| | ☐ 446 Amer. w/Disabilities - | ☐ 555 Prison Condition | | | ☐ 950 Constitutionality of |
| | Other | | | | State Statutes |
| | ☐ 440 Other Civil Rights | | | | |

## V. ORIGIN   (Place an "X" in One Box Only)

☒ 1   Original
Proceeding

☐ 2   Removed from
State Court

☐ 3   Remanded from
Appellate Court

☐ 4   Reinstated or
Reopened

☐ 5   Transferred from
another district
(specify)

☐ 6   Multidistrict
Litigation

☐ 7   Appeal to District
Judge from
Magistrate
Judgment

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing. (Do not cite jurisdictional statutes unless diversity):
10 USC & 2667  and  50 CFR 211.8

Brief description of cause: Declaratory Judgment, Injunctive Relief re: Bid for lease

## VII. REQUESTED IN
COMPLAINT:

☐ CHECK IF THIS IS A CLASS ACTION
UNDER F.R.C.P. 23

DEMAND $

CHECK YES only if demanded in complaint:
JURY DEMAND:   ☐ Yes   ☒ No

## VIII. RELATED CASE(S)
IF ANY

(See instructions):

JUDGE

DOCKET NUMBER

DATE   6/11/05

SIGNATURE OF ATTORNEY OF RECORD

**FOR OFFICE USE ONLY**

RECEIPT #          AMOUNT          APPLYING IFP          JUDGE          MAG. JUDGE